1 | David S. Kupetz (CA Bar No. 125062)
*dkupetz@sulmeyerlaw.com*
2 | Asa S. Hami (CA Bar No. 210728)
*ahami@sulmeyerlaw.com*
3 | Claire K. Wu (CA Bar No. 295966)
*ckwu@sulmeyerlaw.com*
4 | **Sulmeyer**Kupetz
A Professional Corporation
5 | 333 South Grand Ave., Suite 3400
Los Angeles, California 90071-1406
6 | Telephone: 213.626.2311
Facsimile: 213.629.4520
7 |
8 | Attorneys for Debtor and Debtor in Possession
One Way Loans, LLC, d/b/a PowerLend

9 | **UNITED STATES BANKRUPTCY COURT**

10 | **CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION**

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

| | |
|---|---|
| In re | Case No. 2:18-bk-24572-SK |
| | Chapter 11 |
| ONE WAY LOANS, LLC, a California limited liability company, d/b/a POWERLEND, | **EMERGENCY MOTION OF DEBTOR AND DEBTOR IN POSSESSION FOR INTERIM AND FINAL ORDERS AUTHORIZING USE OF CASH COLLATERAL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| Debtor. | [11 U.S.C. §§ 363(a) and (c), 552(b); Fed. R. Bankr. P. 4001(b); LBR 2081-1(a)(9) and 9075-1(a)] |
| | [Declarations of David Redlener and Donald A. Stukes, and Appendix of Exhibits for Cash Collateral Motion filed separately] |
| | Date:     TO BE DETERMINED
Time:     TO BE DETERMINED
Place:    Courtroom 1575
             255 East Temple Street
             Los Angeles, CA 90012 |

0

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  **TO THE HONORABLE SANDRA R. KLEIN, UNITED STATES BANKRUPTCY**

2  **JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, SECURED CREDITOR,**

3  **AND OTHER PARTIES IN INTEREST:**

4  <u>**EMERGENCY MOTION**</u>

5      One Way Loans, LLC, a California limited liability company, d/b/a PowerLend, debtor

6  and debtor in possession in the above-captioned case (the "<u>Debtor</u>"), pursuant to 11 U.S.C. §§

7  363(a), 363(c)(2), and 552(b)(1), Rule 4001(b) of the Federal Rules of Bankruptcy Procedure, and

8  Local Bankruptcy Rules 2081-1(a)(9)  and 9075-1(a), hereby moves this Court for an interim

9  order and final order authorizing the Debtor's use of cash collateral and other ancillary relief (the

10  "<u>Motion</u>").

11  <u>**INTRODUCTION AND NEED FOR RELIEF ON EMERGENCY BASIS**</u>

12      On December 17, 2018 (the "<u>Petition Date</u>"), the Debtor commenced the above-captioned

13  bankruptcy case.  The Debtor is a start-up company formed in April 2017 that provides personal

14  installment loans in the consumer loan market.  It provides fast, flexible, and affordable loan

15  products to individuals in need of immediate cash.  The Debtor's goal is to bridge cash flow

16  shortages with industry-leading financial solutions that are both affordable to and in the best

17  interests of individuals while at the same time improve their credit.

18      The Debtor has one secured creditor, JGB Glenmachrie Ltd. a/k/a JGB (Cayman)

19  Glenmachrie Ltd. ("<u>JGB Cayman</u>").  Pre-petition, to allow the Debtor to begin its loan making

20  operations, the Debtor obtained a secured credit facility from JGB Cayman for up to $30,125,000

21  (the "<u>JGB Facility</u>") collateralized by assets having a combined value of approximately

22  $14,600,000.  This collateral includes, but is not limited to, a first priority lien on a 23-acre real

23  estate development property recently valued at $12,100,000 owned by a third party entity (the

24  "<u>Watermark Property</u>") and approximately $2,500,000 in the Debtor's loan receivables.  JGB

25  Caymen, however, funded only $5,125,000 under that facility and, despite being over-

26  collateralized, unreasonably refused to advance any additional funds under the JGB Facility.  JGB

27  Caymen asserts that it is currently owed approximately $6,198,402.78.

28      More recently, alleging certain defaults, JGB Cayman accelerated the loan and, on

1

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

November 13, 2018, purportedly through JGB Collateral, LLC, as collateral agent for JGB

Cayman (collectively with JGB Cayman and other JGB-affiliated entities, "JGB"), filed an action

in the Supreme Court of New York seeking monetary damages (the "State Court Action").  The

following day, JGB filed a motion for a preliminary injunction seeking, among other things, to

seize the Debtor's bank accounts and loan receivables (the "Injunction Motion").  The hearing on

the Injunction Motion did not proceed in light of this bankruptcy filing.

JGB's success on the Injunction Motion would have crippled the Debtor's business, which

appears to have been JGB's true objective from the start.  It would have destroyed the Debtor's

ability to service and collect its approximately $1,900,000 of delinquent loans and reduce any

liability to JGB.

Furthermore, approximately $70,000 of collections currently is being held in an account

owned by First Associates, the Debtor's third party loan servicer, as a result of the disputes

between the Debtor and JGB.  First Associates agreed to "freeze" its account in light of disputes

between the parties.  As of the Petition Date, the Debtor does not have access to the approximately

$70,000 in such account and, absent an order of this Court authorizing use of cash collateral, will

not have access to such cash or any additional funds deposited with First Associates (the "First

Associates Funds").

As a result, in order to protect the Debtor and its creditors, the Debtor commenced this

reorganization case to provide it with an opportunity to restructure its debts.  To achieve this goal,

the Debtor intends to obtain replacement DIP financing for additional working capital and to

payoff JGB.  The Debtor has been actively seeking and exploring such financing options and is

confident it will have an acceptable term sheet from a proposed DIP lender for limited financing in

short order that, together with the use of cash collateral, will provide the Debtor with working

capital to fund operations until it secured financing to take out JGB.[1]  As discussed below,

---

[1] The Debtor's financial advisor is reasonably confident that by mid-January 2019, the Debtor could secure
an acceptable term sheet for a further DIP loan in an amount sufficient to replace the JGB credit facility,
with the potential to close about 30 to 45 days thereafter.

ASH\ 2657632.7

1  however, out of an abundance of caution, to account for the possibility that the DIP financing

2  sought is not procured by the time currently contemplated or is otherwise not approved, the Debtor

3  prepared an alternate budget that still provides for the Debtor's cash-flow positive operations for

4  an eight-week period.

5       *The Debtor requires the uninterrupted use of cash collateral. With certain expenses*

6  *requiring the use of cash collateral due this week and each of the following budgeted weeks*

7  *thereafter, and given the upcoming holidays starting next week, during which the Court likely is*

8  *dark and parties may be unavailable, the Debtor seeks an emergency hearing on this Motion*

9  *this week (and, preferably, no later than this Thursday).*

10       If the Debtor loses the ability to access funds collected from its loan portfolios, including

11  the defaulting loan accounts, the Debtor would essentially be forced out of business. The Debtor

12  would be unable to service its loan portfolio, effectively implement collection efforts on

13  delinquent loans, pay employee wages, utilities, rent, and other operating expenses. In short, the

14  Debtor must have uninterrupted access to cash to continue operations.

15       With an asserted outstanding balance of approximately $6,198,402.78[2] (the Debtor's total

16  secured debt), secured with collateral valued at approximately $14,600,000, JGB enjoys an

17  enormous equity cushion of *no less than 57%*, which more than adequately protects its interest.

18  Moreover, on top of its equity cushion, JGB will be adequately protected by a combination of: (a)

19  the continued operation of the Debtor's business, including servicing and collecting on its loans

20  and consequent protection of JGB's interest in its collateral; (b) periodic adequate protection

21  payments as set forth in the Budget; and (c) to the extent JGB's lien is valid, enforceable,

22  properly-perfected, and unavoidable, replacement liens on post-petition receivables and proceeds

23  from existing loans to the extent of any diminution in value of JGB's collateral as a result of the

24  Debtor's cash collateral usage.

25

26

27  ---

[2] Nothing herein should be construed as the Debtor's concession to this asserted outstanding amount.

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

ASH\ 2657632.7

## RELIEF SOUGHT

Based on the foregoing, to avoid immediate and irreparable harm to the Debtor, the Debtor requires and seeks an interim order authorizing the use of cash collateral on an expedited basis, followed by a final order, pursuant to either a preferred proposed 15-week budget or, in the alternative, a proposed 8-week budget.

The Motion attaches to two alternate budgets.  The first budget contemplates the Debtor's procurement of DIP financing in the total amount of $3,000,000 in or about early January 2019, with the first draw in the sum of $2,000,000, less gross loan and legal fees netting $1,900,000, in early January 2019, with two subsequent draws of $500,000 each in February and March 2019 (the "First Budget").   The First Budget is attached to the concurrently-filed Appendix of Exhibits in Support of Motion For Interim And Final Orders Authorizing Use of Cash Collateral (the "Appendix of Exhibits") as Exhibit 1.  The second budget is an alternate cash collateral budget that does not contemplate the Debtor's procurement of such DIP financing by such time, and contemplates the Debtor's operations without DIP financing and based only on cash collateral for an approximate period of eight weeks (the "Alternate Budget," and together with the First Budget, the "Cash Collateral Budgets").  The Alternate Budget is attached to the Appendix of Exhibits as Exhibit 2.  This Alternate Budget was prepared in the event the DIP financing is not procured by the time currently contemplated or is not otherwise approved by the Court at such time.[3]

More specifically, the Debtor requests that the Court: (a) permit the Debtor to use cash collateral to the extent necessary to avoid irreparable harm pending a final hearing in accordance with at least one of the Cash Collateral Budgets and the interim order on the Motion; (b) schedule a final hearing on this Motion under Rule 4001(b)(2); (c) following the final hearing, authorizing the Debtor to use cash collateral in order to pay its ordinary and necessary operating expenses and

---

[3] The Debtor also requests some flexibility in connection with the Cash Collateral Budgets; namely, that the Debtor be permitted to exceed the disbursements forecasted in the Cash Collateral Budgets by up to 15% on a line-by-line basis and to exceed aggregate disbursements forecasted in the Cash Collateral Budgets by a total of 10%.  The Debtor further requests that the balance of any unspent amounts on a weekly basis carry forward to be available to the Debtor in the following weeks.

