David S. Kupetz (CA Bar No. 125062)
  *dkupetz@sulmeyerlaw.com*
Asa S. Hami (CA Bar No. 210728)
  *ahami@sulmeyerlaw.com*
Claire K. Wu (CA Bar No. 295966)
  *ckwu@sulmeyerlaw.com*
**Sulmeyer**Kupetz
A Professional Corporation
333 South Grand Ave., Suite 3400
Los Angeles, California  90071-1406
Telephone: 213.626.2311
Facsimile: 213.629.4520

Attorneys for Debtor and Debtor in Possession
One Way Loans, LLC, d/b/a PowerLend

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:18-bk-24572-SK |
| ONE WAY LOANS, LLC, a California limited liability company, d/b/a POWERLEND, | Chapter 11 |
| Debtor. | **OMNIBUS DECLARATION OF DAVID REDLENER IN SUPPORT OF DEBTOR'S "FIRST-DAY" MOTIONS** |
| | Date:    TO BE DETERMINED |
| | Time:    TO BE DETERMINED |
| | Place:    Courtroom 1575 |
| |              255 East Temple Street |
| |              Los Angeles, CA  90012 |

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    I, David Redlener, declare:

2    **PRELIMINARY STATEMENTS**

3    1.    I am one of the co-founders, and am the Chief Executive Officer, of One Way

4 Loans, LLC, a California limited liability company, d/b/a PowerLend (the "Debtor").

5    2.    I am a licensed attorney, and oversee the operations, procedures, and strategic

6 growth initiatives of the Debtor.  As the former Senior Vice President and Deputy Director of

7 Loan Services at one of the nation's largest non-bank small business financing companies, I

8 established and had direct oversight of that company's Loan Servicing, Workout, Liquidation,

9 REO & Alternative Disposition Departments.  In this position, I established a record of

10 accomplishments that included the development of an operational infrastructure to support

11 portfolio growth from $70 million to more than $4 billion.

12    3.    As CEO of the Debtor, I have, subject to the control and oversight of the Debtor's

13 Manager and the Board of Directors, general and active supervision and management over the

14 business of the Debtor and over its several officers, assistants, agents, and employees.

15    4.    As a founding member of the Debtor, and based on my position with the Debtor

16 and my overall experience, I am extremely familiar and have an intimate knowledge of the

17 Debtor's operations, cash position, financial condition, and all other aspects of the Debtor and its

18 business, as well as the consumer lending industry in general.

19    5.    The Debtor commenced the above-captioned reorganization case by filing a

20 voluntary chapter 11 petition on December 17, 2018 (the "Petition Date").  The Debtor continues

21 to manage and operate its business as a debtor in possession.  No trustee or creditors' committee

22 has been appointed in the Debtor's chapter 11 case.

23    6.    To minimize the adverse effects of the commencement of the Debtor's chapter 11

24 case, while at the same time preserving value for the benefit of stakeholders, the Debtor filed

25 several motions requesting various forms of "first day" relief (collectively, the "First Day

26 Motions").

27    7.    I submit this Declaration in support of the First Day Motions.  The various forms of

28 relief requested in the First Day Motions are necessary to avoid irreparable harm to the Debtor and

**SulmeyerKupetz,** A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

the Debtor's bankruptcy estate (the "Estate") and allow the Debtor to sustain its current business operations in chapter 11 while it pursues a reorganization and/or other approaches, as necessary, to emerge successfully from this case and to otherwise maximize the value of the Estate.

8.      I am familiar with the contents of each of the First Day Motions (including the exhibits and other attachments to such motions and related papers) and, to the best of my knowledge, after reasonable inquiry, believe that the relief sought in each of the First Day Motions:  (a) will enable the Debtor to avoid damaging disruption to its operations and sustain its operations while in chapter 11; (b) is critical to the Debtor's ability to maximize the value of its Estate; and (c) best serves the interests of the Estate and creditors.  Further, it is my belief that the relief sought in the First Day Motions is, in each case, narrowly tailored and necessary to achieve the goals identified above.

## BACKGROUND

### Brief History and Description of Debtor's Business

9.      The Debtor, a California limited liability company, dba PowerLend, was founded on April 11, 2017, in California.  The Debtor operates an online subprime small-loan consumer finance business in the State of California.  It provides fast, flexible, and affordable loan products to individuals in need of immediate cash.  The Debtor's goal is to bridge cash flow shortages with industry-leading financial solutions that are both affordable to and in the best interest of individuals while at the same time improve their credit.  The Debtor is licensed in California, Missouri, and Utah.

10.      The Debtor originated its first loan on February 6, 2018.  The Debtor funded over 1,000 consumer loans in excess of $2,800,000 during its first few months operations in 2018, and continued to do so with limited staffing.  The Debtor also currently services approximately $1,900,000 of delinquent loans.

11.      The small-loan consumer finance industry is a highly fragmented segment of the consumer lending industry.  Small-loan consumer finance companies generally make loans to individuals of less than $5,000 with maturities of 24 months or less.  These companies approve loans on the basis of the customer's ability to repay and personal creditworthiness and maintain

1  close contact with borrowers to encourage the repayment or, when appropriate to meet the

2  borrower's needs, the refinancing of loans.

3        12.    By contrast, commercial banks, credit unions and other consumer finance

4  businesses typically make loans of more than $5,000 with maturities of more than two years.

5  Those financial institutions generally approve consumer loans on the security of qualifying

6  personal property pledged as collateral or impose more stringent credit requirements than those of

7  small-loan consumer finance companies.  As a result of their higher credit standards and specific

8  collateral requirements, commercial banks, savings and loans and other consumer finance

9  businesses typically charge lower interest rates and fees and experience lower delinquency and

10  charge-off rates than do small-loan consumer finance companies focused on the subprime lending

11  arena.  Small-loan consumer finance companies generally charge higher interest rates and fees to

12  compensate for the greater credit risk of delinquencies and charge-offs and increased loan

13  administration and collection costs.

14        13.    Small-loan consumer finance companies are subject to extensive regulation,

15  supervision and licensing under various federal and state statutes, ordinances and regulations.

16  Consumer loan offices are licensed under state laws, which, in many states, establish maximum

17  loan amounts and interest rates and the types and maximum amounts of fees and other charges.  In

18  addition, state laws govern other aspects of the operation of small-loan consumer finance

19  companies.

20        14.    Furthermore, the industry is subject to numerous federal laws and regulations that

21  affect lending operations.