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

ASH\ 2657632.7

1  generally operate its business in accordance with the Cash Collateral Budgets on a final basis

2  pursuant to the First Budget or the Alternate Budget (depending on the circumstances), as may be

3  supplemented in advance of the final hearing, which budget would be deemed the "Final

4  Budget";[4] (d) grant the adequate protection described above, including the replacement liens (but

5  only to the extent that JGB's security interests are valid, enforceable, properly-perfected, and

6  unavoidable, and the Debtor's use of cash collateral results in diminution in the value of their cash

7  collateral.

8  The Debtor also requests that the order approving this Motion include a direction to: (i)

9  First Associates to release the First Associates Funds, which includes any funds it currently holds

10  and any funds that it collects in the future, to the Debtor; and (ii) all financial institutions with

11  which the Debtor has bank accounts to comply with the order on the Motion, and abide by the

12  Debtor's direction as to the disbursement of its funds, even to the extent of any deposit account

13  control agreements, or "lock box" agreements, that may be in effect as of the Petition Date.

14  Absent an immediate hearing and entry of an order granting this Motion, the Debtor would

15  not have access to sufficient cash to pay ordinary and necessary expenses essential to continuing

16  its operations, which, in turn, would irreparably jeopardize the Debtor's prospects for a successful

17  reorganization and/or its efforts to maximize the value of the Estate for the benefit of creditors.

18  This Motion is based upon these moving papers, the accompanying memorandum of points

19  and authorities, the concurrently-filed omnibus declaration of David Redlener (the "Redlener

20  Declaration"), the declaration of Donald A. Stukes (the "Stukes Declaration"), the record in this

21  case, the arguments and representations of counsel, and any other evidence or argument that may

22  be presented prior to or at the hearing on this Motion.

23  / / /

24  / / /

25  _____

26  [4] In the event the Debtor procures and seeks authority for DIP financing, the Debtor may supply an updated

27  or supplemental budget that accounts for such DIP financing depending on the particular terms and nature of the DIP financing.

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

ASH\ 2657632.7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**WHEREFORE**, the Debtor respectfully requests that this Court: (1) grant the Motion; (2) (2) authorize the Debtor's use of cash collateral as requested herein (including, but not limited to, the release of the First Associates Funds); (3) enter an order authorizing such use of cash collateral on a final basis; (4) enter an order authorizing such use of cash collateral on an interim basis pending the final hearing (a proposed form of which is appended to the Appendix of Exhibits as Exhibit 3) and entry of the final order on the Motion (a proposed form of which is appended to the Appendix of Exhibits as Exhibit 4); (5) authorize the proposed forms of adequate protection; and (6) provide such other and further relief as is proper.

Dated: December 18, 2018

**Sulmeyer**Kupetz
A Professional Corporation


By:    */s/ Asa S. Hami*
      Asa S. Hami
      **Attorneys for Debtor and Debtor in Possession**
      **One Way Loans, LLC, d/b/a PowerLend**

6

ASH\ 2657632.7

# TABLE OF CONTENTS

**Page**

I.     JURISDICTION AND VENUE ..................................................................................1

II.    FACTS ......................................................................................................................1

     A.     The Debtor, Its Management, And Summary of Business Operations ......................1

     B.     Recent Financial Results ..........................................................................................3

     C.     Servicing And Collection of Loan Portfolio And Cash Management System ...........3

     D.     The Debtor's Assets .................................................................................................5

     E.     The Debtor's Liabilities ...........................................................................................6

     F.     The JGB Loan And Related Disputes ......................................................................6

         1.     Background ..................................................................................................6

         2.     The JGB Loan Documents And Collateral ..................................................6

         3.     The Debtor's Compliance With its Loan Obligations to JGB .......................8

         4.     JGB's Refusal to Advance Additional Capital And Other Acts of
Bad Faith ....................................................................................................9

         5.     JGB's Declared Defaults And Commencement of Litigation ......................11

         6.     Harmful Impact of JGB's Conduct on The Debtor's Operations ................11

     G.     Factors Precipitating Chapter 11 Filing ................................................................12

     H.     The Debtor's Restructuring Goals ..........................................................................12

III.   SCOPE OF REQUEST FOR USE OF CASH COLLATERAL AND PROPOSED
ADEQUATE PROTECTION ...................................................................................14

     A.     The Cash Collateral Budgets And Their Approval ................................................14

     B.     Limited Flexibility in Budget And Carryover of Excess Cash ..............................16

     C.     The Debtor's Need For Cash Collateral .................................................................16

     D.     Proposed Adequate Protection ...............................................................................17

IV.   THIS COURT SHOULD GRANT THE MOTION AND AUTHORIZE THE
DEBTOR'S USE OF CASH COLLATERAL ..........................................................18

     A.     Section 363 of The Bankruptcy Code Authorizes The Use of Cash
Collateral ...............................................................................................................18

     B.     Any Interest in Cash Collateral JGB Holds Will be Adequately Protected by

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

a Substantial Equity Cushion ................................................................20

C.    JGB's Interest in Cash Collateral Will be Adequately Protected Under
Section 361 ..........................................................................................21

D.    JGB's Interest in Cash Collateral Will be Adequately Protected Under
Section 361 Because The Debtor's Use of Cash Collateral Will Preserve
The Going Concern Value of The Collateral .......................................23

E.    Emergency Authority to Use Cash Collateral is Warranted Under Section
363(c)(3) And Rule 4001(b) to Allow The Debtor to Operate Its Business ...........25

V.    THE DEPOSITORY WITH WHICH THE DEBTOR BANKS AND FIRST
ASSOCIATES SHOULD BE REQUIRED TO HONOR THIS ORDER .........................26

VI.    NOTICE ...............................................................................................26

VII.    CONCLUSION .....................................................................................27

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

ASH\ 2657632.7

# TABLE OF AUTHORITIES

Page

## CASES

*Far East Nat'l Bank v. United States Trustee (In re Premier Golf Properties, LP),*
477 B.R. 767 (B.A.P. 9th Cir. 2012) ................................................................. 19, 20

*In re A&B Hearing & Air Conditioning, Inc.,*
48 B.R. 401 (Bankr. M.D. Fla. 1985) ...................................................................... 23

*In re Alyucan Interstate Corp.,*
12 B.R. 803 (Bankr. D. Utah 1981) ........................................................................ 22

*In re Center Wholesale, Inc.,*
759 F.2d 1440 (9th Cir. 1985) ................................................................................. 25

*In re Dynaco Corp.,*
162 B.R. 389 (Bankr. D. N.H. 1993) ....................................................................... 23

*In re Heatron, Inc.,*
6 B.R. 493 (Bankr. W.D. Mo. 1980) ........................................................................ 23

*In re Hoffman,*
51 B.R. 42 (Bankr. W.D. Ark. 1985) ....................................................................... 23

*In re McGowan,*
6 B.R. 241 (Bankr. E.D. Pa. 1980) ......................................................................... 21

*In re Mickler,*
9 B.R. 121 (Bankr. M.D. Fla. 1981) ........................................................................ 19

*In re O'Connor,*
808 F.2d 1393 (10th Cir. 1987) ............................................................................... 24

*In re Pine Lake Village Apartment Co.,*
16 B.R. 750 (Bankr. S.D.N.Y. 1981) ...................................................................... 25

*In re Prime, Inc.,*
15 B.R. 216 (Bankr. W.D. Mo. 1981) ...................................................................... 24

*In re Rogers Development Corp.,*
2 B.R. 679 (Bankr. E.D. Va. 1980) ......................................................................... 21

*In re Shockley Forest Industries, Inc.,*
5 B.R. 160 (Bankr. N.D. Ga. 1980) ......................................................................... 24

*In re Stein,*
19 B.R. 458 (Bankr. E.D. Pa. 1982) ....................................................................... 24

*Pistole v. Mellor (In re Mellor),*
734 F.2d 1396 (9th Cir. 1984) ................................................................................. 20

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

*United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*,
484 U.S. 365, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988) .............................................. 22, 25

**STATUTES**

11 U.S.C. § 105(a) ...................................................................................................... 26

11 U.S.C. § 361 ...................................................................................................... 21, 22

11 U.S.C. § 363 ...................................................................................................... 18, 22

11 U.S.C. § 363(a) ...................................................................................................... 1, 19

11 U.S.C. § 363(c) ...................................................................................................... 20

11 U.S.C. § 363(c)(1) ...................................................................................................... 18

11 U.S.C. § 363(c)(2) ...................................................................................................... 1, 18

11 U.S.C. § 363(c)(3) ...................................................................................................... 25

11 U.S.C. § 506(a)(1) ...................................................................................................... 22

11 U.S.C. § 552(a) ...................................................................................................... 19

11 U.S.C. § 552(b) ...................................................................................................... 19

11 U.S.C. § 552(b)(1) ...................................................................................................... 1, 19

11 U.S.C. § 1107(a) ...................................................................................................... 18

28 U.S.C. § 157 ...................................................................................................... 1

28 U.S.C. § 157(b)(2)(A) ...................................................................................................... 1

28 U.S.C. § 157(b)(2)(M) ...................................................................................................... 1

28 U.S.C. § 157(b)(2)(O) ...................................................................................................... 1

28 U.S.C. § 1334 ...................................................................................................... 1

28 U.S.C. § 1408 ...................................................................................................... 1

28 U.S.C. § 1409 ...................................................................................................... 1

Comm. C. § 9104(a) ...................................................................................................... 20

Comm. C. § 9312(b)(1) ...................................................................................................... 20

**RULES**

Fed. R. Bankr. P. 4001(b)(2) ...................................................................................................... 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

### MEMORANDUM OF POINTS AND AUTHORITIES[5]

The Debtor hereby submits the following memorandum of points and authorities in support of the Motion.