22

23  **The Debtor's Members And Management Team**

24        15.    The Debtor has the following founding members (the "Founder Members"): (1)

25  DCMRED, LLC (whose manager is David Redlener ("Redlener")); (2) LME Capital LLC (whose

26  manager is Moses Gross); (3) JAAT Holdings, LLC (whose manager is Harinder Rana ("Rana"));

27  (4) Erika Harvel ("Harvel"); (5) Michael Silberman ("Silberman"); and (6) Jorge Aroche.  The

28  Founder Members hold membership interests in the Debtor ranging from 1.00% to 45.00%, except

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

that Harvel no longer holds a membership interest in the Debtor.  In addition, as of on or about August 31, 2018, Doolster Holdings, LLC, obtained a 5.00% membership interest (both economic and voting) in the Debtor..

16.    The Debtor also currently has the following limited members (the "Limited Members"): (1) JGB Claggain Bay, Inc., an affiliate of the Debtor's pre-petition senior lender JGB; (2) BRNB, LLC; (3) Sherbrooke Holdings LLC; and (4) Present Media Group, Inc.  The Limited Members also hold minority membership interests in the Debtor, with JGB Claggain Bay, Inc., holding a membership interest of 9.99%.[1]

17.    As stated above, I serve as the Debtor's Chief Executive Officer.  In addition, Silberman serves as the Debtor's President, Chief Financial Officer, and Secretary, with Harvel serving as its Chief Operating Officer.  The Debtor also had a Board of Directors consisting of Silberman, Harvel, Rana, Brad Powers, and me.

18.    As of the Petition Date, the Debtor has 12 employees (among which includes Redlener, Silberman, Rana, and Harvel).

### Recent Financial Results

19.    To date, the Debtor has funded its activities largely through debt financings.  Based on the most recent financial statements, for the nine months ended September 30, 2018, the Debtor generated revenues in the aggregate of approximately $1,676,122.  Expenses during that time totaled approximately $1,986,588, which includes operating expenses in the sum of approximately $1,009,376, and interest and other expenses in the sum of approximately $977,212.  The Debtor's cash at July 31, 2018, August 31, 2018 and September 30, 2018, totaled approximately $197,657, $140,821, and $114,635, respectively.

20.    I believe that the Debtor's cash, collections on its active and recovery portfolios,

---

[1] Subsequent to the Debtor's First Revised Operating Agreement, a series of documented equity transfers have occurred but not yet incorporated into a Second Revised Operating Agreement, under which the equity ownership interests of BRNB, LLC, and Present Media Group, Inc., were converted to profit sharing interests.

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    equity investment and additional debt offerings will provide for adequate liquidity.

2

3                    **Servicing And Collection of Loan Portfolio And Cash Management System**

4          21.    The Debtor's active loan accounts are serviced by a third-party servicer, First

5    Associates, where regular consumer payments from these loans are deposited into an account in

6    the Debtor's name at Preferred Bank.  This account is designated in a Deposit Account Control

7    Agreement (the "<u>DACA</u>") with the purported agent of the Debtor's senior lender, JGB

8    Glenmachrie Ltd. a/k/a JGB (Cayman) Glenmachrie Ltd. ("<u>JGB Cayman</u>"), as the "Collection

9    Account."  JGB Cayman's agent, JGB Collateral LLC ("<u>JGB Agent</u>," and together with JGB

10   Cayman and other affiliated entities, "<u>JGB</u>") has the right to sweep this bank account pursuant to

11   the terms of the DACA upon an event of default.  Defaulted or "de-boarded" customer loan

12   accounts are serviced by the Debtor's in-house collection team.

13         22.    The Debtor maintains the following accounts at Preferred Bank to conduct

14   business: Collections Account, Operating Account, Funding Account and the Payroll Account.

15   Pre-petition, the Debtor employed the following cash management system with respect to

16   payments processed by First Associates: (i) payments from the Debtor's borrowers are deposited

17   into a First Associates bank account; (ii) First Associates then transfers the funds to the Collection

18   Account (less a service fee); and (iii) the Debtor subsequently transfers those funds to its

19   Operating Account on a daily basis to pay the Debtor's operating (Operating Account), loan

20   origination (Funding Account), payroll (Payroll Account), and other business related costs.

21   Excess funds, if any, would be used for new loan originations.

22         23.    The Debtor utilizes a third-party ACH provider to disburse loan proceeds directly

23   to new borrowers.  In order to fund this ACH provider, the Debtor transfers cash from the

24   Operating Account to the Funding Account and from the Funding Account directly to the ACH

25   provider.

26         24.    The Debtor also utilizes a third-party payroll provider to pay its employees.  When

27   paying its employees, the Debtor transfers cash from the Operating Account to the Payroll

28   Account from which the third-party payroll provider drafts the amount necessary to process

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  payroll checks.  In addition to these primary accounts, the Debtor maintains a fifth account that

2  holds $75,107.44. This cash supports a Letter of Credit for the benefit of the Debtor's primary

3  landlord.  The Debtor has no control over this account.  All these accounts are at Preferred Bank.

4        25.     Aside from payments processed through First Associates, the Debtor also receives

5  loan payments from non-performing borrowers directly through the efforts of the Debtor's in-

6  house collections team via-a-vis ACH, or check, which payments previously were deposited

7  directly into the Debtor's operating account.

8        26.     As disputes between the Debtor and JGB escalated (discussed in more detail

9  below), the Debtor had consumer receivables collected by First Associates and payments made on

10  account of delinquent loans deposited into a bank account held by DCMRED, LLC (one of the

11  Debtor's Founder Members) (also at Preferred Bank).  This was done to ensure the Debtor would

12  have the ability to continue operations, service its loan portfolio, and have a stream of revenue to

13  pay limited salaries and collections on defaulting loans and preserve the collateral upon which

14  JGB had a security interest, which the Debtor was servicing in-house.  As of or about the Petition

15  Date, the Debtor has approximately $6,420 of its funds in the DCMRED account. All funds in the

16  DCMRED account belong to the Debtor, and there is no commingling of funds.  The Debtor

17  intends to transfer the cash belonging to the Debtor in the DCMRED account over to one of the

18  accounts held by the Debtor.

19        27.     The limited revenues collected by the Debtor in-house are used to pay for ongoing

20  collection efforts, minimal staffing, utilities and other essential business requirements necessary to

21  prevent further deterioration of the loan portfolio.[2]  These funds also permit the Debtor to continue

22  to service these loans.

23        28.     First Associates currently holds in an account approximately $70,000 and is

24  expected to receive $10,000 to $25,000 per week in cash remittances received on behalf of the

25  Debtor.  In light of such disputes, First Associates has agreed to "freeze" that account and will not

26  _____

27  [2] It should be noted that the Debtor's Loan Agreement with JGB allows for the payment of salaries, even
upon an event of default as "Permitted Compensation."