### I.

### JURISDICTION AND VENUE

This Motion seeks authority to use cash collateral and related relief. This Court has jurisdiction to consider the Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M) and (O). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Pursuant to the Motion, the Debtor seeks authority to use cash collateral to pay its ordinary and necessary expenses, operate its business, and meet administrative expenses. The statutory predicates for the relief requested herein are 11 U.S.C. §§ 363(a), 363(c)(2), and 552(b)(1).

### II.

### FACTS

A.    **The Debtor, Its Management, And Summary of Business Operations**

On December 17, 2018, the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing this case. The Debtor continues to operate its business and manage its affairs as a debtor in possession in this case.

The Debtor, a California limited liability company, dba PowerLend, was founded on April 11, 2017, in California. The Debtor operates an online subprime small-loan consumer finance business in the State of California. It provides fast, flexible, and affordable loan products to individuals in need of immediate cash. The Debtor's goal is to bridge cash flow shortages with industry-leading financial solutions that are both affordable to and in the best interest of individuals while at the same time improve their credit. The Debtor is licensed in California, Missouri, and Utah.

---

[5] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the motion to which this memorandum of points and authorities is appended.

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1     The Debtor originated its first loan on February 6, 2018.  The Debtor funded over 1,000

2  consumer loans in excess of $2,800,000 during its first few months operations in 2018.  The

3  Debtor also currently services approximately $1,900,000 of delinquent loans.

4     The Debtor has the following founding members (the "Founder Members"): (1)

5  DCMRED, LLC (whose manager is David Redlener ("Redlener")); (2) LME Capital LLC (whose

6  manager is Moses Gross); (3) JAAT Holdings, LLC (whose manager is Harinder Rana ("Rana"));

7  (4) Erika Harvel ("Harvel"); (5) Michael Silberman ("Silberman"); and (6) Jorge Aroche.  The

8  Founder Members hold membership interests in the Debtor ranging from 1.00% to 45.00%, except

9  that Harvel no longer holds a membership interest in the Debtor.  In addition, as of on or about

10  August 31, 2018, Doolster Holdings, LLC, obtained a 5.00% membership interest (both economic

11  and voting) in the Debtor.

12     The Debtor also currently has the following limited members (the "Limited Members"):

13  (1) JGB Claggain Bay, Inc., a JGB affiliate; (2) BRNB, LLC; (3) Sherbrooke Holdings LLC; and

14  (4) Present Media Group, Inc.  The Limited Members also hold minority membership interests in

15  the Debtor, with JGB Claggain Bay, Inc., holding a membership interest of  9.99%.[6]

16     Redlener serves as the Debtor's Chief Executive Officer.  Silberman serves as the Debtor's

17  President, Chief Financial Officer, and Secretary, with Harvel serving as its Chief Operating

18  Officer.  The Debtor also had a Board of Directors consisting of Redlener, Silberman, Harvel,

19  Rana, and Brad Powers.

20     As of the Petition Date, the Debtor has 12 employees (among which includes Redlener,

21  Silberman, Rana, and Harvel).  The most recent payday was November 15, 2018, at which only

22  six employees were paid (and, given the tight cash position of the  Debtor, only a percentage of the

23  total amount due), with the next contemplated payday not until January 4, 2018.  Payroll for

24  certain employees is on a monthly basis, and semi-monthly for other employees.  The average

25

26  [6] Subsequent to the Debtor's First Revised Operating Agreement, a series of documented equity transfers
have occurred but not yet incorporated into a Second Revised Operating Agreement, under which the

27  equity ownership interests of BRNB, LLC, and Present Media Group, Inc., were converted to profit sharing
interests.

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

1  amount the Debtor needs for any given monthly payroll period in the ordinary course of business

2  is approximately $67,033 (wages only and not including benefits or employer taxes).  The average

3  amount the Debtor needs for any given semi-monthly payroll period in the ordinary course of

4  business is approximately $21,018 (wages only and not including benefits or employer taxes).

5  The Debtor also offers various employee benefits, including, for example, medical, vision, dental

6  insurance, and parking.

7      A more detailed discussion of the Debtor's employee wage obligations, employee benefits,

8  and other related information is included in the concurrently-filed "first day" motion to authorize

9  payment of certain pre-petition wages and maintenance of employee benefit programs.

10  **B.    <u>Recent Financial Results</u>**

11      To date, the Debtor has funded its activities largely through debt financings.  Based on the

12  most recent financial statements, for the nine months ended September 30, 2018, the Debtor

13  generated revenues in the aggregate of approximately $1,676,122.  Expenses during that time

14  totaled approximately $1,986,588, which includes operating expenses in the sum of approximately

15  $1,009,376, and interest and other expenses in the sum of approximately $977,212.  The Debtor's

16  cash at July 31, 2018, August 31, 2018 and September 30, 2018, totaled approximately $197,657,

17  $140,821, and $114,635, respectively.

18      The Debtor's management believes that the Debtor's cash, collections on its active and

19  recovery portfolios, equity investment and additional debt offerings will provide for adequate

20  liquidity.

21  **C.    <u>Servicing And Collection of Loan Portfolio And Cash Management System</u>**

22      The Debtor's active loan accounts are serviced by a third-party servicer, First Associates,

23  where regular consumer payments from these loans are deposited into an account in the Debtor's

24  name at Preferred Bank.  This account is designated in a Deposit Account Control Agreement with

25  JGB (the "<u>DACA</u>") as the "Collection Account."  JGB has the right to sweep this bank account

26  pursuant to the terms of the DACA upon an event of default.  Defaulted or "de-boarded" customer

27  loan accounts are serviced by the Debtor's in-house collection team.

28      The Debtor maintains the following accounts at Preferred Bank to conduct business:

ASH\ 2657632.7                                         3

1   Collections Account, Operating Account, Funding Account and the Payroll Account.  Pre-petition,

2   the Debtor employed the following cash management system with respect to payments processed

3   by First Associates: (i) payments from the Debtor's borrowers are deposited into a First Associates

4   bank account; (ii) First Associates then transfers the funds to the Collection Account (less a

5   service fee); and (iii) the Debtor subsequently transfers those funds to its Operating Account on a

6   daily basis to pay the Debtor's operating (Operating Account), loan origination (Funding

7   Account), payroll (Payroll Account), and other business related costs.  Excess funds, if any, would

8   be used for new loan originations.

9       The Debtor utilizes a third-party ACH provider to disburse loan proceeds directly to new

10   borrowers.  In order to fund this ACH provider, the Debtor transfers cash from the Operating

11   Account to the Funding Account and from the Funding Account directly to the ACH provider.

12       The Debtor also utilizes a third-party payroll provider to pay its employees.  When paying

13   its employees, the Debtor transfers cash from the Operating Account to the Payroll Account from

14   which the third-party payroll provider drafts the amount necessary to process payroll checks.  In

15   addition to these primary accounts, the Debtor maintains a fifth account that holds $75,107.44.

16   This cash supports a Letter of Credit for the benefit of the Debtor's primary landlord.  The Debtor

17   has no control over this account.  All these accounts are at Preferred Bank.

18       Aside from payments processed through First Associates, the Debtor also receives loan

19   payments from non-performing borrowers directly through the efforts of the Debtor's in-house

20   collections team vis-à-vis ACH, or check, which payments previously were deposited directly into

21   the Debtor's operating account.

22        As disputes between the Debtor and JGB escalated (discussed in more detail below and

23   the concurrently-filed Redlener Declaration), the Debtor had consumer receivables collected by

24   First Associates and payments made on account of delinquent loans deposited into a bank account

25   held by DCMRED, LLC (one of the Debtor's Founder Members) (also at Preferred Bank).  This

26   was done to ensure the Debtor would have the ability to continue operations, service its loan

27   portfolio, and have a stream of revenue to pay limited salaries and collections on defaulting loans

28   and preserve the collateral upon which JGB had a security interest, which the Debtor was

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

1  servicing in-house.

2      The limited revenues collected by the Debtor in-house are used to pay for ongoing

3  collection efforts, minimal staffing, utilities and other essential business requirements necessary to

4  prevent further deterioration of the loan portfolio.[7]  These funds also permit the Debtor to continue

5  to service these loans.

6      First Associates currently holds in an account approximately $70,000 and is expected to

7  receive between $10,000 to $25,000 per week in cash remittances received on behalf of the

8  Debtor.  In light of such disputes, First Associates has agreed to "freeze" that account, and will not

9  release any of the funds it currently holds or will receive, pending further instructions from the

10  parties or order of court.

11      The Debtor authorized First Associates to provide JGB with full access to the loan

12  portfolio and cash remittance data for the loans that it was servicing on behalf of the Debtor

13  through an internet portal, upon JGB's request.  Since the outset, the Debtor and JGB

14  communicated by email and telephone regularly concerning weekly and monthly cash and loan

15  reports, First Associates portfolio remittances, financial statements, bank statements, and other

16  loan portfolio matters.