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

release any of the funds it currently holds or will receive, pending further instructions from the parties or order of court.

29.    The Debtor authorized First Associates to provide JGB with full access to the loan portfolio and cash remittance data for the loans that it was servicing on behalf of the Debtor through an internet portal, upon JGB's request.  Since the outset, the Debtor and JGB communicated by email and telephone regularly concerning weekly and monthly cash and loan reports, First Associates portfolio remittances, financial statements, bank statements, and other loan portfolio matters.

30.    The consumer loan payment receivables that have been collected and are presently in the possession of First Associates are secure and fully accounted for.  As set forth above, JGB has access to this information and has firsthand knowledge of the funds on account with First Associates through the internet portal.

**The Debtor's Office Lease And Other Material Contracts**

31.    The Debtor currently is the tenant under a commercial office lease for premises at 10325 W. Jefferson Blvd., Culver City, California (the "Lease"), with CF Culver City Office, L.P. The Lease's term commenced on August 1, 2018 and extends through November 30, 2022.  The current monthly rent of $20,816.68 (base of $16,683.00, plus $4,133.68 for common area and maintenance costs charged by the landlord and due monthly), with annual fixed increases of the monthly rent.  In addition to the Lease, the Debtor also maintains a NY-based office located at 12 N. Broadway, Unit 2, Yonkers, NY 10701 (the "NY Office"). The NY Office was formerly my residence but after moving to Los Angeles to serve as the Debtor's CEO, it was converted to an office out of which, Debtor related business is conducted.  The current rent for the NY Office is $2,300 per month.

32.    The Debtor has several executory contracts.  Among those contracts is the loan servicing agreement with First Associates, contracts for various loan management services and software, and a contract with a third-party lead provider.

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

### The Debtor's Assets

33.     As of the Petition Date, the Debtor had total assets valued at approximately $5,500,000.  The Debtor's primary asset is its loan receivables in the approximate amount of $2,500,000.  The Debtor's other assets deferred marketing expenses of approximately $2,141,538 and other prepaid expenses and assets in the aggregate of approximately $179,265, as well as intangibles, equipment and cash.

### The Debtor's Liabilities

34.     The Debtor has estimated liabilities in the aggregate of approximately $5,800,000.

35.     This includes: (a) JGB's secured debt in the principal amount of $5,125,000 (although JGB currently claims the total outstanding amount due is approximately $6,198,402.78), the only amount JGB ultimately advanced under the $30,000,000 JGB Facility; (b) an unsecured note in the principal amount of $1,700,000 in favor of P&G Holdings, LLC/Moses Gross (one of the Debtor's Founder Members) provided as part of P&G Holding's agreement to pledge the Watermark Property as collateral for the JGB Facility; (c) two unsecured working capital loans, each in the amount of $100,000, one from Jorge Aroche and another from Silberman; and (d) unsecured trade payables in the aggregate of approximately $256,907.

### The JGB Loan And Related Disputes Background

36.     Around the time the Debtor was created, it entered negotiations with JGB, who agreed to provide the Debtor an initial credit facility in the amount of $30,125,000.00 (the "JGB Credit Facility").  A true and correct copy of the loan Term Sheet issued by "JGB Management Inc." is attached to the concurrently-filed Appendix of Exhibits in support of the motion to authorize use of cash collateral (the "Cash Collateral Motion") as Exhibit 5.

37.     The JGB Credit Facility was supposed to allow the Debtor to begin its loan making operations, with a requirement that JGB Claggain Bay, Inc. (presumably another JGB affiliate) become a 9.99% percent equity (limited) partner and part owner of the Debtor.  A true and correct copy of the Limited Liability Company Agreement for the Debtor, dated December 1, 2017,

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1 evidencing JGB's 9.99% equity interest is attached to the Appendix of Exhibits in support of the

2 Cash Collateral Motion (the "Appendix of Exhibits") as Exhibit 6.  The JGB Term Sheet

3 memorialized the parties' understandings and responsibilities and was executed by JGB

4 Management Inc. and the Debtor on November 6, 2017.

5       38.     Thereafter, the loan agreement was processed, loan documents were executed by

6 email in piecemeal by the parties, and the closing completed on December 1, 2017.

7

8 **The JGB Loan Documents And Collateral**

9       39.     The loan arrangement between the parties included numerous forms of collateral

10 demanded by JGB to secure its interests, including a first priority lien on a 23-acre real estate

11 development property in Muskegon, Michigan, having a fair market value of $12,100,000 (the

12 "Watermark Property").  It is important to note that the Watermark Property was required

13 collateral.  Had the Watermark Property not been pledged, JGB would have not proceeded with

14 the loan. This collateral alone far exceeds the $5,125,000.00 advance JGB made to the Debtor, as

15 it was given in reliance of JGB's promise to provide additional capital.  JGB also took an equity

16 interest and became a 9.99% member of the Debtor.  This is in addition to guaranties, pledges and

17 other collateral JGB took to secure the JGB Credit Facility.

18       40.     The loan documents and collateral include: (a) Promissory Note in the sum of

19 $30,125,000.00 in favor of JGB Cayman; and (b) Loan and Security Agreement (the "Loan

20 Agreement") in favor of JGB Collateral, LLC, as collateral Agent for JGB Cayman, granting JGB

21 a security interest in substantially all of the Debtor's assets, including, but not limited to, its loan

22 portfolio.  True and correct copies of the Promissory Note and Loan Agreement are attached to the

23 Appendix of Exhibits as Exhibit 7 and Exhibit 8, respectively.

24       41.     The JGB Facility was secured by an extensive array of documents and diverse

25 collateral aside from substantially all of the Debtor's assets (the "Additional Collateral") including

26 the following (collectively with the Note and Loan Agreement, the "Loan Documents"):

27 • Guaranty Agreement executed by each of: (i) Redlener; (ii) DCMRED, LLC; (iii)
Harvel; (iv) Rana; (v) JAAT Holdings, LLC; and (vi) Silberman.

28

ASH\ 2657706.8

- Pledge Agreement executed by each of: (i) DCMRED; (ii) Harvel; (iii) JAAT Holdings; and (iv) Silberman.

- Numerous UCC-1 filings filed against the following parties in either California, Delaware, or New York: (i) the Debtor; (ii) Harvel; (iii) Silberman; (iv) DCMRED; and (v) JAAT Holdings.