17      The consumer loan payment receivables that have been collected and are presently in the

18  possession of First Associates are secure and fully accounted for.  As set forth above, JGB  has

19  access to this information and has firsthand knowledge of the funds on account with First

20  Associates through the internet portal.

21  **D.**      **The Debtor's Assets**

22      As of the Petition Date, the Debtor had total assets valued at approximately $5,500,000.

23  The Debtor's primary asset is its loan receivables in the approximate amount of $2,500,000.  The

24  Debtor's other assets deferred marketing expenses of approximately $2,141,538 and other prepaid

25  expenses and assets in the aggregate of approximately $179,265, as well as intangibles, equipment

26  

27  [7] It should be noted that the Debtor's Loan Agreement with JGB allows for the payment of salaries, even
upon an event of default as "Permitted Compensation."

28  

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

1  and cash.

2  **E.      The Debtor's Liabilities**

3         The Debtor has estimated liabilities in the aggregate of approximately $5,800,000.

4         This includes: (a) JGB's secured debt in the principal amount of $5,125,000 (although JGB

5  currently claims the total outstanding amount due is approximately $6,198,402.78), the only

6  amount JGB ultimately advanced under the $30,000,000 JGB Facility; (b) an unsecured note in

7  the principal amount of $1,700,000 in favor of P&G Holdings, LLC/Moses Gross (one of the

8  Debtor's Founder Members) provided as part of P&G Holding's agreement to pledge the

9  Watermark Property as collateral for the JGB Facility; (c) two unsecured working capital loans,

10  each in the amount of $100,000, one from Jorge Aroche and another from Silberman; and (d)

11  unsecured trade payables in the aggregate of approximately $256,907.00.

12  **F.      The JGB Loan And Related Disputes**

13        **1.      Background**

14        Around the time the Debtor was created, it entered negotiations with JGB, who agreed to

15  provide the Debtor an initial credit facility in the amount of $30,125,000.00.  A true and correct

16  copy of the loan Term Sheet issued by "JGB Management Inc." is attached to the Appendix of

17  Exhibits as Exhibit 5.

18        The JGB Facility was supposed to allow the Debtor to begin its loan making operations,

19  with a requirement that JGB Claggain Bay, Inc. (presumably another JGB affiliate) become a

20  9.99% percent equity (limited) partner and part owner of the Debtor.  A true and correct copy of

21  the Limited Liability Company Agreement for the Debtor, dated December 1, 2017, evidencing

22  JGB's 9.99% equity interest is attached to the Appendix of Exhibits as Exhibit 6.  The JGB Term

23  Sheet memorialized the parties' understandings and responsibilities and was executed by JGB

24  Management Inc. and the Debtor on November 6, 2017. *See* Exhibit 5.

25        Thereafter, the loan agreement was processed, loan documents were executed by email in

26  piecemeal by the parties, and the closing completed on December 1, 2017.

27        **2.      The JGB Loan Documents And Collateral**

28        The loan arrangement between the parties included numerous forms of collateral

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  demanded by JGB to secure its interests, including a first priority lien on the 23-acre Watermark

2  Property recently valued at $12.1 million.  This collateral alone far exceeds the $5,125,000.00

3  advance JGB made to the Debtor, as it was given in reliance of JGB's promise to provide

4  additional capital.  JGB also took an equity interest and became a 9.99% member of the Debtor.

5  This is in addition to guaranties, pledges and other collateral JGB took to secure the JGB Facility.

6       The loan documents and collateral include: (a) Promissory Note in the sum of

7  $30,125,000.00 in favor of JGB Cayman; and (b) Loan and Security Agreement (the "Loan

8  Agreement") in favor of JGB Collateral, LLC, as collateral Agent for JGB Cayman, granting JGB

9  a security interest in substantially all of the Debtor's assets, including, but not limited to, its loan

10  portfolio.  True and correct copies of the Promissory Note and Loan Agreement are attached to the

11  Appendix of Exhibits as Exhibit 7 and Exhibit 8, respectively.

12       The JGB Facility was secured by an extensive array of documents and diverse collateral

13  aside from substantially all of the Debtor's assets (the "Additional Collateral") including the

14  following (collectively with the Note and Loan Agreement, the "Loan Documents"):

15  • Guaranty Agreement executed by each of: (i) Redlener; (ii) DCMRED, LLC; (iii)
16     Harvel; (iv) Rana; (v) JAAT Holdings, LLC; and (vi) Silberman.

17  • Pledge Agreement executed by each of: (i) DCMRED; (ii) Harvel; (iii) JAAT Holdings;
   and (iv) Silberman.

18
19  • Numerous UCC-1 filings filed against the following parties in either California,
   Delaware, or New York: (i) the Debtor; (ii) Harvel; (iii) Silberman; (iv) DCMRED; and
20     (v) JAAT Holdings.

21  • Four separate mortgages securing the approximately 23-acre Watermark Property
   owned by P&G Holdings LLC, d/b/a P&G Holdings NY LLC, and located in
22     Muskegon, Michigan, having a fair market value of $12,100,000.00 pursuant to a June
   26, 2018 appraisal prepared by Colliers International.  A true and correct copy of this
23     appraisal is attached to the Appendix of Exhibits as Exhibit 9.  True and correct copies
   of the mortgage filings against the Watermark Property are attached to the Appendix of
24     Exhibits, collectively, as Exhibit 10.

25  • A new Limited Liability Company Agreement for the Debtor (drafted by JGB's
   counsel) granting JGB Claggain Bay, Inc., a JGB affiliate, a 9.99% limited interest in
26     the Debtor.

27  • A Deposit Account Control Agreement.

28

1  The loan closed on December 1, 2017.  The total closing costs paid equaled $428,076.00

2 (based on a loan of $5,125,000.00), with JGB's legal fees alone totaling more than 20% of this

3 amount.  Closing costs included a payment for legal fees to JGB's attorneys in the sum of

4 $79,500.00, and another legal fee of $10,000.00 to another set of counsel for JGB to prepare the

5 four mortgages encumbering the Watermark Property.  As a result, the $5,125,000 advanced

6 yielded working capital of only $4,696,924.00 for the Debtor.  A true and correct copy of the

7 closing statement for the JGB Loan ("Flow of Funds Memorandum") is attached to the Appendix

8 of Exhibits as Exhibit 11.[8]

9  The Debtor now services over 1,000 consumer loans it originated.  These loans in the

10 Debtor's portfolio are also collateral under the Loan Agreement.

11  **3.**  **The Debtor's Compliance With its Loan Obligations to JGB**

12  The Debtor made nine monthly interest payments, of approximately $79,000 each, totaling

13 $702,122 at the rate of 18% per annum to JGB.  The first interest payment was on December 27,

14 2017, and the last on September 5, 2018.

15  Contrary to allegations JGB has made in the State Court Action, the Debtor complied with

16 its reporting obligations to JGB and otherwise supplied it with substantial information on a regular

17 basis.  The Debtor provided JGB with monthly financial reports, cash reports, monthly and weekly

18 collateral reports for active accounts on a regular basis, and later on, information on delinquent

19 accounts and on-going collection efforts.

20  JGB also was given full access to the First Associates loan report portal providing full

21 access to loan reports related to the Debtor loan portfolio with First Associates immediately upon

22 JGB's request.

23  From the start, the Debtor also provided JGB access to the online bank accounts. Attached

24 to the Appendix of Exhibits as Exhibit 12 is a true and correct copy of an email dated February 2,

25

26 [8] On information and belief, JGB did not acquire the Lender's Environmental Liability Insurance policy

27 despite holding back $40,000 for that purpose from the loan proceeds, contrary to the parties' loan
agreement. *See* Exhibit 11.

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  2018, confirming this arrangement and JGB's acknowledgment of having access to the Preferred

2  Bank online account.  The Debtor was in constant communication with JGB throughout 2018, and

3  most importantly, even after the last submission of monthly reports on August 9, 2018.

4  Communications from August 10, 2018, through the date of default did not pertain to the delivery

5  of loan portfolio reports generated by the Debtor.  The post-August 9 communications were

6  primarily discussions regarding release of the loan receivables for the purpose of securing

7  additional financing, as well as terms of a JGB payoff.

8  　　　At no time was the Debtor made aware of any mention made by JGB regarding any lack of

9  reporting or reports or any request for same that went unanswered.  JGB has all of the Debtor's

10  principals' contact information, including emails, office and mobile telephone numbers.

11  Notwithstanding the foregoing, there may have been one occasion where JGB contacted the

12  Debtor to transmit reports, which was immediately complied with and transmitted to JGB.

13  　　　Upon request in November 2018, JGB was also granted access to the First Associates

14  internet portal repository for all loan reports related to the Debtor's loan portfolio.  Once JGB had

15  gained access to the bank account and the internet portal repository, it was redundant, repetitive,

16  and unnecessary for the Debtor to keep forwarding the same financial reports and loan portfolio

17  information to which JGB already had full access.

18  　　　**4.　　　JGB's Refusal to Advance Additional Capital And Other Acts of Bad Faith**

19  　　　Pursuant to the terms of the Loan Agreement, it was further agreed and understood that

20  JGB would continue to fund the Debtor's loan operations on a regular basis, with up to an

21  additional $25,000,000.00 in capital, provided that certain goals and performance markers were

22  met, including making interest payments of approximately $79,000.00 per month to JGB, which

23  were duly made.  This promise was a material term upon which the Debtor relied when entering

24  into the loan arrangement and providing the Additional Collateral.