- Four separate mortgages securing the approximately 23-acre Watermark Property owned by P&G Holdings LLC, d/b/a P&G Holdings NY LLC, having a fair market value of $12,100,000.00 pursuant to a June 26, 2018, appraisal prepared by Colliers International.  A true and correct copy of this appraisal, which I commissioned from Collier's International Valuation & Advisory Services on behalf of the Debtor, is attached to the Appendix of Exhibits as <u>Exhibit 9</u>.  True and correct copies of the mortgage filings against the Watermark Property are attached to the Appendix of Exhibits, collectively, as <u>Exhibit 10</u>.

- A new Limited Liability Company Agreement for the Debtor (drafted by JGB's counsel) granting JGB Claggain Bay, Inc., a JGB affiliate, a 9.99% limited interest in the Debtor.

- A Deposit Account Control Agreement.

42.    The loan closed on December 1, 2017.  The total closing costs paid equaled $428,076.00 (based on a loan of $5,125,000.00), with JGB's legal fees alone totaling more than 20% of this amount.  Closing costs included a payment for legal fees to JGB's attorneys in the sum of $79,500.00, and another legal fee of $10,000.00 to another set of counsel for JGB to prepare the four mortgages encumbering the Watermark Property.  As a result, the $5,125,000 advanced yielded working capital of only $4,696,924.00 for the Debtor.  A true and correct copy of the closing statement for the JGB Loan ("Flow of Funds Memorandum") is attached to the Appendix of Exhibits as <u>Exhibit 11</u>.[3]

43.    The Debtor now services over 1,000 consumer loans it originated.  These loans in the Debtor's portfolio are also collateral under the Loan Agreement.

---

[3] On information and belief, JGB did not acquire the Lender's Environmental Liability Insurance policy despite holding back $40,000 for that purpose from the loan proceeds, contrary to the parties' loan agreement.

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**The Debtor's Compliance With its Loan Obligations to JGB**

44.     The Debtor made nine monthly interest payments, of approximately $79,000 each, totaling $702,122 at the rate of 18% per annum to JGB.  The first interest payment was on December 27, 2017, and the last on September 5, 2018.

45.     Contrary to allegations JGB has made in the State Court Action (defined below), the Debtor complied with its reporting obligations to JGB and otherwise supplied it with substantial information on a regular basis.  The Debtor provided JGB with monthly financial reports, cash reports, monthly and weekly collateral reports for active accounts on a regular basis, and later on, information on delinquent accounts and on-going collection efforts, if and when requested.

46.     JGB also was given full access to the First Associates loan report portal providing full access to loan reports related to the Debtor loan portfolio with First Associates immediately upon JGB's request.

47.     From the start, the Debtor also provided JGB access to the online bank accounts. Attached to the Appendix of Exhibits as <u>Exhibit 12</u> is a true and correct copy of an email dated February 2, 2018, confirming this arrangement and JGB's acknowledgment of having access to the Preferred Bank online account.  The Debtor was in constant communication with JGB throughout 2018, and, most importantly, even after the last submission of monthly reports on August 9, 2018.  Communications from August 10, 2018, through the date of default did not pertain to the delivery of loan portfolio reports generated by the Debtor.  The post-August 9 communications were primarily discussions regarding release of the loan receivables for the purpose of securing additional financing, as well as terms of a JGB payoff.

48.     At no time was the Debtor made aware of any mention made by JGB regarding any lack of reporting or reports or any request for same that went unanswered.  JGB has all of the Debtor's principals' contact information, including emails, office and mobile telephone numbers. Notwithstanding the foregoing, there may have been one occasion where JGB contacted the Debtor to transmit reports, which was immediately complied with and transmitted to JGB.

49.     Upon request in November 2018, JGB was also granted access to the First

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  Associates internet portal repository for all loan reports related to the Debtor's loan portfolio.

2  Once JGB had gained access to the bank account and the internet portal repository, it was

3  redundant, repetitive, and unnecessary for the Debtor to keep forwarding the same financial

4  reports and loan portfolio information to which JGB already had full access.

5

6  **JGB's Refusal to Advance Additional Capital And Other Acts of Bad Faith**

7       50.     Pursuant to the terms of the Loan Agreement, it was further agreed and understood

8  that JGB would continue to fund the Debtor's loan operations on a regular basis, with up to an

9  additional $25,000,000.00 in capital, provided that certain goals and performance markers were

10  met, including making interest payments of approximately $79,000.00 per month to JGB, which

11  were duly made.  This promise was a material term upon which the Debtor relied when entering

12  into the loan arrangement and providing the Additional Collateral.

13       51.     However, JGB then only funded $5,125,000 under that JGB Credit Facility, refused

14  to provide additional capital funds.  This left the Debtor with a limited amount of working capital

15  and affected its ability to generate new loans.  After JGB refused to advance additional capital, the

16  Debtor sought a release of lien on the loan portfolio so it could access other credit facilities and

17  pay off JGB.  This request was, in my view, unreasonably denied, thereby further hampering the

18  Debtor's ability to initiate new loans and conduct business.  Numerous efforts were made by the

19  Debtor to sustain and grow the business.

20       52.     In March 2018, the Debtor was offered a tremendous opportunity to finance and

21  defer marketing and lead generation costs utilizing a subordinated credit line.  In that these are the

22  perhaps the most significant line item expenses, it was an opportunity to enhance cash flow,

23  maintain JGB's cash requirements, and allow for increased loan origination.  However, JGB

24  would not consent to this subordinated credit line.

25       53.     In July 2018, after hitting every monthly loan origination target and just 45-60 days

26  from being both cash-flow positive and profitable, the Debtor requested an additional advance

27  under its $30 million Credit Facility.  Despite having excellent collateral coverage from the 23

28  acre Watermark Property with a loan to value ratio of less than 50%, and owning 9.99% of the

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    Debtor, JGB still refused to provide a further advance.

2         54.    At the time JGB stopped advancing capital necessary to fund the Debtor's ongoing

3    business operations, it devastated the Debtor's ability to initiate new loans.  As a result, the Debtor

4    was unable to initiate any new loans since June 2018, with the exception of two loans in July and

5    one loan in August 2018.

6         55.    JGB's refusal to provide any additional capital to the Debtor, despite demands

7    therefor, left the Debtor with a limited amount of working capital and affected its ability to

8    generate new loans.

9         56.    On or about September 18, 2018, JGB suddenly demanded a "redemption"

10   payment in the amount of $150,000.00 to be paid on or before September 20, 2018, just two days

11   later.  A true and correct copy of JGB's redemption notice is attached to the Appendix of Exhibits

12   as Exhibit 13.  This demand was made in bad faith and was yet another action taken by JGB in the

13   pursuit of its predatory strategy to cripple the Debtor's cash flow and ongoing business operations.