25  　　　However, JGB then only funded $5,125,000 under that JGB Facility, refused to provide

26  additional capital funds.  This left the Debtor with a limited amount of working capital and

27  affected its ability to generate new loans.  After JGB refused to advance additional capital, the

28  Debtor sought a release of lien on the loan portfolio so it could access other credit facilities and

1  pay off JGB.  This request was unreasonably denied, thereby further hampering the Debtor's

2  ability to initiate new loans and conduct business.  Numerous efforts were made by the Debtor to

3  sustain and grow the business.

4      In March 2018, the Debtor was offered a tremendous opportunity to finance and defer

5  marketing and lead generation costs utilizing a subordinated credit line.  In that these are the

6  perhaps the most significant line item expenses, it was an opportunity to enhance cash flow,

7  maintain JGB's cash requirements, and allow for increased loan origination.  However, JGB

8  would not consent to this subordinated credit line.

9      In July 2018, after hitting every monthly loan origination target and just 45-60 days from

10  being both cash-flow positive and profitable, the Debtor requested an additional advance under its

11  $30 million Credit Facility.  Despite having excellent collateral coverage from the 23-acre

12  Watermark Property with a loan to value ratio of less than 50%, and owning 9.99% of the Debtor,

13  JGB still refused to provide a further advance.

14      At the time JGB stopped advancing capital necessary to fund the Debtor's ongoing

15  business operations, it devastated the Debtor's ability to initiate new loans.  As a result, the Debtor

16  was unable to initiate any new loans since June 2018, with the exception of two loans in July and

17  one loan in August 2018.

18      On or about September 18, 2018, JGB suddenly demanded a "redemption" payment in the

19  amount of $150,000.00 to be paid on or before September 20, 2018, just two days later.  A true

20  and correct copy of JGB's redemption notice is attached to the Appendix of Exhibits as Exhibit

21  13.  This demand was made in bad faith and was yet another action taken by JGB in the pursuit of

22  its predatory strategy to cripple the Debtor's cash flow and ongoing business operations.

23      In addition, as discussed below, in September 2018 (and many times prior and subsequent

24  thereto), the Debtor sought financing from credit facilities that would leverage our existing loan

25  portfolio.  As discussed below, although the Debtor kept JGB informed throughout this process,

26  received term sheets from two facilities, JGB's excellent collateral coverage, and the Debtor's

27  offer to pay $550,000, JGB refused to release the loan portfolio.

28      Based on JGB's actions described above, it became clear that JGB was not acting in the

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

1   best interest of the Debtor.  As such, the Debtor's managing member, DCMRED LLC, took

2   measures to protect the Debtor and curtail the deterioration of collateral.  More specifically, the

3   consumer receivables collected by First Associates on behalf of the Debtor were deposited into a

4   bank account at Preferred Bank held by DCMRED.  This was done to ensure the Debtor would

5   have the ability to continue operations, service its loan portfolio, and have a stream of revenue to

6   pay limited salaries and collections on defaulting loans which the Debtor was servicing in-house.

7        **5.**     **JGB's Declared Defaults And Commencement of Litigation**

8        On or about October 8, 2018, JGB defaulted the Debtor for a litany of alleged defaults,

9   citing, among other things, noncompliance with the terms of the Loan Agreement and failure to

10  provide information to JGB (which was false as described above).

11       On or about October 10, 2018, JGB issued an acceleration notice to the Debtor.  A true and

12  correct copy of the acceleration notice is attached to the Appendix of Exhibits as <u>Exhibit 14</u>.

13       On November 13, 2018, JGB commenced the State Court Action against the Debtor.  In

14  that action, JGB seeks monetary compensation.  JGB concurrently filed the Injunction Motion

15  seeking, among other things, to seize the Debtor's bank accounts and, in the process, shut down

16  the Debtor's operations.  The hearing on the Injunction Motion did not proceed in light of

17  commencement of this bankruptcy case.

18       At or about the same time as the State Court Action against the Debtor was filed, JGB

19  commenced a second action in the Supreme Court of New York pertaining to the same loan

20  arrangement and $30,125,000.00 Credit Facility against the guarantors of the Loan.

21       **6.**     **Harmful Impact of JGB's Conduct on The Debtor's Operations**

22       JGB's refusal to advance additional capital, consent to Debtor friendly/subordinated

23  financing and its draconian refusal of allowing the Debtor to utilize its existing loan portfolio to

24  secure additional financing devastated the Debtor's ability to initiate new loans.  As a result, as

25  noted above, the Debtor has been unable to originate any new loans since June 2018, except for

26  two loans in July and one in August 2018.  Despite JGB's bad faith and course of conduct, the

27  Debtor made nine interest payments totaling $702,122, with the last payment on September 5,

28  2018.

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

1  Although the Debtor ceased originating new loans and reduced its staffing, it did not cease

2  operating.  The Debtor continued its efforts to collect on its non-performing loan portfolio to

3  preserve the value of JGB's collateral.

4  Furthermore, as discussed below, the Debtor's inability to access and use cash collateral,

5  including the First Associates Funds, will force the Debtor out of business.

6  **G.**    **Factors Precipitating Chapter 11 Filing**

7  As discussed above, JGB's refusal to advance any additional funding under the Credit

8  Facility, and its refusal to release its lien on the Debtor's loan receivables to permit the Debtor to

9  obtain additional financing, significantly impeded the Debtor's cash flow position.  Moreover, as

10  discussed above, in light of the escalating disputes between the Debtor and JGB, the Debtor no

11  longer had access to the First Associates Funds.

12  More recently, JGB commenced the State Court Action against the Debtor and sought a

13  preliminary injunction, among other things, to seize the Debtor's bank accounts and access the

14  First Associates Funds.  A hearing on the Injunction Motion was set for December 17, 2018.

15  If the Debtor lost the ability to access any funds collected from its loan portfolios,

16  including the defaulting loan accounts and would have been ordered to transfer all of these funds

17  to JGB, the Debtor will essentially be forced out of business.  The Debtor relies on the consumer

18  receivables for operating expenses including servicing the active loan portfolio with First

19  Associates.

20  To avoid this potential risk and the consequential disastrous results to the interests of the

21  Debtor and its creditors (including its secured creditor, JGB) if JGB were successful on the

22  Injunction Motion, the Debtor commenced this case to protect the interests of the Debtor and its

23  creditors with the goal of achieving a successful reorganization.

24  **H.**    **The Debtor's Restructuring Goals**

25  The Debtor believes that with adequate working capital it could be cash flow positive in

26  short order.  In fact, in July 2018, the Debtor was just 45-60 days from being both cash flow

27  positive and profitable (but that achievement was thwarted when JGB denied an additional

28  advance under the JGB Facility).

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

1    Pre-petition, the Debtor consistently sought financing from credit facilities that would

2    leverage its existing loan portfolio.  Throughout this period, the Debtor transmitted emails to JGB

3    advising it of the Debtor's efforts to secure financing, including providing it with prospective

4    lender names and the loan details in a showing of good faith to comply with its repayment

5    obligations and remain open for business.  Ultimately, the Debtor received term sheets from two

6    facilities, both requiring a first priority UCC lien on the loan portfolio.  However, despite excellent

7    collateral coverage from the Watermark Property **and** the Debtor's offer to pay $550,000 for the

8    release of the loan portfolio, JGB refused to release the loan portfolio.  A true and correct copy of

9    a July 12, 2018, e-mail from the Debtor to JGB concerning these financing efforts is attached to

10    the Appendix of Exhibits as Exhibit 15.

11    Notwithstanding JGB's posture, the Debtor continued with its efforts to procure financing

12    to obtain additional working capital and/or to payoff and replace the JGB Facility.  As set forth in

13    the First Budget and the concurrently-filed Redlener Declaration and Stukes Declaration, at this

14    point, the Debtor is confident it will have an acceptable term sheet for an initial DIP financing loan

15    from a lender for approximately $1,900,000 (net) to be funded no later than early January,

16    followed by a second and third tranche of $500,000 each in or about February and March.  Based

17    on ongoing discussions with lenders, the Debtor further believes that, by mid-January 2019, the

18    Debtor could secure an acceptable term sheet for a further DIP loan from this or another lender in

19    an amount sufficient to replace the JGB Facility, with the potential to close about 30 to 45 days

20    thereafter, and which will put the Debtor in a position to successfully reorganize its debts and

21    emerge from this case a viable going concern.  The Debtor anticipates filing a motion to approve

22    the initial DIP loan concurrently with the present motion or in the very near future.

23    In the event the Debtor is unable to procure the DIP Financing as currently contemplated,

24    the Debtor will continue to seek financing to satisfy the existing JBG outstanding loan via a new

25    credit facility, in addition to funding to be made available to underwrite new loans consistent with

26    the business mandate.  Further, efforts will be made to identify a suitable equity partner to provide

27    additional capital to support business operations.  The Debtor's proposed Alternate Budget

28    provides for the Debtor to continue operations by paying its employees, its key vendors, its

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

ASH\ 2657632.7

1  required insurances, office lease and necessary administrative fees, until a new credit facility can

2  be secured.  Such facility could serve as the basis for a proposed Reorganization Plan leading to

3  the exit from Chapter 11.

**III.**

**SCOPE OF REQUEST FOR USE OF CASH COLLATERAL AND PROPOSED**

**ADEQUATE PROTECTION**

A.      **The Cash Collateral Budgets And Their Approval**

8          Attached to the Appendix of Exhibits as <u>Exhibit 1</u> and <u>Exhibit 2</u> are the Debtor's two

9  proposed cash collateral/operating budgets.  Both Cash Collateral Budgets were prepared by the

10  Debtor with the assistance of the Debtor's outside financial consultant Donald A. Stukes of ASI

11  Advisors, LLC.  *See* Stukes Declaration.  The Cash Collateral Budgets were reviewed and

12  approved by Redlener (the Debtor's CEO).  *See* Redlener Declaration.