14        57.    In addition, as discussed below, in September 2018 (and many times prior and

15   subsequent thereto), the Debtor sought financing from credit facilities that would leverage our

16   existing loan portfolio.  As discussed below, although the Debtor kept JGB informed throughout

17   this process, received term sheets from two facilities, JGB's excellent collateral coverage, and the

18   Debtor's offer to pay $550,000, JGB refused to release the loan portfolio.

19        58.    Based on JGB's actions described above, it became clear to me that JGB was not

20   acting in the best interest of the Debtor.  As such, the Debtor's managing member, DCMRED

21   LLC, took measures to protect the Debtor and curtail the deterioration of collateral.  More

22   specifically, the consumer receivables collected by First Associates on behalf of the Debtor were

23   deposited into a bank account at Preferred Bank held by DCMRED.  This was done to ensure the

24   Debtor would have the ability to continue operations, service its loan portfolio, and have a stream

25   of revenue to pay limited salaries and collections on defaulting loans which the Debtor was

26   servicing in-house.

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

ASH\ 2657706.8

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**JGB's Declared Defaults And Commencement of Litigation**

59.    On or about October 8, 2018, JGB defaulted the Debtor for a litany of alleged defaults, citing, among other things, noncompliance with the terms of the Loan Agreement and failure to provide information to JGB (which was false as described above).

60.    On or about October 10, 2018, JGB issued an acceleration notice to the Debtor.  A true and correct copy of the acceleration notice is attached to the Appendix of Exhibits as <u>Exhibit 13</u>.

61.    On November 13, 2018, JGB commenced an action in the Supreme Court of New York (the "<u>State Court Action</u>") against the Debtor.  In that action, JGB seeks monetary compensation.  JGB concurrently filed a motion for a preliminary injunction (the "<u>Injunction Motion</u>") seeking, among other things, to seize the Debtor's bank accounts and, in the process, shut down the Debtor's operations.  The hearing on the Injunction Motion did not proceed in light of commencement of this bankruptcy case.

62.    At or about the same time as the State Court Action against the Debtor was filed, JGB commenced a second action in the Supreme Court of New York pertaining to the same loan arrangement and $30,125,000.00 Credit Facility against the guarantors of the Loan.

**Harmful Impact of JGB's Conduct on The Debtor's Operations**

63.    JGB's refusal to advance additional capital, consent to Debtor friendly subordinated financing  and its draconian refusal of allowing the Debtor to utilize its existing loan portfolio to secure additional financing devastated the Debtor's ability to initiate new loans.  As a result, as noted above, the Debtor has been unable to originate any new loans since June 2018, except for two loans in July and one in August 2018.  Despite JGB's bad faith and course of conduct, the Debtor made nine interest payments totaling $702,122, with the last payment on September 5, 2018.

64.    Although the Debtor ceased originating new loans and reduced its staffing, it did not cease operating.  The Debtor continued its efforts to collect on its non-performing loan portfolio to preserve the value of JGB's collateral.

65.    Furthermore, as discussed below, the Debtor's inability to access and use cash collateral, including the First Associates Funds, will force the Debtor out of business.

### FACTORS PRECIPITATING CHAPTER 11 FILING

66.    As discussed above, JGB's refusal to advance any additional funding under the JGB Facility, and its refusal to release its lien on the Debtor's loan receivables to permit the Debtor to obtain additional financing, significantly impeded the Debtor's cash flow position. Moreover, as discussed above, in light of the escalating disputes between the Debtor and JGB, the Debtor no longer had access to the First Associates Funds.

67.    More recently, JGB commenced the State Court Action against the Debtor and sought a preliminary injunction, among other things, to seize the Debtor's bank accounts and access the First Associates Funds.  A hearing on the Injunction Motion was set for December 17, 2018.

68.    If the Debtor lost the ability to access any funds collected from its loan portfolios, including the defaulting loan accounts and would have been ordered to transfer all of these funds to JGB, the Debtor will essentially be forced out of business.  The Debtor relies on the consumer receivables for operating expenses including servicing the active loan portfolio with First Associates.

69.    To avoid this potential risk and the consequential disastrous results to the interests of the Debtor and its creditors (including its secured creditor, JGB) if JGB were successful on the Injunction Motion, the Debtor commenced this case to protect the interests of the Debtor and its creditors with the goal of achieving a successful reorganization.

### THIS CHAPTER 11 CASE

70.    The Debtor believes that with adequate working capital it could be cash flow positive in short order.  In fact, in July 2018, the Debtor was just 45-60 days from being both cash flow positive and profitable (but that achievement was thwarted when JGB denied an additional advance under the JGB Facility).

71.    Pre-petition, the Debtor consistently sought financing from credit facilities that would leverage its existing loan portfolio.  Throughout this period, the Debtor transmitted emails

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

to JGB advising it of the Debtor's efforts to secure financing, including providing it with

prospective lender names and the loan details in a showing of good faith to comply with its

repayment obligations and remain open for business.  Ultimately, the Debtor received term sheets

from two facilities, both requiring a first priority UCC lien on the loan portfolio.  However,

despite excellent collateral coverage from the Watermark Property ***and*** the Debtor's offer to pay

$550,000 for the release of the loan portfolio, JGB refused to release the loan portfolio.  A true

and correct copy of a July 12, 2018, e-mail from the Debtor to JGB concerning these financing

efforts is attached to the Appendix of Exhibits as Exhibit 15.

72.    Notwithstanding JGB's posture, the Debtor continued with its efforts to procure

financing to obtain additional working capital and/or to payoff and replace the JGB Facility.  As

discussed in the concurrently-filed Declaration of Donald A. Stukes, at this point, I am confident

the Debtor will have an acceptable term sheet for an initial DIP financing loan from a lender for

approximately $1,900,000 (net) to be funded no later than early January, followed by a second and

third tranche of $500,000 each in or about February and March.  Based on ongoing discussions

with lenders, I further believe that in the relatively near term, the Debtor will procure a further DIP

loan from this or another lender in an amount sufficient to replace the JGB Facility and which will

put the Debtor in a position to successfully reorganize its debts and emerge from this case a viable

going concern.  The Debtor anticipates filing a motion to approve the initial DIP loan concurrently

with the present motion or in the very near future.

73.    In the event the Debtor is unable to procure the DIP Financing as currently

contemplated, the Debtor will continue to seek financing to satisfy the existing JBG outstanding

loan via a new credit facility, in addition to funding to be made available to underwrite new loans

consistent with the business mandate.  Further, efforts will be made to identify a suitable equity

partner to provide additional capital to support business operations.  Such funding or capital could

serve as the basis for a proposed Reorganization Plan leading to the exit from Chapter 11.