13          The First Budget contemplates the Debtor's procurement of DIP financing in the total

14  amount of $3,000,000 in or about early January 2019, with the first draw in the sum of

15  $2,000,000, less gross loan and legal fees netting $1,900,000, in early January 2019, with two

16  subsequent draws of $500,000 each in February and March 2019.  The First Budget extends for 15

17  weeks, and provides for periodic adequate protection payments to JGB, and includes line items for

18  the Debtor's administrative professional fees.

19          The Alternate Budget is an alternate cash collateral budget that does not contemplate the

20  Debtor's procurement of such DIP financing by such time, and contemplates the Debtor's

21  operations without DIP financing and based only on cash collateral for an approximate period of

22  eight weeks.  This Alternate Budget was prepared in the event the DIP financing is not procured

23  by the time currently contemplated or is not otherwise approved by the Court at such time.

24          The Debtor requests authority to use cash collateral in accordance with the Cash Collateral

25  Budgets.  More specifically, the Debtor requests (i) pending a final hearing, emergency authority

26  to use cash collateral on an interim basis to satisfy post-petition administrative expenses and

27  operational expenses (including, for example, the payment of rent, costs of servicing loans, and

28  pre and post-petition wages) in accordance with the First Budget or the Alternate Budget, and

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

1    (ii) at the final hearing, set not less than 14 days after the interim hearing, final authority to use

2    cash collateral pursuant to the First Budget or the Alternate Budget (depending on the

3    circumstances), as may be supplemented in advance of the final hearing, which budget would be

4    the Final Budget.[9]

5          The Cash Collateral Budgets were prepared based upon historical assumptions of the

6    Debtor's business activity on its performing loans and collection history on its non-performing

7    loans.  As noted above, the rationale for the First Budget is based upon securing debtor-in-

8    possession financing to provide interim cash liquidity to operate the business, underwrite and

9    place news loans, and provide adequate protection payments to the senior lender post-petition.

10   With the ability to continue operations, the Debtor contemporaneously will be seeking a new

11   senior credit facility that be secured as a take-out of the current debt of JGB, which has an

12   encumbrance on a development project called Watermark owned by a minority owner in the

13   Debtor named Moses Gross.  Post-petition operational expenses are based upon current service

14   contracts, payroll based upon employee compensation agreements, and adequate protection

15   payments identified in the First Budget are based upon the current loan agreement terms.

16         The rationale for the Alternate Budget is based upon the Debtor not obtaining approval for

17   a DIP loan in the first 8-week period post-petition, but the Debtor will contemporaneously seek

18   financing to satisfy the existing JBG outstanding loan via a new credit facility, in addition to

19   funding to be made available to underwrite new loans consistent with the business mandate.

20   Further, efforts will be made to identify a suitable equity partner to provide additional capital to

21   support business operations.   The Alternate Budget provides for the Debtor to continue operations

22   by paying its employees, its key vendors, its required insurances, office lease and necessary

23   administrative fees, until a new credit facility can be secured.

24         In addition to various categories of general operating expenses, including payments on the

25   _____

26   [9] In the event the Debtor procures and seeks authority for DIP financing, the Debtor may supply an updated
27   or supplemental budget that accounts for such DIP financing depending on the particular terms and nature
     of the DIP financing.

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

1  Debtor's office space lease, both Cash Collateral Budgets contain line items for U.S. Trustee fees.

2  As the Cash Collateral Budgets reflect, based on the assumptions underlying the Cash Collateral

3  Budgets, the Debtor will be able to operate post-petition with the use of cash collateral on a cash

4  flow positive basis through the period covered by the respective budgets.

5      All payments described in the Budget are necessary to maintain and continue the Debtor's

6  operations and to maximize the value of the Estate.  Failure to make payment in accordance with

7  the Cash Collateral Budgets could result in immediate and irreparable harm to the Debtor's

8  operations, the value of the Estate, and the interests of creditors.

9      In summary, the Cash Collateral Budgets reflect that, with the anticipated DIP financing

10  and funds generated from operations, the Debtor will be able to meet operating and administrative

11  expenses for at least the next 15 weeks, and would be able to operate without the currently

12  contemplated DIP Financing, if necessary, for at least the next eight weeks.  Further, the Debtor

13  believes that the Cash Collateral Budgets and the assumptions underlying the budgets are

14  reasonable and appropriate under the circumstances.

15  **B.**    **Limited Flexibility in Budget And Carryover of Excess Cash**

16      The Debtor also requests some flexibility in connection with the Cash Collateral Budgets

17  such that the Debtor may exceed the disbursements forecasted in the Cash Collateral Budgets by

18  up to 15% on a line-by-line basis, and to exceed aggregate disbursements forecasted in the Cash

19  Collateral Budgets by a total of 10%.

20      Further, the Debtor requests that, to the extent any amount in a disbursement category is

21  unused during a particular period, that amount be preserved and available for use in any

22  subsequent period.  *See* <u>Exhibit 3</u> (Proposed Interim Order); <u>Exhibit 4</u> (Proposed Final Order).

23  **C.**    **The Debtor's Need For Cash Collateral**

24      The Debtor's use of cash collateral as set forth in the Cash Collateral Budgets is necessary

25  in order to allow the Debtor to move forward with its contemplated reorganization.  As discussed

26  above, the Debtor's uninterrupted access to cash is critical to maintaining operations.  The Debtor

27  relies on the consumer receivables for operating expenses, including servicing the active loan

28  portfolio with First Associates.

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

1    In light of JGB's excessive collateral coverage, it would be more beneficial and equitable

2    if the entirety of the First Associates Funds were released to the Debtor so that it can more

3    effectively service its loan portfolio, including the non-performing loan portfolio.  Due to

4    extremely tight cash flow, the Debtor does not have the resources to maximize collection efforts

5    on its $1.9 million non-performing loan portfolio absent release of those funds and use of cash

6    collateral.

7    If the Debtor is not permitted to access any funds collected from its loan portfolios,

8    including the defaulting loan accounts, or the First Associates Funds (those currently held and

9    future collections) are not released to the Debtor, the Debtor will essentially be forced out of

10   business.  This is especially true if the Debtor is unable to obtain the DIP financing as currently

11   contemplated and is not able to use cash collateral.  Therefore, absent an immediate hearing and

12   entry of an order granting this Motion, the Debtor would not have access to sufficient cash to pay

13   ordinary and necessary expenses essential to continuing its operations, which, in turn, would

14   irreparably jeopardize the Debtor's prospects for a successful reorganization and/or its efforts to

15   maximize the value of the Estate for the benefit of creditors.

16   **D.**     **Proposed Adequate Protection**

17   JGB is more than adequately protected by its security interests and the abundant and

18   diverse sources of collateral securing the loan.  With an asserted outstanding balance of

19   approximately $6,198,402.78[10] (the Debtor's total secured debt), secured with collateral valued at

20   approximately $14,600,000 ($12.1 million in Watermark Property and approximately $2.5 million

21   in loan receivables), JGB enjoys an enormous equity cushion that adequately protects its interest

22   in any cash collateral.  Indeed, JGB is over collateralized for its loan and it faces absolutely no risk

23   from the Debtor's use of cash collateral.

24   Moreover, JGB will be further protected by a combination of: (a) the continued operation

25   of the Debtor's business, including servicing and collecting on its loans and consequent reduction

26   

27   [10] Nothing herein should be construed as the Debtor's concession to this asserted outstanding amount.

28   

ASH\ 2657632.7                                        17

1   of JGB's outstanding debt, which will preserve the value of JGB's collateral; (b) periodic adequate

2   protection payments to JGB as set forth in the First Budget (assuming DIP Financing is procured

3   as reflected in the First Budget); and (c) replacement liens on receivables and proceeds received

4   post-petition from existing loans to extent that: (i) the pre-petition security interest of JGB is valid,

5   enforceable, properly perfected, and unavoidable; and (ii) the Debtor's use of cash collateral

6   results in diminution in the value of JGB's collateral.

7                                                    **IV.**

8   **THIS COURT SHOULD GRANT THE MOTION AND AUTHORIZE THE DEBTOR'S**

9                            **USE OF CASH COLLATERAL**

10  A.      **Section 363 of The Bankruptcy Code Authorizes The Use of Cash Collateral**

11          Section 363 of the Bankruptcy Code governs the Debtor's use of property of its estate.

12  Section 363(c)(1) provides in pertinent part that:

13                  If the business of the debtor is authorized to be operated under
                    section . . . 1108 . . . and unless the court orders otherwise, the
14                  trustee may enter into transactions, including the sale or lease of
                    property of the estate, in the ordinary course of business, without
15                  notice or a hearing, and may use property of the estate in the
                    ordinary course of business without notice or a hearing.
16
    11 U.S.C. § 363(c)(1).
17
            A debtor in possession has all the rights and powers of a trustee with respect to property of
18
    the estate, including the right to use property of the estate in compliance with section 363 of the
19
    Code.  *See* 11 U.S.C. § 1107(a).  Section 363(c)(2) establishes a special requirement with respect
20
    to "cash collateral," by providing that the trustee or debtor in possession may not use, sell or lease
21
    "cash collateral" under subsection (c)(1) unless (i) such entity that has an interest in such collateral
22
    consents, or (ii) the court, after notice and a hearing, authorizes such use, sale or lease.
23
            "Cash collateral" is defined by the Bankruptcy Code as follows:
24
                    [C]ash, negotiable instruments, documents of title, securities,
25                  deposit accounts, or other cash equivalents whenever acquired in
                    which the estate and an entity other than the estate have an interest
26                  and includes the proceeds, products, offspring, rents, or profits of
                    property and the fees, charges, accounts or other payments for the
27                  use or occupancy of rooms and other public facilities in hotels,
                    motels, or other lodging properties subject to a security interest as
28                  provided in section 552(b) of this title, whether existing before or