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

## FACTS IN SUPPORT OF "FIRST DAY" MOTIONS

**Motion for Order Authorizing Payment and/or Honoring of Prepetition Employee Compensation Benefits, Reimbursements, Withholding Taxes, Accrued Vacation, and Related Employee Claims (the "Employee Claims Motion")**

74.  As set forth above, as of the Petition Date, the Debtor has 12 employees (the "Employees") – 4 partners (the "Partners"), 4 managers (the "Managers"),[4] and 4 sales agents or collection agents (the "Sales/Collection Agents").  The Employees are all full-time employees and either compensated on a salaried basis or on an hourly basis (with rates in the range of $15.00 per hour to $25.00 per hour).

75.  A list of the Debtor's Employees (not identified by name), including the amount of such employee's annual salary or hourly rate (as the case may be) and gross wages, is attached to the Employee Claims Motions as Exhibit "1".

76.  The Debtor pays its Employees on either a monthly basis or a semi-monthly basis. The 4 Partners and 2 of the Managers (i.e., the Independent Contractor Managers) are paid on a monthly basis; the other 2 Managers and the 4 Sales/Collection Agents are paid semi-monthly. The average amount the Debtor needs for any given monthly payroll period in the ordinary course of business is approximately $67,033 (wages only and not including benefits or employer taxes); the average amount the Debtor needs for any given semi-monthly payroll period in the ordinary course of business is approximately $21,018 (wages only and not including benefits or employer taxes).  Annual salaries are divided equally over the same pay dates each year.  The Debtor also offers various employee benefits, including, for example, medical, vision, dental insurance, and parking.

77.  The most recent payday for those employees on the semi-monthly payroll cycle was November 15, 2018, at which only 6 employees (2 Managers and the 4 Sales/Collection Agents) were paid (and, given the tight cash position of the Debtor, were paid only a percentage of

---

[4] 2 of the 4 managers (the Sales Manager and Loan Systems Manager) are independent contractors (the "Independent Contractor Managers").

1    the total amount due).  The other 2 Managers (the Independent Contractor Managers), who are on

2    a monthly payroll cycle, were last paid on September 27, 2018 and October 23, 2018, respectively

3    (and, again, only a percentage of the total amount due).  The next contemplated payday is not until

4    January 4, 2019.

5         78.    The charts attached to the Employee Claims Motion as Exhibit "2" identify (a) the

6    full amounts to be paid each employee for each payroll period for the last 6 months, (b) the actual

7    amounts paid, and (c) the deferred amounts (the "Deferred Amounts") for each employee.

8         79.    The amount of the Debtor's payroll it will make on January 4, 2019 (as detailed in

9    the Cash Collateral Budgets proposed with the Debtor's Cash Collateral Motion) will either be: (1)

10   $88,051 (i.e., $67,033 for monthly payroll, plus $21,018 for semi-monthly payroll), if DIP

11   financing is obtained; or (2) $47,275 ($33,267 monthly payroll, plus $14,008 semi-monthly

12   payroll), if no DIP financing is obtained and just using cash collateral.  These amounts are not

13   including payroll taxes.  The January 4, 2019 payroll will compensate (in full or in a reduced

14   amount): (1) the Partners, for their post-petition monthly payroll amounts; (2) the 2 Independent

15   Contractor Managers for working prior to the Petition Date from December 1, 2018 through

16   December 17, 2018, as well as their remaining post-petition monthly payroll amounts; and (3) the

17   2 Managers and 4 Sales/Collection Agents, for their post-petition semi-monthly payroll amounts

18   from December 17, 2018 through December 28, 2018.  The January 4, 2019 payroll does not

19   compensate any employees for Deferred Amounts.

20        80.    The Debtor seeks Court authority to pay the 4 Managers and 4 Sales/Collection

21   Agents their pre-petition employee compensation (the "Employee Compensation"), for the current

22   payroll period, as well as any Deferred Amounts, with the total amount paid on account of pre-

23   petition wages for these employees not to exceed the $12,850 priority cap.  The pay period that

24   had not concluded at the time of the commencement of the Debtor's case is December 1, 2018

25   through December 28, 2018.

26        81.    The Debtor also seeks Court authority to (1) pay and/or honor all employee

27   benefits, employee reimbursements, withholding and payroll taxes, accrued vacation time, and

28   related employee claims, as well as to (2) direct the bank (the "Issuing Bank") against which pre-

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  petition checks for Employee Compensation and claims were issued to honor such pre-petition

2  checks.

3      82.    The Debtor is not seeking in the Employee Claims Motion the authority to pay pre-

4  petition employee compensation to any insiders of the Debtor.  The Debtor will be filing a "Notice

5  of Setting Insider Compensation".

6      83.    I believe the above relief is necessary in order to maintain employee stability,

7  morale, and loyalty, and in order to sustain the work ethic and effort of the Debtor's employees.  If

8  the Debtor is not authorized to pay and honor the Employee Compensation, including the Deferred

9  Amounts, to the Managers and Sales/Collection Agents as requested herein, the Debtor's business

10  and efforts to maximize the value of the Estate and creditor recovery could be immediately and

11  severely disrupted.

12      84.    The pre-petition amounts to be paid to the 2 Independent Contractor Managers <u>for

13  working prior to the Petition Date from December 1, 2018 through December 17, 2018</u> will not

14  exceed approximately $5,666.67 and $5,005.37, irrespective of whether DIP financing is secured.

15  The remainder of the January 4, 2019 payroll will only compensate the Partners, Managers, and

16  Sales/Collection Agents for post-petition payroll amounts.

17      85.    Subject to Court authorization to use cash collateral, and as set forth in the Debtor's

18  Cash Collateral Budgets, the Debtor has sufficient funds to make the January 4, 2019 payroll and

19  to continue to operate its business without rendering the Estate administratively insolvent.

20      86.    The Debtor uses PrimePay to process its payroll.  Payroll and payroll taxes are

21  wired out of the Debtor's payroll bank account at Preferred Bank by PrimePay 48 hours before

22  each pay date.

23      87.    With respect to employee benefits, Partners receive six (6) weeks of paid vacation,

24  and Managers and Employees receive two (2) weeks of paid vacation.  There are six (6) paid

25  company holidays for all employees, and six (6) sick days for all employees each year.

26      88.    As set forth in more detail in the Employee Claims Motion, the Debtor also seeks

27  authority to pay the pre-petition employee compensation amounts in the Employee Checks

28  (defined below), and to direct Preferred Bank to honor the Employee Checks post-petition.