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    after the commencement of a case under this title

2    11 U.S.C. § 363(a). "As a general rule, postpetition revenue is not cash collateral," and "a

3    creditor's prepetition security interest does not extend to property acquired by the debtor

4    postpetition even if there is an 'after acquired' clause in the security agreement." *Far East Nat'l*

5    *Bank v. United States Trustee (In re Premier Golf Properties, LP)*, 477 B.R. 767, 771 (B.A.P. 9th

6    Cir. 2012) (citing section 552(a)).

7    Section 552(b) of the Bankruptcy Code, referred to in section 363(a), however, provides an

8    exception to the extent "the security agreement expressly provides for an interest in such [after

9    acquired] property and the interest has been perfected under applicable nonbankruptcy law" (*Id.* at

10    772):

11    Except as provided in sections 363, 506(c), 522, 544, 545, 547, and
548 of this title, if the debtor and an entity entered into a security

12    agreement before the commencement of the case and if the security
interest created by such security agreement extends to property of

13    the debtor acquired before the commencement of the case and to
proceeds, products, offspring, or profits of such property, then such

14    security interest extends to such proceeds, products, offspring, or
profits acquired by the estate after the commencement of the case to

15    the extent provided by such security agreement and by applicable
nonbankruptcy law, except to any extent that the court, after notice

16    and a hearing and based on the equities of the case, orders
otherwise.

17    11 U.S.C. § 552(b)(1).

18    It is universally acknowledged that the debtor's cash "is the life blood of the business" and

19    the bankruptcy court must assure that such life's blood "is available for use even if to a limited

20    extent." *In re Mickler*, 9 B.R. 121, 123 (Bankr. M.D. Fla. 1981). Courts typically authorize a

21    debtor to use cash collateral to continue its operations so long as the interests asserted by affected

22    creditors in such cash are adequately protected.

23    Absent a deposit account control agreement, a secured party does not hold a perfected

24    security interest in any of a debtor's "cash on hand" or cash in deposit accounts not maintained

25    under the secured party's control. "[I]mplicit in the concept of 'cash collateral' is that a creditor

26    has an enforceable security interest" in the property at issue, and a security interest in cash

27    requires possession. *Far East Nat'l Bank v. United States Trustee (In re Premier Golf Props.,*

28

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

1  *LP*), 477 B.R. 767, 777 (B.A.P. 9th Cir. 2012) (holding that cash receipts from golf customers

2  constituted "money" which does not fall under the definition of a general intangible and, in turn,

3  "did not constitute cash collateral because the creditor did not have possession of the case

4  receipts"). *See also*, Cal. Comm. Code § 9312(b)(1) ("A security interest in a deposit account may

5  be perfected only by control under Section 9314"), 9104(a) (setting forth conditions for "control of

6  a deposit account"). Without possession of cash or an appropriate cash control agreement, such

7  funds are not the Secured Parties' cash collateral and the Debtor is free to use such funds without

8  the need to resort to section 363(c) of the Bankruptcy Code.

9       As this Motion establishes, the standards for authorizing the Debtor to utilize cash

10  collateral are satisfied in this case because JGB enjoys a sufficient equity cushion protecting its

11  interests in any cash collateral (whatever that interest may be) based on the value of the

12  Watermark Property and other collateral securing the JGB Loan.  This alone provides more than

13  sufficient basis for authorization of the requested use of cash collateral.  In addition, the Debtor's

14  ongoing business operations will adequately protect and preserve the value of JGB's interest in the

15  cash collateral.  Finally, JGB will be further adequately protected by periodic adequate protection

16  payments as set forth in the First Budget and the grant of replacement liens as proposed in Section

17  III.D. above.

18  **B.**    **Any Interest in Cash Collateral JGB Holds Will be Adequately Protected by a**

19      **Substantial Equity Cushion**

20       The Ninth Circuit Court of Appeals holds that an equity cushion alone can provide the

21  requisite adequate protection:

22          Although the existence of the equity cushion is a method of
        adequate protection is not specifically mentioned in § 361, it is the

23          classic form of protection for a secured debt justifying restraining of
        lien enforcement by a bankruptcy court…. In fact, it has been held

24          that the existence of an equity cushion, standing alone, can provide
        adequate protection…. A sufficient equity cushion has been found

25          to exist although not a single mortgage payment had been made.

26  *Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396, 1400 (9th Cir. 1984) (citation omitted).  The Ninth

27  Circuit defined the term "equity cushion" as "the value in the property, above the amount owed to

28  the creditor with a secured claim, that will shield that interest from loss due to any decrease in the

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

1  value in the property during the time the automatic stay in effect." *Id.* at 1400 n.2.  An equity

2  cushion of 10% or greater has been found sufficient to provide a lienholder with adequate protection.

3  *See Id.* at 1401 (citing *In re McGowan*, 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) (holding that a 10%

4  equity cushion constitutes adequate protection); *In re Rogers Development Corp.*, 2 B.R. 679, 685

5  (Bankr. E.D. Va. 1980) (holding that an equity cushion of approximately 15 % to 20% was

6  sufficient adequate protection to the secured creditor).

7          In the instant case, JGB is adequately protected by a substantial equity cushion.  As

8  discussed above, even accepting (but not conceding) JGB's figure for purposes of this Motion,

9  JGB holds a claim in the amount of approximately $6.2 million.  With assets against which JGB

10 asserts a first priority lien valued at over $14.5 million, JGB is protected by an equity cushion of

11 *no less than 57%*.  An equity cushion of that level clearly satisfies the requisite adequate

12 protection requirements to permit the Debtor's use of any of JGB's cash collateral.

13 **C.      JGB's Interest in Cash Collateral Will be Adequately Protected Under Section 361**

14         As noted above, a debtor's authority to use cash collateral is typically conditioned on

15 providing "adequate protection" to entities that assert an interest in such cash.  *See* 11 U.S.C.

16 § 361.  Although the term "adequate protection" is not defined in the Bankruptcy Code, Section

17 361 provides the following three non-exclusive examples of what may constitute adequate

18 protection:

19         (1) requiring the trustee to make a cash payment or periodic cash
           payments to such entity, to the extent that the . . . use . . . under
20         section 363 of this title . . . results in a decrease in the value of such
           entity's interest in such property.

21
           (2) providing to such entity an additional or replacement lien to the
22         extent that such . . . use . . . results in a decrease in the value of such
           entity's interest in such property; or
23
           (3) granting such other relief . . . as will result in the realization by
24         such entity of the indubitable equivalent of such entity's interest in
           such property.
25
   11 U.S.C. § 361.
26
           Neither section 361 nor any other provision of the Bankruptcy Code defines the nature and
27
   extent of "interest in property" of which a secured creditor is entitled to adequate protection under
28

ASH\ 2657632.7                                       21

1    section 363.  However, the statute plainly provides that a qualifying interest demands protection

2    only to the extent that the use of the creditor's collateral will result in a decrease in "the value of

3    such entity's interest in such property."  *United Savings Ass'n of Texas v. Timbers of Inwood*

4    *Forest Assocs., Ltd.*, 484 U.S. 365, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988).

5        *Timbers* teaches that a secured creditor is entitled to "adequate protection" only against the

6    diminution in value of the collateral securing its allowed secured claim.  Where the value of the

7    secured party's collateral is *not* diminishing by a debtor's use, sale, or lease, it follows that their

8    respective interests in cash collateral (if any) is adequately protected.

9        As an initial matter, as explained below, the proposed use of cash collateral enhances the

10    value of the collateral.  Moreover, separate and independent of any question of diminution in

11    value, a secured creditor has no right to preservation of the equity cushion in its collateral.  The

12    Supreme Court in *Timbers* determined that the property interest the Debtor must adequately

13    protect is the lien that secures the creditor's claim.  *See Timbers*, 484 U.S. at 371.  Further, the

14    value of the lien may not exceed the allowed amount of the secured claim.  *See* 11 U.S.C. §

15    506(a)(1).  Accordingly, the property interest of an oversecured creditor that a debtor must

16    adequately protect, namely the lien value, is the allowed amount of the secured claim and does not

17    include the equity cushion.

18        In *In re Alyucan Interstate Corp.*, 12 B.R. 803 (Bankr. D. Utah 1981), the court ruled that

19    an equity cushion is not a requirement of adequate protection because a secured creditor is only

20    entitled to protection against a decline in the value of its lien.  The existence of an equity cushion

21    (the value of the property above the lien) is not a necessary component of adequate protection.

22    The court reasoned that section 361 speaks not in terms of preserving equity, but in terms of

23    compensating for any "decrease in the value of [an] interest in property."  *Id.* at 803.  The

24    Supreme Court's decision in *Timbers* confirms this interpretation of section 361.  The instant case,

25    however, is one where there is equity cushion well-above the amount of its lien that provides it

26    with adequate protection and the proposed use of cash collateral to operate the Debtor's business

27    increases the equity cushion.

28        In any event, aside from any equity cushion, JGB is adequately protected by the Debtor's

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

1  ongoing operation and granting of appropriate replacement liens.  Accordingly, JGB's claim will

2  remain adequately protected throughout the Budget period.  As such pending a final hearing, the

3  Debtor requests emergency authority to use cash collateral according to the Budget during the

4  interim Budget period.