ASH\ 2657706.8

**Motion for Order (1) Deeming Utility Companies Adequately Assured of Future**

**Performance, (2) Establishing Procedures for Requests for Additional Assurance, and**

**(3) Restraining Utility Companies From Discontinuing, Altering, or Refusing Service (the**

**"Utilities Motion")**

89.     In connection with the operation of its business, the Debtor obtains electricity, IT, telephone and other similar services from a number of different utility suppliers (collectively, the "Utility Providers" and, each, a "Utility Provider").[5]  These utilities are essential to the continued operation of the Debtor's business.

90.     The Utility Providers are identified to the best of the Debtor's ability in the chart attached to the Utilities Motion as Exhibit "1".  That Exhibit "1" details the name and address of the Utility Providers, the type of service provided, the location for which the service is provided, the amount of the deposit, if any, made by the Debtor to each Utility Provider, the amount of the Debtor's average one month expense, and the amount of the Debtor's average monthly charges for service during the six months prior to the commencement of the instant case, for each provider.[6]  The Debtor's phone and internet expenses average $2,275 per month.  The Debtor's other utility expenses average $3,965 per month.

91.     The Debtor's total average monthly expenditure for utilities is approximately $6,240.  The Debtor's projected total average monthly utility payments going forward is $7,339, as follows:[7]

| Utility Provider | Type | Projected Monthly Average |
|---|---|---|
| Broadvoice | Phone | $1,500 |
| ACC (AT&T) | IP & Ethernet | $1,325 |

[5] Certain utility services are provided to the Debtor under its Office Lease.  In such situations, the Debtor may not have any contractual relationship with the utility provider and the utility provider may not have any claim against the Debtor.

[6] Inclusion of a particular entity on this schedule shall not be deemed an admission or acknowledgement that such entity is a utility within the purview of section 366 of the Bankruptcy Code.

[7] This increase is due to deactivated phone lines that, upon re-activation, will increase the monthly payment.

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

| CCS | Answering Service | $214 |
| Southern Calif. Edison | Electric | $1,200 |
| Effortless Office | Servers / IT | $3,100 |

92.     The Debtor has not been in default of any of its obligations to the Utility Providers. I do not anticipate the Debtor will have any problems honoring its utility obligations.

**Motion for Order Authorizing Debtor to Maintain Bank Accounts and Cash Management System and Continue Use of Its Existing Business Forms (the "Cash Management Motion")**

93.     The Debtor's pre-petition cash management system is described above in the paragraphs under the heading "Servicing And Collection of Loan Portfolio And Cash Management System."  A schedule of the Debtor's accounts (collectively, the "Debtor Accounts"), together with the approximate balance for each account, is attached to the Cash Management Motion as Exhibit "1."

94.     As set forth in more detail in the Cash Management Motion, one form of relief sought through that motion is authority for the Debtor to maintain its existing cash management system (at least for a minimum transition period).  If the Debtor is required to close its existing accounts, open all new bank accounts and substantially alter its existing cash management system, there likely would be a significant disruption in the Debtor's ability to collect and disburse funds in the ordinary course of its operations.  Such a disruption would negatively impact the Debtor's ability to make a smooth transition into chapter 11.  Accordingly, in the Cash Management Motion, the Debtor requests that the Court enter an order authorizing (but not directing) the Debtor's continued use of the Debtor's existing bank accounts, rather than opening new debtor in possession accounts, for a minimum period of 60 days.

95.     Additionally, as a way of minimizing expense to the Estate, I believe the Debtor should be permitted to continue to use its correspondence and business forms including, but not limited to, checks, letterhead, envelopes, loan documents, and other business forms (collectively, the "Business Forms"), substantially in the form existing immediately before the commencement

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

of this chapter 11 case, without reference to the Debtor's status as a debtor in possession.  The

Debtor proposes that, in the event it needs to purchase or print new Business Forms during the

pendency of this chapter 11 case, such forms will include a legend referring to the Debtor's status

as a debtor in possession.

96.     If the Debtor is not permitted to maintain and utilize its cash management and

banking system (with certain modifications described below), and is not permitted to continue to

use its existing Business Forms, I believe the Debtor, the Estate, and creditors will be prejudiced

by: (a) the resulting disruption in the ordinary financial affairs and business operations of the

Debtor; (b) potential delay in the administration of the Estate; and (c) the unnecessary cost to the

Estate to set up new accounts and new systems and purchase/print new business forms.  Moreover,

as a result of the highly regulated industry in which the Debtor does business, it is not easy for the

Debtor to open/close and/or move accounts.

97.     In order to prevent the inadvertent cashing of outstanding prepetition checks by the

Debtor's bank, the Debtor will provide the institution where the Debtor's accounts are maintained

with notice of the commencement of the chapter 11 case and direction that outstanding prepetition

checks are not to be honored, unless and until a court order (if any) is entered authorizing payment

of such obligations.  If such an order or orders of the Court are entered, the Debtor's banks will be

directed to honor checks for prepetition obligations only to the extent the Court has authorized

payment of such obligations.

98.     In order to discourage certain critical employees from resigning, DCMRED

negotiated a modest compensation structure for five loan collectors.  DCMRED agreed that these

five employees would receive a portion of the cash collected on the non-performing loan portfolio

each week.  These five employees would share equally in 40% of the total weekly collections.  On

the Friday prior to the filing of the Chapter 11 proceeding, five checks, totaling $1,219.65, were

issued (Check Nos. 24 through 28) each in the amount of $243.93 (the "Employee Checks").  As

of the Petition Date, based on my review of the account activity, check numbers 24 and 25 were in

the clearing process, and check numbers 26, 27, and 28 were not yet deposited. Instructing the

bank to not honor these checks will have a significant impact on an already tenuous employee

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311  •  FAX 213.629.4520

1   morale.

2       99.    In order to avoid disruptions to its operations and the reorganization effort, and to

3   avoid unnecessary expense, the Debtor requests authority to continue its existing cash

4   management/banking system as described above.  In addition, the Debtor requests that Preferred

5   Bank and JGB be precluded from asserting control over or otherwise sweeping (or transferring or

6   seizing in any manner) funds from the Debtor Accounts for the purpose of paying down any

7   obligations the Debtor may have to each of them, or for any other purpose.  The Debtor believes

8   that any such action would violate the automatic stay, but requests this relief to avoid potentially

9   severe disruption in the flow of its revenues and its operations.