5  The Debtor proposes providing JGB with adequate protection by granting it a replacement

6  lien on cash and loan receivables from existing loans acquired post-petition, to the extent that: (i)

7  JGB's pre-petition security interests are valid, enforceable, properly perfected, and unavoidable,

8  and (ii) the Debtor's use of cash collateral results in diminution in the value of JGB's cash

9  collateral.  In addition, the Debtor proposes making periodic payments to JGB pursuant to the First

10  Budget, providing it with yet another form and level of adequate protection.

11  **D.**  **JGB's Interest in Cash Collateral Will be Adequately Protected Under Section 361**

12  **Because The Debtor's Use of Cash Collateral Will Preserve The Going Concern**

13  **Value of The Collateral**

14  It must be emphasized that the value of the Debtor's assets is primarily the value of its loan

15  receivables and the Debtor's ability to service and collect on defaulted loans.  The Debtor's ability

16  to maximize the value of these assets is inextricably tied to maintaining the going concern value of

17  the Debtor's business.  If the Debtor does not have access to cash, it may be forced to shut down

18  operations to the detriment of unsecured creditors and equity holders of the Debtor and JGB.

19  Accordingly, the use of cash collateral to conduct the Debtor's business will preserve and protect

20  the value of JGB's collateral generally, and enhance and maximize the potential recovery for all

21  creditors.

22  It is well established that a bankruptcy court, where possible, should resolve issues

23  presented in favor of reorganization rather than to force a liquidation because the business cannot

24  use cash or other property to operate.  *See, e.g.*, *In re Dynaco Corp.*, 162 B.R. 389 (Bankr. D. N.H.

25  1993); *In re Hoffman*, 51 B.R. 42 (Bankr. W.D. Ark. 1985); *In re A&B Hearing & Air*

26  *Conditioning, Inc.*, 48 B.R. 401 (Bankr. M.D. Fla. 1985); *In re Heatron, Inc.*, 6 B.R. 493 (Bankr.

27  W.D. Mo. 1980).  As the *Heatron* court stated in granting a debtor's motion to use cash collateral:

28  The policy of the Code, as was that of the predecessor statutes, is to

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

ASH\ 2657632.7

23

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1

2

3

> encourage reorganization if there is a reasonable possibility of
> success.  At the beginning of the reorganization process, the court
> must work with less evidence than might be desirable and should
> resolve issues in favor of the reorganization, where the evidence is
> conflicting.

4    *Id.* at 496.

5    In *In re O'Connor*, 808 F.2d 1393 (10th Cir. 1987), the court eloquently summarized the

6    foregoing principle as follows:

7

8

9

10

> Because the ultimate benefit to be achieved by a successful
> reorganization inures to all the creditors of the estate, a fair
> opportunity must be given to the Debtor to achieve that end.  Thus,
> while interests of the secured creditor . . . are of concern to the court,
> the interests of all other creditors also have bearing upon the
> question of whether use of cash collateral shall be permitted during
> the early stages of administration.

11

12

13

14

> The first effort of the court must be to insure the value of the
> collateral will be preserved.  Yet prior to confirmation for a plan of
> reorganization, the test of that protection is not by the same
> measurements applied to treatment of a secured creditor in a
> proposed plan.  In order to encourage the Debtor's efforts in the
> formative period prior to the proposal of a reorganization, the court
> must be flexible in applying the adequate protection standard.

15

16    *Id.* at 1397-98.

17    This important sentiment is echoed in other cases.  In *In re Prime, Inc.*, 15 B.R. 216, 218

18    (Bankr. W.D. Mo. 1981), the court succinctly stated that "it is not the purpose of a Chapter 11

19    proceeding to close a business at the beginning."  Similarly, in *In re Shockley Forest Industries,*

20    *Inc.*, 5 B.R. 160, 162 (Bankr. N.D. Ga. 1980), the bankruptcy court explained as follows:

21

22

23

> Chapter 11 is designed for the purpose of preventing dissolution of
> an otherwise viable corporation.  A court should not precipitously
> sound the death knell for a debtor by prematurely determining that
> the debtor's prospects for economic revival are poor.  At this time
> the Court has no basis on which to conclude the debtor cannot be
> rehabilitated.

24    Applying the foregoing, courts have frequently allowed a debtor to use cash collateral in

25    circumstances where such use would enhance or preserve the debtor's reorganization value.  Thus,

26    for example, in *In re Stein*, 19 B.R. 458 (Bankr. E.D. Pa. 1982), the court allowed a debtor to use

27    cash collateral where the bank was undersecured and had no cushion for protection.  The court in

28    *Stein* found that the use of cash collateral was necessary to the continued operations of the debtor

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

1   and "the creditor's secured position can only be enhanced by the continued operation of the

2   [debtor's business]." *Id.* at 460.  *See also, In re Pine Lake Village Apartment Co.*, 16 B.R. 750

3   (Bankr. S.D.N.Y. 1981) (marginally secured creditor adequately protected by lien in post-petition

4   property acquired by debtor; debtor can use cash collateral "in the normal course of their

5   business").

6          The conclusion that preservation of value is sufficient, without more, to provide adequate

7   protection follows from the principle that a secured creditor is only entitled to adequate protection

8   of the secured creditor's interest in its collateral to the extent that such collateral secured the

9   creditor's allowed claim.  *See Timbers*, 484 U.S. at 368-71.

10         Here, JGB is oversecured and protected by a sufficient equity cushion.  Further, even

11  without such an equity cushion, adequate protection of JGB's interest is present in this case since

12  the proposed use of cash collateral will preserve and protect the value of the Debtor's business and

13  JGB's collateral.

14  **E.**    **Emergency Authority to Use Cash Collateral is Warranted Under Section 363(c)(3)**

15         **And Rule 4001(b) to Allow The Debtor to Operate Its Business**

16         Section 363(c)(3) of the Bankruptcy Code and Rule 4001(b)(2) of the Federal Rules of

17  Bankruptcy Procedure require the Court to schedule a cash collateral hearing in accordance with

18  the needs of the debtor and conduct a preliminary hearing for the purpose of authorizing the use of

19  cash collateral to the extent necessary to avoid irreparable harm to the Debtor.  *See* 11 U.S.C. §

20  363(c)(3) (mandating that "[a]ny hearing [on the use of cash collateral] . . . shall be scheduled in

21  accordance with the needs of the debtor").  The Ninth Circuit has recognized that emergency relief

22  is often crucial to the success of a corporate reorganization:

23              We realize that "in certain circumstances, the entire reorganization
                effort may be thwarted if emergency relief is withheld" and that
24              reorganization under the Bankruptcy Code "is a perilous process,
                seldom more so than at the outset of the proceedings when the
25              debtor is often without sufficient cash flow to fund essential
                business operations".  It is for this very reason that Congress
26              specified that hearings concerning the use of cash collateral "shall be
                scheduled in accordance with the needs of the debtor."  11 U.S.C. §
27              363(c)(3).

28  *In re Center Wholesale, Inc.*, 759 F.2d 1440, 1449 n. 21 (9th Cir. 1985) (citations omitted).

1    In the present case, emergency use of cash collateral by the Debtor, pending a final

2    hearing, is necessary to prevent immediate and irreparable harm to the Debtor and its creditors.

3    Absent such use, the Debtor will have little or no funds from which to conduct operations, and

4    may be forced to permanently discontinue its business to the detriment of all creditors.

5    On the other hand, JGB will not suffer harm if interim relief is granted. To the extent that

6    JGB has an interest in property of the Estate which is worthy of adequate protection, that interest

7    is adequately protected by the substantial equity cushion, preservation of the value of their

8    collateral through the Debtor's continued business operations, and by the proposed replacement

9    liens.

10    As such, the Debtor requests that the Court grant the Debtor the relief requested on an

11    emergency and interim basis, followed by final approval of the Motion at a final hearing to be set

12    by the Court.

13    **V.**

14    **THE DEPOSITORY WITH WHICH THE DEBTOR BANKS AND FIRST ASSOCIATES**

15    **SHOULD BE REQUIRED TO HONOR THIS ORDER**

16    The Debtor has depository accounts with Preferred Bank (the "Depository").[11] In order to

17    give effect to this Court's order authorizing the Debtor's use of cash collateral, the Debtor requests

18    that the Court also direct the Depository and First Associates to comply with the order, and abide

19    by requests for use of funds by the Debtor, notwithstanding any contrary direction from JGB or

20    any other third party. *See* 11 U.S.C. § 105(a) (authorizing court to "issue any order, process, or

21    judgment that is necessary or appropriate to carry out the provisions of this title").

22    **VI.**

23    **NOTICE**

24    The Debtor intends to provide notice of this Motion by overnight mail, e-mail, facsimile,

25

26    _____

27    [11] Concurrently herewith, the Debtor filed an emergency first day motion to maintain certain active bank accounts and its cash management system for a limited period of time to ensure a smooth transition into this chapter 11 case.

28

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    or hand delivery on: (i) JGB; (ii) the 20 largest general unsecured creditors; (iii) First Associates;

2    (iv) the Depository; (v) the Office of the United States Trustee; (vi) any other party that requested

3    special notice; and (vi) any other party this Court orders be provided with notice of this Motion.

4

**VII.**

5

**<u>CONCLUSION</u>**

6       Based on the foregoing, this Court should grant the Motion.

7 Dated:  December 18, 2018       **Sulmeyer**Kupetz
                                     A Professional Corporation

8

9

10                           By: */s/ Asa S. Hami*
                                  Asa S. Hami

11                                   Attorneys for Debtor and Debtor in Possession
                                  One Way Loans, LLC, d/b/a PowerLend

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520