10

11   **Cash Collateral Motion[8]**

12   **The Budget And Its Approval**

13       100.    Attached to the Appendix of Exhibits as <u>Exhibit 1</u> and <u>Exhibit 2</u> are the Debtor's

14   two proposed cash collateral/operating budgets (together, the "<u>Cash Collateral Budgets</u>").  I was

15   actively involved in the preparation of both Cash Collateral Budgets, together with the assistance

16   of the Debtor's outside financial consultant Donald A. Stukes of ASI Advisors, LLC.  I am aware

17   of the contends of the Cash Collateral Budgets and the underlying assumptions, and approve both

18   budgets.

19       101.    By the Cash Collateral Motion, the Debtor requests authority to use cash collateral

20   in accordance with the Cash Collateral Budgets.  More specifically, the Debtor requests

21   (i) pending a final hearing, emergency authority to use cash collateral on an interim basis to satisfy

22   post-petition administrative expenses and operational expenses (including, for example, the

23   payment of rent, costs of servicing loans, and pre and post-petition wages) in accordance with the

24   Cash Collateral Budgets, and (ii) at the final hearing, set not less than 14 days after the interim

25   hearing, final authority to use cash collateral for the next 8 to 15 weeks.

26   _____

27   [8] Capitalized terms in this section of this declaration not otherwise defined shall have the meaning ascribed
to them in the Cash Collateral Motion.

28

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

ASH\ 2657706.8

102.    The First Budget (<u>Exhibit 1</u> to the Appendix of Exhibits) is based upon securing debtor-in-possession financing to provide interim cash liquidity to operate the business, underwrite and place news loans, and provide adequate protection payments to the senior lender post-petition.  With the ability to continue operations, the Debtor contemporaneously will be seeking a new senior credit facility to take-out JGB.  Post-petition operational expenses are based upon current service contracts, payroll based upon employee compensation agreements, and adequate protection payments identified in the First Budget are based upon the current loan agreement terms.

103.    The Alternate Budget (<u>Exhibit 2</u> to the Appendix of Exhibits) is based upon the Debtor not obtaining approval for a DIP loan in the first 8-week period post-petition.  The Alternate Budget provides for the Debtor to continue operations by paying its employees, its key vendors, its required insurances, office lease and necessary administrative fees, until a new credit facility can be secured.

104.    In addition to various categories of general operating expenses, including payments on the Debtor's office space lease, both Cash Collateral Budgets contain line items for U.S. Trustee fees.  As the Cash Collateral Budgets reflect, based on the assumptions underlying the Cash Collateral Budgets, the Debtor will be able to operate post-petition with the use of cash collateral on a cash flow positive basis through the period covered by the respective budgets.

105.    I believe that all payments described in the Cash Collateral Budgets are necessary to maintain and continue the Debtor's operations and to maximize the value of the Estate.  Failure to make payment in accordance with the Cash Collateral Budgets could result in immediate and irreparable harm to the Debtor's operations, the value of the Estate, and the interests of creditors.

106.    The Cash Collateral Budgets reflect that, with the anticipated DIP financing and funds generated from operations, the Debtor will be able to meet operating and administrative expenses for at least the next 15 weeks, and would be able to operate without the currently contemplated DIP Financing, if necessary, for at least the next eight weeks.  Further, the Debtor believes that the Cash Collateral Budgets and the assumptions underlying the budgets are reasonable and appropriate under the circumstances.

ASH\2657706.8

25

1

2    **The Debtor's Need For Cash Collateral**

3        107.    I believe that the Debtor's use of cash collateral as set forth in the Cash Collateral

4    Budgets, as well as the release of the First Associates Funds, is necessary in order to allow the

5    Debtor to move forward with its contemplated reorganization.  The Debtor's uninterrupted access

6    to cash is critical to maintaining operations.  With certain expenses requiring the use of cash

7    collateral due this week and each of the following budgeted weeks thereafter, and given the

8    upcoming holidays starting next week, during which the Court likely is dark and parties may be

9    unavailable, the Debtor seeks an emergency hearing on this Motion this week (and, preferably, no

10    later than this Thursday).  The Debtor relies on the consumer receivables for operating expenses,

11    including servicing the active loan portfolio with First Associates.

12        108.    In light of JGB's excessive collateral coverage, it would be more beneficial and

13    equitable if the entirety of the First Associates Funds were released to the Debtor so that it can

14    more effectively service its loan portfolio, including the non-performing loan portfolio.  Due to

15    extremely tight cash flow, the Debtor does not have the resources to maximize collection efforts

16    on its $1.9 million non-performing loan portfolio absent release of those funds and use of cash

17    collateral.

18        109.    If the Debtor is not permitted to access any funds collected from its loan portfolios,

19    including the defaulting loan accounts, or the First Associates Funds (those currently held and

20    future collections) are not released to the Debtor, the Debtor will essentially be forced out of

21    business.  This is especially true if the Debtor is unable to obtain the DIP financing as currently

22    contemplated and is not able to use cash collateral.  Therefore, absent an immediate hearing and

23    entry of an order granting this Motion, the Debtor would not have access to sufficient cash to pay

24    ordinary and necessary expenses essential to continuing its operations, which, in turn, would

25    irreparably jeopardize the Debtor's prospects for a successful reorganization and/or its efforts to

26    maximize the value of the Estate for the benefit of creditors.

27

28

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**Proposed Adequate Protection**

110.    I believe that JGB is more than adequately protected by its security interests and the abundant and diverse sources of collateral securing the loan.  With an asserted outstanding balance of approximately $6,198,402.78[9] (the Debtor's total secured debt), secured with collateral valued at approximately $14,600,000 ($12.1 million in Watermark Property and approximately $2.5 million in loan receivables), JGB enjoys an enormous equity cushion that adequately protects its interest in any cash collateral.  Indeed, JGB is over collateralized for its loan and it faces absolutely no risk from the Debtor's use of cash collateral.

111.    Moreover, I believe JGB will be further protected by a combination of: (a) the continued operation of the Debtor's business, including servicing and collecting on its loans and consequent reduction of JGB's outstanding debt, which will preserve the value of JGB's collateral; (b) periodic adequate protection payments to JGB as set forth in the First Budget (assuming DIP financing is procured as reflected in the First Budget); and (c) replacement liens on post-petition receivables and proceeds from existing loans to extent that: (i) the respective pre-petition security interests of JGB is valid, enforceable, properly perfected, and unavoidable; and (ii) the Debtor's use of cash collateral results in diminution in the value of JGB's collateral.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on December __17__, 2018, at Los Angeles, California.

David Redlener

---

[9] Nothing herein should be construed as the Debtor's concession to this asserted outstanding amount.