| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| David S. Kupetz (CA Bar No. 125062)<br> dkupetz@sulmeyerlaw.com<br>Asa S. Hami (CA Bar No. 210728)<br> ahami@sulmeyerlaw.com<br>Claire K. Wu (CA Bar No. 295966)<br> ckwu@sulmeyerlaw.com<br>SulmeyerKupetz, A Professional Corporation<br>333 South Grand Ave., Suite 3400<br>Los Angeles, California 90071-1406<br>Telephone: 213.626.2311 / Facsimile: 213.629.4520<br><br>☐ *Movant(s) appearing without an attorney*<br>☒ *Attorney for Movant(s)* Debtor and Debtor in Possession One Way Loans, LLC, dba PowerLend | |

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA -LOS ANGELES DIVISION**

| In re:<br><br>ONE WAY LOANS, LLC, a California limited liability company, d/b/a POWERLEND,<br><br><br><br><br><br><br>Debtor(s). | CASE NO.: 2:18-bk-24572-SK<br>CHAPTER: 11<br><br>**DECLARATION THAT NO PARTY REQUESTED A HEARING ON MOTION LBR 9013-1(o)(3)**<br><br>[No Hearing Required] |
|---|---|

1.  I am the ☐ Movant(s) or ☒ attorney for Movant(s) or ☐ employed by attorney for Movant(s).

2.  On (*date*): June 28, 2019 , Movant(s) filed a motion or application (Motion) entitled:    DEBTOR'S MOTION FOR ORDER AUTHORIZING REJECTION OF LOAN SERVICING AGREEMENT WITH FIRST ASSOCIATES LOAN SERVICING, LLC

3.  A copy of the Motion and notice of motion is attached to this declaration.

4.  On (*date*): June 28, 2019 , Movant(s), served a copy of ☐ the notice of motion or ☒ the Motion and notice of motion on required parties using the method(s) identified on the Proof of Service of the notice of motion.

5.  Pursuant to LBR 9013-1(o), the notice of motion provides that the deadline to file and serve a written response and request for a hearing is 14 days after the date of service of the notice of motion, plus 3 additional days if served by mail, or pursuant to F.R.Civ.P. 5(b)(2)(D) or (F).

6.  More than  17   days have passed after Movant(s) served the notice of motion.

7.  I checked the docket for this bankruptcy case and/or adversary proceeding, and no response and request for hearing was timely filed.

8.  No response and request for hearing was timely served on Movant(s) via Notice of Electronic Filing, or at the street address, email address, or facsimile number specified in the notice of motion.

2676140v1   This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2016*                                    Page 1                    **F 9013-1.2.NO.REQUEST.HEARING.DEC**

American LegalNet, Inc.
www.FormsWorkFlow.com

9.   Based on the foregoing, and pursuant to LBR 9013-1(o), a hearing is not required.

Movant(s) requests that the court grant the motion and enter an order without a hearing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


**Sulmeyer**Kupetz, APC


Date: July 16, 2019                    /s/ Claire K. Wu
                                       Signature


                                       Claire K. Wu
                                       Printed name

2676140v1  This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

December 2016                          Page 2                    F 9013-1.2.NO.REQUEST.HEARING.DEC

American LegalNet, Inc.
www.FormsWorkFlow.com

# EXHIBIT A

David S. Kupetz (CA Bar No. 125062)
  *dkupetz@sulmeyerlaw.com*
Asa S. Hami (CA Bar No. 210728)
  *ahami@sulmeyerlaw.com*
Claire K. Wu (CA Bar No. 295966)
  *ckwu@sulmeyerlaw.com*
**Sulmeyer**Kupetz
A Professional Corporation
333 South Grand Ave., Suite 3400
Los Angeles, California  90071-1406
Telephone: 213.626.2311
Facsimile: 213.629.4520

Attorneys for Debtor and Debtor in Possession
One Way Loans, LLC, d/b/a PowerLend

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION**

| | |
|---|---|
| In re | Case No. 2:18-bk-24572-SK |
| ONE WAY LOANS, LLC, a California limited liability company, d/b/a POWERLEND, | Chapter 11 |
| Debtor. | **DEBTOR'S MOTION FOR ORDER AUTHORIZING REJECTION OF LOAN SERVICING AGREEMENT WITH FIRST ASSOCIATES LOAN SERVICING, LLC; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF DAVID REDLENER IN SUPPORT THEREOF** |
| | [No hearing required unless requested] |

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA, 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

ASH\ 2675534v1

1  **TO THE HONORABLE SANDRA R. KLEIN, UNITED STATES BANKRUPTCY**

2  **JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND OTHER PARTIES IN**

3  **INTEREST:**

4  **MOTION**

5  One Way Loans, LLC, d/b/a PowerLend, the debtor and debtor in possession in the above-

6  captioned bankruptcy case (the "Debtor"), hereby moves this Court, pursuant to 11 U.S.C. § 365(a),

7  for an order authorizing the Debtor's rejection of its "Loan Servicing Agreement," dated as of

8  January 15, 2018 (the "Servicing Agreement"), with First Associates Loan Servicing, LLC ("First

9  Associates"), effective as of entry of the order granting this motion (the "Motion").[1]

10  The Motion is made pursuant to 11 U.S.C. § 365(a) on the grounds that the Servicing

11  Agreement is an executory contract that has become burdensome to the Debtor and the bankruptcy

12  estate (the "Estate").  As discussed in more detail below, the monthly minimum fees charged by

13  First Associates under the Servicing Agreement to service the Debtor's performing loans is

14  excessive in relation to the amount collected on such loans.  Moreover, given the relatively small

15  size of the Debtor's existing loan portfolio, the Debtor is capable of servicing the loans internally

16  and no longer requires the services of First Associates.  As a result, in the exercise of its business

17  judgment, the Debtor believes rejection of the Servicing Agreement and having the loans "de-

18  boarded" from First Associates is in the best interests of the Debtor, the Estate, and creditors.

19  This Motion is based on the Motion, the accompanying memorandum of points and

20  authorities, the declaration of David Redlener, any exhibits thereto, the concurrently-filed notice of

21  this Motion and such other evidence and argument that may be presented to the Court prior to or at

22  any hearing that may be requested on the Motion.

23  / / /

24  / / /

25  / / /

26  ─────────────────

27  [1] To the extent necessary, this Motion shall serve as notice of the Debtor's termination of the Servicing
Agreement.

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1     **WHEREFORE**, the Debtor respectfully requests that this Court enter an order: (1) granting

2    the Motion; (2) authorizing the Debtor to reject the Servicing Agreement, effective as of entry of the

3    order on this Motion; and (3) providing such other or further relief as is proper.

4    Dated:  June 28, 2019          **Sulmeyer**Kupetz
                       A Professional Corporation

7                By:  */s/ Asa S. Hami*
                       Asa S. Hami
                       Attorneys for Debtor and Debtor in Possession
                       One Way Loans, LLC, d/b/a/ PowerLend

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**MEMORANDUM OF POINTS AND AUTHORITIES**

The Debtor hereby submits the following memorandum of points and authorities in support of the foregoing motion (the "Motion").[2]

**I.**

**FACTS**

**A.      The Debtor And Its Bankruptcy Filing**

The Debtor, a California limited liability company, dba PowerLend, was founded on April 11, 2017, in California.  The Debtor operates an online subprime small-loan consumer finance business in the State of California.

On December 17, 2018, the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing this case.  The Debtor continues to operate its business and manage its affairs as a debtor in possession in this case.

**B.      The Servicing Agreement**

On or about January 15, 2018, the Debtor and First Associates entered the Servicing Agreement.  A true and correct copy of the Servicing Agreement is attached to the accompanying declaration of David Redlener as Exhibit 1.[3]  Since then, First Associates has been servicing the Debtor's active loan accounts under the Servicing Agreement from the time a loan is "boarded" with First Associates.  Under the Servicing Agreement, First Associates is designated as the exclusive servicer of loans originated, services, managed, or purchased by the Debtor.  First Associates does *not* service the Debtor's non-performing loans; the Debtor services those loans itself.

Under the Servicing Agreement, although First Associates establishes and maintains a

_____

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

[3] The version of Exhibit "B" attached to Exhibit 1 to the Redlener Declaration is not the version the parties executed, with the version executed and effective containing a slightly different fee schedule.  Relevant for purposes of this Motion is that the minimum monthly fee schedule in both version (including the version attached) is identical.  The Debtor is not attaching the version executed solely out of an abundance of caution given that most pages of it are marked "confidential."

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

servicing file for each loan, ownership of each such servicing file vests in the Debtor, with First Associates retaining and maintaining it, in trust, only in a custodial capacity for the Debtor's benefit. The Debtor currently has approximately 117 active loan accounts with First Associates.

As of the Petition Date, pursuant to the Servicing Agreement, payments from borrowers under these active loans are deposited into a First Associates client trust deposit account that it maintains. All such proceeds, less First Associates's fees and other charges, are thereafter transmitted to a "Deposit Account" owned and maintained by the Debtor.

The particular schedule of fees First Associates charges the Debtor under the Servicing Agreement is set forth in Exhibit "B" to the Servicing Agreement (Exhibit 1).[4] As set forth therein, First Associates charges the Debtor a minimum monthly service fee that increases as the term of the Servicing Agreement continues. More specifically: (a) between months 1 to 3, the minimum monthly service fee was $7,500; (b) between months 4-12, the minimum monthly service fee was $10,000; and (c) from month 13 forward, the minimum monthly service fee has been and will continue to be $20,000.[5]

The Servicing Agreement currently is in month 17. Therefore, for the past four months, First Associates has been deducting a *minimum* monthly service fee of $20,000 from all proceeds collected on active loans it services. Absent rejection of the Servicing Agreement, First Associates will continue to charge this minimum monthly service fee from all collections. This does not include the various other fees and charges identified in the fee schedule and any other portions of the Servicing Agreement.

---

[4] See previous footnote.

[5] The Servicing Agreement does not have a fixed term. The only provision addressing the length of time under which the Servicing Agreement is effective simply states that First Associates is appointed to service the loan "[f]rom and after the Effective Date and until the earlier of: (i) such date all Loans become Liquidated Loans; or (ii) this Agreement is terminated in accordance with Section 6.01 [of the Servicing Agreement]." Servicing Agreement, § 2.01(a). A "Liquidated Loan" is a "Loan that has been liquidated, whether by way of a payment in full, a disposition, a refinance, a compromise, a charge-off as a Charged Off Loan or any other means of liquidation of such Loan." *Id.*, § 1.01 ("Liquidated Loan").

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**C.**    **Need to Reject The Servicing Agreement**

1

2        In the exercise of its business judgment, the Debtor has determined that rejection of the

3    Servicing Agreement is in the best interests of the Debtor, the Estate, creditors, and this case in

4    general.  The Debtor is developing its exit strategy from this case based on the Debtor's present

5    financial condition and the overall status and stage of this case, which strategy requires the Debtor

6    to minimize costs as much as possible and realize the greatest return on its loan portfolio.

7    Rejection of the Servicing Agreement, "de-boarding" of the loans, and allowing the Debtor to

8    service the loans internally is critical to the Debtor's efforts to achieve these goals.

9        Since February 2019, First Associates has been charging the Debtor a minimum monthly

10    service fee of $20,000.  This fee is excessive for the Debtor given the current size of the Debtor's

11    performing loan portfolio.  The Debtor projects that, based on the amount collected on a monthly

12    basis from the performing loans and the current fee structure under the Servicing Agreement: (a)

13    between now and November 2019, the Debtor will net an aggregate of only approximately

14    $59,780 (estimated) on the loans First Associates is servicing; and (b) beginning November 2019,

15    the fees First Associates charges will match or exceed the amount collected such that the Debtor

16    will receive none of the loan funds collected.

17        As a result, at this point, continued maintenance of the Servicing Agreement is detrimental

18    to the Debtor, the Estate, and its creditors.  Moreover, the Debtor no longer needs the services of

19    First Associates.  The Debtor is fully capable of servicing the loans on its own.  The Debtor

20    already services its non-performing loans, and has the capacity to service the performing loans

21    given the current relatively small size of the existing portfolio.

22        Therefore, the Debtor seeks to reject the Servicing Agreement to have the loans "de-

23    boarded" to allow the Debtor to service the loans on its own.  Allowing the Debtor to reject the

24    Services Agreement and serve the loans internally will provide the Debtor with significant cost

25    savings and allow the Debtor to realize significantly more value from the loans.  In stark contrast

26    to the approximately $59,780 the Debtor is projected to realize from the performing loans through

27    November 2019 if the Servicing Agreement is not rejected and First Associates continues to

28    service the loans, the Debtor estimates it will recover, at least, over $205,000 from those same

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

ASH\ 2675534v1                                    5

1    loans during that period if the agreement is rejected and the Debtor begins services the loans

2    internally.

3                                                **II.**

4              **THE COURT SHOULD AUTHORIZE THE DEBTOR'S REJECTION OF THE**

5                                    **SERVICING AGREEMENT**

6    **A.    Standard**

7            Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the

8    court's approval, may assume or reject any executory contract . . . of the debtor." "In making its

9    determination, a bankruptcy court need engage in only a cursory review of a [debtor-in-

10   possession]'s decision to reject the contract. Specifically, a bankruptcy court applies the business

11   judgment rule to evaluate a [debtor-in-possession]'s rejection decision. *Agarwal v. Pomona Valley*

12   *Med. Group, Inc. (In re Pomona Valley Med. Group, Inc.)*, 476 F.3d 665, 670 (9th Cir. 2007)

13   (multiple citations omitted).

14           In "defin[ing] the contours of the business judgment rule in the bankruptcy context," the

15   Ninth Circuit Court of Appeals explained as follows:

16                   [C]ourts are no more equipped to make subjective business
                     decisions for insolvent business[ed] than they are for solvent
17                   businesses, so we have no difficulty concluding that its formulation
                     in corporate litigation is also appropriate here. [Citation omitted].
18
                     Thus, in evaluating the rejection decision, the bankruptcy court
19                   should presume that the debtor-in-possession acted prudently, on an
                     informed basis, in good faith, and in the honest belief that the action
20                   taken was in the best interests of the bankruptcy estate. [Citations
                     omitted].  It should approve the rejection of an executory contract
21                   under § 365(a) unless it finds that the debtor-in-possession's
                     conclusion that rejection would be "advantageous is so manifestly
22                   unreasonable that it could not be based on sound business judgment,
                     but only on bad faith, or whim or caprice." [Citation omitted].
23
     *Id.* The Court's determination to authorize rejection of an executory contract is reviewed for clear
24
     error. *Id.*
25
     **B.    Rejection of The Servicing Agreement Represents The Debtor's Proper Exercise of**
26
            **Its Business Judgment**
27
             As noted above, the Debtor is developing its exit strategy from this case based on the
28

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  present circumstances.  That strategy requires the Debtor to minimize costs as much as possible

2  and realize the greatest return on its loan portfolio.  Rejection of the Servicing Agreement will

3  help achieve that goal.

4       First Associates currently is charging, and if the Servicing Agreement is not rejected and

5  the loans are not "de-boarded," will continue to charge, a *minimum* monthly service fee of

6  $20,000.  This fee is excessive for the Debtor given the current size of the Debtor's performing

7  loan portfolio.

8       With this fee structure, the the Debtor projects that: (a) between now and November 2019,

9  the Debtor will net an aggregate of only approximately $59,780 (estimated) on the loans First

10  Associates is servicing; and (b) as of November 2019, the fees First Associates charges will match

11  or exceed the amount collected such that the Debtor will receive none of the loan funds collected.

12  As a result, at this point, the Debtor believes continued maintenance of the Servicing Agreement is

13  detrimental to the Debtor, the Estate, and its creditors.

14       Instead, the Debtor believes rejection of the Servicing Agreement and "de-boarding" the

15  loans is in the best interest of the Debtor, the Estate, creditors, and this case.  This will allow the

16  Debtor to service the loans on its own, which it is fully capable of doing at this time.

17       The Debtor already services its non-performing loans, and has the capacity to service the

18  performing loans given the current relatively small size of the existing portfolio.  Allowing the

19  Debtor to reject the Services Agreement and servicing the loans internally will provide the Debtor

20  with significant cost savings and allow the Debtor to realize significantly more value from the

21  loans.  In stark contrast to the approximately $59,780 the Debtor is projected to realize from the

22  performing loans through November 2019 if the Servicing Agreement is not rejected and First

23  Associates continues to service the loans, the Debtor estimates it will recover over $205,000 from

24  those same loans if the agreement is rejected and the Debtor services the loans internally.

25  / / /

26  / / /

27  / / /

28  / / /

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

ASH\ 2675534v1                    7

1

### III.

2

### CONCLUSION

3

Based on the foregoing, the Court should grant the Motion.

4

5

Dated:  June 28, 2019

**Sulmeyer**Kupetz
A Professional Corporation

6

7

8

By:    */s/ Asa S. Hami*
_____
Asa S. Hami

9

Attorneys for Debtor and Debtor in Possession
One Way Loans, LLC, d/b/a/ PowerLend

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

ASH\ 2675534v1

8

### DECLARATION OF DAVID REDLENER[6]

I, David Redlener, declare:

1.      I am one of the co-founders, and am the Chief Executive Officer, of One Way Loans, LLC, a California limited liability company, d/b/a PowerLend (the "Debtor").

2.      I am an attorney, and oversee the operations, procedures, and strategic growth initiatives of the Debtor.  As CEO of the Debtor, I have, subject to the control and oversight of the Debtor's Manager and the Board of Directors, general and active supervision and management over the business of the Debtor and over its several officers, assistants, agents, and employees.

3.      As a founding member of the Debtor, and based on my position with the Debtor and my overall experience, I am extremely familiar with, and have an intimate knowledge of, the Debtor's operations, cash position, financial condition, and all other aspects of the Debtor and its business, as well as the consumer lending industry in general.

4.      I submit this declaration in support of the Motion.

5.      The Debtor, a California limited liability company, dba PowerLend, was founded on April 11, 2017, in California.  The Debtor operates an online subprime small-loan consumer finance business in the State of California.

6.      On December 17, 2018, the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing this case.  The Debtor continues to operate its business and manage its affairs as a debtor in possession in this case.

7.      On or about January 15, 2018, the Debtor and First Associates entered the Servicing Agreement.  A true and correct copy of the Servicing Agreement is attached hereto as Exhibit 1.[7] Since then, First Associates has been servicing the Debtor's active loan accounts under the Servicing

---

[6] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the motion to which this declaration is attached (the "Motion").

[7] The version of Exhibit "B" attached to Exhibit 1 hereto is not the version the parties executed, with the version executed and effective containing a slightly different fee schedule.  Relevant for purposes of this Motion is that the minimum monthly fee schedule in both version (including the version attached) is identical.  The Debtor is not attaching the version executed solely out of an abundance of caution given that most pages of it are marked "confidential."

Sulmeyer Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    Agreement from the time a loan is "boarded" with First Associates.  Under the Servicing

2    Agreement, First Associates is designated as the exclusive servicer of loans originated, services,

3    managed, or purchased by the Debtor.  First Associates does *not* service the Debtor's non-

4    performing loans; the Debtor services those loans itself.

5        8.    Under the Servicing Agreement, although First Associates establishes and maintains

6    a servicing file for each loan, ownership of each such servicing file vests in the Debtor, with First

7    Associates retaining and maintaining it, in trust, only in a custodial capacity for the Debtor's benefit.

8    The Debtor currently has approximately 117 active loan accounts with First Associates.

9        9.    As of the Petition Date, pursuant to the Servicing Agreement, payments from

10    borrowers under these active loans are deposited into a First Associates client trust deposit account

11    that it maintains.  All such proceeds, less First Associates's fees and other charges, are thereafter

12    transmitted to a "Deposit Account" owned and maintained by the Debtor.

13        10.    The particular schedule of fees First Associates charges the Debtor under the

14    Servicing Agreement is set forth in Exhibit "B" to the Servicing Agreement (Exhibit 1).[8]  As set

15    forth therein, First Associates charges the Debtor a minimum monthly service fee that increases as

16    the term of the Servicing Agreement continues.  More specifically: (a) between months 1 to 3, the

17    minimum monthly service fee was $7,500; (b) between months 4-12, the minimum monthly service

18    fee was $10,000; and (c) from month 13 forward, the minimum monthly service fee has been and

19    will continue to be $20,000.

20        11.    The Servicing Agreement currently is in month 17.  Therefore, for the past four

21    months, First Associates has been deducting a *minimum* monthly service fee of $20,000 from all

22    proceeds collected on active loans it services.  Absent rejection of the Servicing Agreement, I

23    understand that First Associates will continue to charge this minimum monthly service fee from all

24    collections.  This does not include the various other fees and charges identified in the fee schedule

25    and any other portions of the Servicing Agreement.

26    _____

27    [8] See previous footnote.

28

Sulmeyer Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

12.      In the exercise of the Debtor's business judgment, I have determined that rejection of the Servicing Agreement is in the best interests of the Debtor, the Estate, creditors, and this case in general.  The Debtor is developing its exit strategy from this case based on the Debtor's present financial condition and the overall status and stage of this case, which strategy requires the Debtor to minimize costs as much as possible and realize the greatest return on its loan portfolio.  I believe that rejection of the Servicing Agreement, "de-boarding" of the loans, and allowing the Debtor to service the loans internally is critical to the Debtor's efforts to achieve these goals.

13.      Since February 2019, First Associates has been charging the Debtor a minimum monthly service fee of $20,000.  This fee is excessive for the Debtor given the current size of the Debtor's performing loan portfolio.  Based on projections I generated, I estimate that, based on the amount collected on a monthly basis from the performing loans and the current fee structure under the Servicing Agreement: (a) between now and November 2019, the Debtor will net an aggregate of only approximately $59,780 (estimated) on the loans First Associates is servicing; and (b) beginning November 2019, the fees First Associates charges will match or exceed the amount collected such that the Debtor will receive none of the loan funds collected.

14.      As a result, at this point, I believe the continued maintenance of the Servicing Agreement is detrimental to the Debtor, the Estate, and its creditors.  Moreover, I do not believe the Debtor needs the services of First Associates any longer.  The Debtor is fully capable of servicing the loans on its own.  The Debtor already services its non-performing loans, and has the capacity to service the performing loans given the current relatively small size of the existing portfolio.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1      15.    I believe that allowing the Debtor to reject the Services Agreement and service the

2 loans internally will provide the Debtor with significant cost savings and allow the Debtor to realize

3 significantly more value from the loans.  In stark contrast to the approximately $59,780 the Debtor is

4 projected to realize from the performing loans through November 2019 if the Servicing Agreement

5 is not rejected and First Associates continues to service the loans, I estimate the Debtor will recover,

6 at least, over $205,000 from those same loans during that period if the agreement is rejected and the

7 Debtor begins services the loans internally.

8      I declare under penalty of perjury that the foregoing is true and correct and that this

9 declaration was executed on June 28, 2019, at New York, New York.

David Redlener

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA, 90071-1406
TEL 213.626.2311 · FAX 213.629.4520

ASH\ 2675534v1

12

# EXHIBIT 1

LOAN SERVICING AGREEMENT

dated as of January 15, 2018

between

FIRST ASSOCIATES LOAN SERVICING, LLC,

as Servicer,

and

One Way Loans, LLC dba Powerlend,

as Client

(Unsecured Consumer Loans)

EXHIBIT 1   -   13

This LOAN SERVICING AGREEMENT (this "Agreement"), dated as of January 15th, 2018 (the "Effective Date"), is made by and between First Associates Loan Servicing, LLC, a Delaware limited liability company, as servicer (together with its successors and assigns, "Servicer"), and One Way Loans, LLC dba Powerlend, a California limited liability company (together with its successors and assigns, "Client").

## RECITALS

WHEREAS, Client owns certain unsecured consumer loans; and

WHEREAS, Servicer has agreed to service the loans owned by Client or to which Client has the right to service or direct servicing, and Servicer and Client desire to set forth the terms and conditions under which Servicer will service such loans on behalf of Client.

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, and for other good and reasonable consideration, the receipt and adequacy of which is hereby acknowledged, Servicer and Client hereby agree as follows:

## ARTICLE I
### DEFINITIONS

Section 1.01.    Definitions.  The following terms are defined as follows:

"AAA" has the meaning set forth in Section 4.02(h).

"Accepted Servicing Practices" means, with respect to each Loan, the loan servicing practices and procedures set forth on Exhibit A.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with, such Person.  As used in this definition of Affiliate, the term "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of a Person, whether through ownership of such Person's voting securities, by contract or otherwise, and the terms "affiliated", "controlling" and "controlled" have correlative meanings.

"Agreement" means this Loan Servicing Agreement, including all exhibits and schedules attached hereto or delivered in connection herewith, as such agreement may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Ancillary Fees" means any insufficient fund charges and other administrative fees, including, without limitation, late fees, extension processing fees, NSF fees, payment processing fees and other similar fees imposed in relation to servicing activities in the amounts consistent with Applicable Law, the Loan Documents and this Agreement, but in all event not including or duplicative of (i) Servicing Fees, (ii) origination fees, (iii) payments of principal and interest, (iv) payments of default interest or (v) Collection Fees.  Servicer shall be entitled to receive all Ancillary Fees collected or due with respect to the Loans, which amounts will be paid over to Servicer from proceeds of the related Loans.

"Applicable Laws" means all federal, state and local laws, statutes, rules, regulations, court orders and decrees, administrative orders and decrees, and other legal requirements of any and every conceivable type applicable to Servicer's servicing any Loan, and all requirements of any Regulatory Authority having jurisdiction over Servicer, as any such laws, statutes, regulations, orders or requirements may be amended and in effect from time to time during the term of this Agreement.

EXHIBIT 1  -  14

"Bankruptcy Loan" means any Charged Off Loan for which voluntary proceedings under Chapter 13 of the Bankruptcy Code have been commenced by the applicable Borrower.

"Borrower" means, with respect to any Loan, each of the borrower of such Loan and each other obligor (including any co-signor or guarantor) of the payment obligation for such Loan.

"Business Day" means any day other than (i) a Saturday, (ii) a Sunday, (iii) any day that is a legal holiday under the laws of the State of California, or (iv) any day on which a bank located in the State of California is authorized or permitted to close for business.

"Charged Off Loan" means any Loan (i) that has been due for at least 120 consecutive days or (ii) that Servicer otherwise deems uncollectible, in accordance with the Servicing Standard.

"Client" has the meaning set forth in the recitals to this Agreement.

"Client Indemnified Parties" has the meaning set forth in Section 4.03(a).

"Code" means the Internal Revenue Code of 1986, as amended.

"Collection Account" means Servicer's client trust deposit account segregated from Servicer's or its Affiliates' own funds and general assets maintained by Servicer at California Bank & Trust or Wells Fargo, N.A. for the benefit of Servicer's clients, or such other additional or replacement account or accounts segregated from Servicer's or its Affiliates' own funds and general assets as may from time to time be maintained by Servicer for the benefit of Servicer's clients.

"Collection Agent" means any Person to whom Servicer transfers servicing and collection activities for a Delinquent Loan or Charged Off Loan.

"Collection Fees" means any fees or charges payable to a Collection Agent in connection with its servicing or collection efforts with respect to any Delinquent Loan or Charged Off Loan.

"Confidential Information" means:

(i)    information regarding Discloser's customers, capital structure, financial condition and results of operations, financial and risk models, projections, loss and return estimates, compliance and risk management systems, loan pricing, customer fees and charges, vendor pricing, organizational structure, employee compensation and benefits, stock and other deferred compensation plans, employee and stockholder agreements, as well as non-public information regarding pending or threatened litigation or regulatory matters involving Discloser;

(ii)    information regarding Discloser's inventions, discoveries, developments, improvements, processes, systems, methods, devices, patents, patent applications, trademarks, intellectual property, know-how, trade secrets, instruments, materials, products, programs, techniques, designs, research/development activities and plans, data, specifications, computer programs/code (object or source), costs of production, promotional methods, marketing plans/strategies, clinical plans, business opportunities, vendors, customer lists, and Client's credit policy;

(iii)    with respect to Client, as Discloser, any Customer NPPI;

(iv)    this Agreement and any other documents, instruments or agreements entered into or delivered in connection herewith or therewith;

(v)    information: (A) that is marked "Confidential", "Proprietary" or in some similar way; (B) that Discloser identifies as Confidential Information when disclosed or within a reasonable time afterwards; or (C) that Recipient knows or should know to be confidential or proprietary to Discloser; and

EXHIBIT 1  -  15

(vi)    any third party information with respect to which Discloser is subject to restrictions on disclosure or use based on the confidential nature of such information; provided, however, that "Confidential Information" does not include any information:

(A)    that was publicly known or made generally available to the public prior to its disclosure hereunder;

(B)    that becomes publicly known or is made generally available to the public following its disclosure hereunder through no wrongful act or omission of Recipient or anyone to whom Recipient has disclosed such information;

(C)    that Recipient rightfully possessed without any duty of confidentiality prior to its disclosure hereunder;

(D)    that was independently developed by Recipient without use of or reference to any information received by or on behalf of Recipient hereunder; or

(E)    that Recipient rightfully obtained from a third party, where such third party was not subject to any restrictions on disclosure with respect to such information.

"Continued Errors" has the meaning set forth in Section 2.01(c).

"Customer NPPI" means any Non-Public Personal Information of any actual or potential Borrower or other customer of Servicer.

"Debtor Relief Laws" means any of: (i) the United States Bankruptcy Code and (ii) all other applicable liquidation, conservatorship, bankruptcy, moratorium, arrangement, receivership, insolvency, reorganization, suspension of payments, adjustment of debt, marshalling of assets or similar debtor relief laws of the United States, any state or any foreign country from time to time in effect affecting the rights of creditors generally.

"Delinquent Loan" means a Loan that is past due past any applicable grace period.

"Deposit Account" means an account specified by Client which is owned by Client or maintained for the benefit of Client.

"Discloser" has the meaning set forth in Section 5.01.

"Due Date" means the day of the calendar month on which the Scheduled Payment is due on a Loan, exclusive of any grace period.

"Early Termination Notice" has the meaning set forth in Section 6.01(b).

"Early Termination Payment" means an amount equal to (i) the past 12 months of Servicing Fees and Ancillary Fees paid to Servicer, or (ii) if the Agreement is terminated prior to the first anniversary of the Effective Date, the past 3 months of Servicing Fees and Ancillary Fees paid to Servicer multiplied by four.

"Errors" has the meaning set forth in Section 2.01(c).

"Extraordinary Servicing Activities" means activities relating to the realization of Proceeds, the enforcement of the obligations of Borrowers or the defense of the rights of the owners of Loans that are (i) not identified as Accepted Servicing Practices and (ii) are (A) outside of the scope of servicing activities undertaken by Servicer or its Affiliates in the ordinary course of servicing consumer loans for its or their own account or for the account of their respective customers, clients, assigns and transferees, or (B) are reasonably likely to create or result in Materially Increased Liabilities, including the appearance

in, initiation of or prosecution or defense of legal actions, arbitral proceedings, bankruptcy proceedings or similar adversarial proceedings, or the preparation of or response to pleadings, filings, motions, discovery requests, subpoenas or other similar activities ancillary thereto.

"FATCA Provisions" means Sections 1471 through 1474 of the Internal Revenue Code.

"FTC" means the Federal Trade Commission.

"Indemnified Parties" has the meaning set forth in Section 5.03.

"Insolvency Event" means, with respect to any Person, if any of the following events shall occur: (i) such Person shall file a petition or commence a Proceeding (A) to take advantage of any Debtor Relief Law or (B) for the appointment of a trustee, conservator, receiver, liquidator or similar official for or relating to such Person or all or substantially all of its property, or for the winding up or liquidation of its affairs, (ii) such Person shall consent or fail to object to any such petition filed or Proceeding commenced against or with respect to it or all or substantially all of its property, or any such petition or Proceeding shall not have been dismissed or stayed within sixty 60 days of its filing or commencement, or a court, agency or other supervisory authority with jurisdiction shall not have decreed or ordered relief with respect to such petition or Proceeding, (iii) such Person shall admit in writing its inability to pay its debts generally as they become due, (iv) such Person shall make an assignment for the benefit of its creditors, (v) such Person shall voluntarily suspend payment of its obligations, or (vi) such Person shall take any action in furtherance of any of the foregoing.

"Liquidated Loan" means a Loan that has been liquidated, whether by way of a payment in full, a disposition, a refinance, a compromise, a charge-off as a Charged Off Loan or any other means of liquidation of such Loan.

"Liquidation Proceeds" means cash proceeds, if any, received in connection with the liquidation of a Liquidated Loan.

"Loan" means any loan, lease or other installment payment agreement boarded to Servicer by Client.

"Loan Confidential Information" means any Confidential Information contained in a Servicing File.

"Loan Documents" means all documents delivered to Servicer in connection with a Loan.

"Loan Modification" means, with respect to any Loan, any waiver, modification or variance of any term of any Loan or any consent to the postponement of strict compliance with any such term or any other grant of an indulgence or forbearance to the related Borrower.

"Material Adverse Change" means, with respect to a Person, any material adverse change in the business, financial condition, operations or properties of such Person.

"Material Adverse Effect" means, with respect to a Person, (i) a Material Adverse Change with respect to such Person or any of its Affiliates taken as a whole; (ii) a material impairment of the ability of such Person to perform under this Agreement (which impairment cannot be timely cured, to the extent a cure period is applicable); or (iv) a material adverse effect upon the legality, validity, binding effect or enforceability of this Agreement against such Person.

"Materially Increased Liabilities" means any imposition on Servicer of: (i) obligations or duties that are materially different in scope or materially more burdensome (economically or operationally) than

Servicer's express obligations and duties under this Agreement, including in relation to the manner of servicing Loans, reporting (including reporting under the Securities and Exchange Act of 1934 (as amended)), audits and inspections, collections or cash management; (ii) obligations or liabilities in relation to the accuracy or completeness of offering materials in relation to securities offerings or sales by Persons that are not Affiliates of Servicer; (iii) materially increased risk of being subject to or being required to appear in or defend adversarial proceedings initiated by third Persons or investigations or actions on the part of any Regulatory Authority; or (iv) materially increased risk of reputational harm.

"Net Proceeds" means, with respect to a Loan on any date of determination, the Proceeds less any applicable Servicing Compensation and Collection Fees earned and unpaid to date.

"Non-Public Personal Information" has the meaning ascribed to such term in the FTC's Rule regarding Privacy of Consumer Financial Information (16 C.F.R. Part 313).

"Party" means either Servicer or Client and "Parties" means Servicer and Client collectively.

"Pass-through Expenses" means third-party legal expenses, correspondence, mailing costs, jurisdictional fees, title processing, skip tracing, field calls, recovery, travel, payment processing, bank charges and insurance tracking fees incurred by Servicer in connection with servicing the Loans.

"Payment Date" means a date on which any payment of principal and/or interest on a Loan is acknowledged to be paid under the terms of such Loan.

"Person" means any individual, corporation (including a business trust), partnership, joint venture, association, bank, limited liability company, joint-stock company, estate, trust, unincorporated organization, government or any agency or political subdivision thereof, or any other entity.

"Portfolio Interest Exemption" means the exemption from U.S. tax under Section 871(h) or Section 881(c) of the Internal Revenue Code.

"Principal Prepayment" means any payment or other recovery of principal on a Loan that is received in advance of its scheduled Due Date.

"Privacy Laws" has the meaning set forth in Section 5.03(a).

"Proceeding" means any suit in equity, action at law or other judicial or administrative proceeding.

"Proceeds" means, with respect to a Loan, (i) all payments on account of principal on such Loan, including all Principal Prepayments; (ii) all payments on account of interest and fees (including Collection Fees) on such Loan; (iii) all Liquidation Proceeds and other recoveries; and (iv) any other payments on or proceeds of such Loan, including those received or recovered by or through Servicer, any Subcontractor or any Collection Agent.

"Recipient" has the meaning set forth in Section 5.01.

"Regulatory Authority" means any federal, state or local regulatory agency or other governmental agency, department, court, commission, board, bureau, instrumentality or political subdivision thereof, or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case, having jurisdiction over a Party, any Loan or any Borrower.

"Scheduled Payment" means the scheduled weekly, bi-weekly or monthly payment of principal and/or interest on a Loan.

"Servicer" has the meaning set forth in the preamble to this Agreement.

"Servicer Indemnified Parties" has the meaning set forth in Section 4.03(b).

"Servicer Event of Default" has the meaning set forth in Section 6.01(a).

"Servicing Compensation" means the compensation payable to Servicer hereunder consisting of the Servicing Fees and the Supplemental Fees.

"Servicing Fees" means all fees set forth on Exhibit B attached hereto.

"Servicing File" means, with respect to any Loan, the documents, files and records held or maintained by or on behalf of Servicer pertaining specifically to such Loan or the servicing thereof, including, without limitation, computer files, data tapes, books, records, electronic copies of documents, notes and Loan Documents relating to such Loan; it being understood and agreed that all of the items that constitute a Servicing File may only exist in electronic form and, therefore, that no single original of any such item may exist.

"Servicing Period" means, with respect to any Loan, any period beginning on the immediately preceding Payment Date (or in the case of the first such period, the Effective Date) and ending on the day immediately preceding such Payment Date.

"Servicing Rights" means, with respect to any Loan, the rights and interests to service and administer such Loan and the responsibility for performing the servicing functions for such Loan.

"Servicing Standard" has the meaning set forth in Section 3.01(a).

"Subcontractor" means, subject to the terms hereof, any vendor, third party service provider or other Person that is not responsible for the overall servicing (as "servicing" is commonly understood) of Loans but performs one or more discrete functions with respect to Loans under the direction or authority of Servicer.

"Supplemental Fees" means (i) the Ancillary Fees and (ii) the Pass-through Expenses.

"U.S. Financial Institution" means a U.S. Person that is a "financial institution", as such term is defined in 26 C.F.R. 1.1.165-12(c)(1)(iv).

"U.S. Person" means a "United States person", as such term is defined in Section 7701(a)(30) of the Internal Revenue Code.

"Works" has the meaning set forth in Section 5.06.

Section 1.02.    Rules of Construction.

(a)    As used in this Agreement: (i) all references to the masculine gender shall include the feminine gender (and vice versa); (ii) all references to "include," "includes," or "including" shall be deemed to be followed by the words "without limitation"; (iii) references to any law or regulation refer to that law or regulation as amended from time to time and include any successor law or regulation; (iv) references to another agreement, instrument or other document means such agreement, instrument or other document as the same may be amended,

EXHIBIT 1  -  19

restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof; (v) references to "dollars" or "$" shall be to United States dollars unless otherwise specified herein; (vi) unless otherwise specified, all references to days, months or years shall be deemed to be preceded by the word "calendar"; (vii) all references to "quarter" shall be deemed to mean calendar quarter; and (viii) unless otherwise specified, all references to an article, section, subsection, exhibit or schedule shall be deemed to refer to, respectively, an article, section, subsection, exhibit or schedule of or to this Agreement.

(b)    The fact that any Party provides approval or consent shall not mean or otherwise be construed to mean that: (i) either Party has performed any due diligence with respect to the requested or required approval or consent, as applicable; (ii) either Party agrees that the item or information for which the other Party seeks approval or consent complies with any Applicable Laws; (iii) either Party has assumed the other Party's obligations to comply with all Applicable Laws arising from or related to any requested or required approval or consent; or (iv) except as otherwise expressly set forth in such approval or consent, either Party's approval or consent impairs in any way the other Party's rights or remedies under the Agreement, including indemnification rights for any failure to comply with all Applicable Laws.

## ARTICLE II.

### PURCHASER'S ENGAGEMENT OF SERVICER TO PERFORM SERVICING

Section 2.01.    Contract for Servicing; Possession of Servicing Files.

(a)    From and after the Effective Date and until the earlier of: (i) such date all Loans become Liquidated Loans; or (ii) this Agreement is terminated in accordance with Section 6.01, Client appoints and contracts with Servicer as an independent contractor, subject to the terms of this Agreement, for the servicing of such Loan.  Servicer is the owner of the Servicing Rights relating to each Loan serviced by Servicer hereunder, subject to Client's rights hereunder with respect to such Servicing Rights in the event of a Servicer Event of Default hereunder.

(b)    Servicer shall establish and maintain a Servicing File with respect to each Loan in order to service such Loan pursuant to this Agreement.  Ownership of such Servicing File shall vest in Client, and the Servicing File shall be retained and maintained, in trust, by Servicer in a custodial capacity only; provided, however, that Client acknowledges and agrees that Servicer will retain electronic copies of: (i) the Loan Documents for such Loan as well as (ii) any other items, documents, data or information that comprise such Servicing File; provided, further, that subject to Article VI, Servicer will retain the right (A) to use and permit its Affiliates to use the same in the performance of its obligations hereunder and in the conduct of its and its Affiliates' businesses generally (subject to the confidentiality provisions of this Agreement), including, without limitation, to facilitate the acquisition and sale of consumer loans to persons other than Client, and to fulfill the reporting obligations of Servicer and its Affiliates with respect to any such sales, and (B) to use, deliver or release copies of any such data, information or documents, and permit its Affiliates to use, deliver or release copies thereof, to its or their accountants, counsel or advisors, to regulators or other Regulatory Authorities of competent jurisdiction, or to other Persons to the extent necessary and appropriate to respond to subpoenas or other appropriate demands therefor in connection with any action, proceeding, arbitration or investigation in any forum of or before any Regulatory Authority.  Servicer shall mark its records to reflect ownership of the Loans by Client. Except as permitted under this Section 2.01(b), Servicer shall release from its custody the contents of any Servicing File retained by it only to Client or such other Persons as Client may authorize.

(c)    If any error, inaccuracy, omission or incorrect or non-standard practice or procedure (collectively "Errors") exist in any materials delivered to Servicer by any prior servicer of the Loans which cause Servicer to make or continue any Errors (collectively, "Continued Errors"), Servicer

shall have no liability for such Continued Errors; provided, however, that Servicer, agrees to use its commercially reasonable efforts to prevent Continued Errors.  In the event that Servicer becomes aware of Errors or Continued Errors, it shall use its commercially reasonable efforts to reconstruct and reconcile such data and to prevent future Continued Errors.  Servicer shall be entitled to recover its reasonable costs thereby expended.

Section 2.02.    Use of Subcontractors.

Client acknowledges that Servicer may use one or more Subcontractors to assist or facilitate the servicing of the Loans; provided, that the use of a Subcontractor shall not relieve Servicer of any of its obligations hereunder.  Servicer shall remain responsible for any and all acts or omissions of its Subcontractors to the same extent as if such acts or omissions were taken or omitted by Servicer directly.

Section 2.03.    Assistance and Cooperation of Client; Non-Solicitation.

If any actions of Client are necessary or appropriate in connection with the servicing and administration of the Loans hereunder, then upon the request of Servicer, Client shall use its commercially reasonable efforts to perform such actions in a timely manner and to cooperate with and assist Servicer in connection with such actions; provided, however, that Client shall not contact any Borrower, other than in connection with an audit, without the prior written consent of Servicer.  Client shall furnish or cause to be furnished to Servicer in form satisfactory to Servicer all information necessary for Servicer's duties under this Agreement.  During the term of this Agreement and for one year after its termination, neither Client nor any Affiliate of Client shall (a) attempt to induce an employee of Servicer to terminate his or her employment or contract; or (b) hire or enter into a contract for the Services of an employee of Servicer without first obtaining Servicer's written consent.

**ARTICLE III.**

SERVICING OF LOANS

Section 3.01.    Servicer to Service.

(a)    Servicer, as an independent contractor, shall service and administer each Loan from and after the date such Loan is boarded to Servicer with reasonable care using that degree of skill and attention that is (i) deemed commercially reasonable in the unsecured consumer loan servicing industry and (ii) no less than the degree of skill and attention that it uses in relation to its servicing and administration of unsecured consumer loans for the account of its other customers, and, in all cases in accordance with the terms of this Agreement, the Accepted Servicing Practices and Applicable Laws (such standard of care being, the "Servicing Standard"), and Servicer shall have full power and authority, acting alone or through the utilization of Subcontractors, to do any and all things in connection with such servicing and administration as limited by the Servicing Standard.  Servicer shall perform the duties set forth in Exhibit B.

(b)    Servicer may grant, permit or enter into any Loan Modification for any Loan, provided, that such Loan Modification (i) is in accordance with the Servicing Standard and (ii) is determined by Servicer at the time of such modification to be a practical manner to obtain a reasonable recovery from such Loan based upon its prior servicing experience for similar unsecured consumer loans.

(c)    Without limiting the generality of the foregoing, Servicer is hereby authorized and empowered to execute and deliver on behalf of itself and Client, all notices or instruments of satisfaction, cancellation or termination, or of partial or full release, discharge and all other comparable instruments, with respect to the Loans; provided, however, that Servicer shall not be entitled to release, discharge, terminate or cancel any Loan or the related Loan Documents unless (i) Servicer shall have

received payment in full of all principal, interest and fees owed by the Borrower related thereto, or (ii) in the case of a Delinquent Loan, Servicer accepts a short pay or reduced payment of full principal, interest and fees owed on such Loan in accordance with the Servicing Standard.  If reasonably required by Servicer, Client shall furnish Servicer with any powers of attorney and other documents reasonably necessary or appropriate to enable Servicer to carry out its servicing and administrative duties under this Agreement and Servicer shall indemnify and hold Client harmless for any costs, liabilities or expenses incurred by Client in connection with any use of such power of attorney by Servicer or its agents in breach of this Agreement.

(d)     Other than the Pass-through Expenses, Servicer shall pay out of its own funds all expenses incurred in connection with its servicing activities hereunder, including, without limitation, expenses related to enforcement of the Loans and all other fees and expenses; provided, however, that Servicer will not be required to undertake any Extraordinary Servicing Activities unless it shall have received assurances of reimbursement for and indemnification reasonably acceptable to it in relation to the costs, expenses and liabilities attendant to the performance thereof.

(e)     Servicer shall be the exclusive servicer of loans, leases or other installment payment agreements originated, serviced, managed or purchased by Client or Affiliates of Client, or to which Client or Affiliates of Client have the right to service, each of which shall be boarded to Servicer within two (2) Business Days of origination or acquisition.

(f)     Notwithstanding anything herein to the contrary, Servicer shall not be considered in default hereunder or have any liability to Client for any failure to perform if such failure arises out of causes beyond the control of Servicer, to the extent falling into one of the following categories: Acts of God or public enemy, acts of the government acting in any capacity, fires, floods, epidemics, quarantine restrictions, strikes, war, terroristic or criminal acts, civil disturbance, riots, rebellion, freight embargoes, degradation of telephone, computer equipment, software, network based services or other communication service or weather conditions.

Section 3.02.    Collection and Liquidation of Loans.

(a)     Collection of Payments.  Continuously from the Effective Date until the date each Loan becomes a Liquidated Loan or otherwise ceases to be subject to this Agreement, in accordance with the Servicing Standard, Servicer shall use commercially reasonable efforts to collect all Scheduled Payments and any other payments due under each of the Loans when the same shall become due and payable.  Client hereby grants permission to Servicer to service the Loans under the name "PowerLend" and grants permission to Servicer to utilize such proprietary brand identifiers associated with this name. The use of such name under this Agreement shall not cause Servicer to infringe upon any patent, license, copyright or other proprietary, intellectual or property right, or violate any other right (including but not limited to, the right to royalties or license fees) of any person, partnership, corporation or other entity.

(b)     Loss Mitigation.  With respect to any Loan, in accordance with the Servicing Standard, Servicer shall use commercially reasonable efforts to realize upon Loans in such a manner that reasonably attempts to maximize the receipt of principal and interest, including pursuing any Loan Modification pursuant to Section 3.01(b) or pursuing other loss mitigation or other default recovery actions in accordance with the Servicing Standard.

(c)     Charged Off Loans and Delinquent Loans.  Promptly following any Loan becoming a Charged Off Loan, Servicer shall charge off that Loan.  Subject to the Servicing Standard, Servicer may transfer the servicing and collection activities for any Delinquent Loan or Charged Off Loan to a Collection Agent, and Servicer shall be relieved of its ongoing servicing and collection obligations hereunder with respect to such Loan (however, if and when all past due amounts are received with respect to any Delinquent Loan, Servicer shall resume its servicing and collection obligations with respect to such

Loan), except as to the obligation to handle all Proceeds of such Loans in accordance with Section 3.02(c) below. To the extent Servicer receives information from a Collection Agent regarding any Charged Off Loans or Delinquent Loans, Servicer shall include such information in the reports regarding the Loans that are required to be delivered under this Agreement. Neither Servicer nor any Collection Agent shall have the right to sell, assign, transfer, liquidate or otherwise dispose of any Charged Off Loan without the prior written consent of Client except as specifically permitted under this Section 3.02(c).

(d)     Recovery of Charged Off Loans and Bankruptcy Loans. With respect to any Charged Off Loan or Bankruptcy Loan, Servicer and the applicable Collection Agents shall be permitted to accept a payment from the related Borrower of an amount less than outstanding principal balance of such Loan in final satisfaction of such Loan; provided, that such Borrower is unable to pay or settle for the outstanding principal balance of such Loan in full, as reasonably determined by Servicer or the applicable Collection Agent.

Section 3.03.     Deposits to Accounts.

(a)     Servicer shall direct or otherwise cause the applicable Borrower of each Loan to make all payments directly to the Collection Account, and shall direct each Collection Agent to deposit all Proceeds of any Loan received by such Collection Agent directly to the Collection Account. With respect to any Proceeds deposited in the Collection Account, Servicer will cause the applicable Net Proceeds to be remitted to the Deposit Account, less the Servicing Compensation due hereunder, which shall be netted from all payments received in the Collection Account, within five (5) days after the end of each calendar month.

(b)     Without limiting the foregoing, to the extent any Proceeds are received by Servicer, other than remitted directly to the Collection Account, Servicer will cause such Proceeds to be deposited into the Collection Account as promptly as is reasonably practicable and in any event within two (2) Business Days of receipt thereof.

(c)     Client shall be responsible for all fees and charges imposed with respect to the Deposit Account, which fees and charges shall expressly include but not be limited to account fees, money transfer fees and any legal or other fees associated with entering into any control or other agreements covering the Deposit Account.

Section 3.04.     Credit Reporting.

Servicer shall accurately and fully furnish, in accordance with the Fair Credit Reporting Act and its implementing regulations as well as Servicer's own policies and practices, accurate and complete information (e.g., favorable and unfavorable) on its Borrower credit files in its discretion. Client shall assist in any investigations required by the Fair Credit Reporting Act, including, without limitation, any claims pursuant to 15 U.S.C. § 1692e(14).

Section 3.05.     Servicing Compensation.

Servicer and Client acknowledge and agree that, as consideration to Servicer for servicing the Loans subject to this Agreement, Client shall be responsible for paying Servicer the Servicing Compensation under this Agreement during any month or part thereof to the extent Servicer has not netted such Servicing Compensation from Proceeds remitted by a Borrower or a Collection Agent to the Collection Account. Client shall pay outstanding invoices within ten (10) Business Days of receipt or incur monthly interest charges of two percentage points over the current prime interest rate charged by Wells Fargo Bank on any outstanding balance.

# ARTICLE IV.

## REPRESENTATIONS, WARRANTIES AND COVENANTS

Section 4.01.    Representations and Warranties of Servicer.

As a condition to the consummation of the transactions contemplated hereby, as of the Effective Date, Servicer hereby makes the following representations and warranties to Client:

(a)    Servicer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all licenses necessary to carry on its business as now being conducted, and is licensed, qualified and in good standing in each state where the laws of such state require licensing or qualification in order to conduct business of the type conducted by Servicer, except to the extent that the failure to obtain or maintain any such license would not reasonably be expected to have a Material Adverse Effect with respect to Servicer, and in any event Servicer is in compliance with all Applicable Laws to the extent necessary to ensure the enforceability of the terms of this Agreement and its ability to perform its obligations hereunder.

(b)    Servicer has the full limited liability company power and authority to execute and deliver this Agreement and to perform in accordance herewith; the execution, delivery and performance of this Agreement (including all instruments of transfer to be delivered pursuant to this Agreement) by Servicer, and the consummation of the transactions contemplated hereby have been duly and validly authorized; this Agreement evidences the valid, binding and enforceable obligation of Servicer (except as such enforceability  may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally and by general principles of equity) and all requisite limited liability company action has been taken by Servicer to make this Agreement valid and binding upon Servicer in accordance with its terms.

(c)    Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement (assuming receipt of all necessary consents), nor compliance with its terms and conditions, (i) will result in the creation or imposition of any lien, charge or encumbrance of any nature upon the Loans, or (ii) conflicts with or results in the breach of, or constitutes a default under, any Loan or any material contract, agreement or other instrument to which Servicer is a party or which may be applicable to Servicer or its assets.

(d)    No consent, approval, license, registration, authorization or order of any Regulatory Authority is required for the execution, delivery and performance by Servicer of, or compliance by Servicer with, this Agreement, including the servicing of each Loan hereunder, or if required, such consent, approval, license, registration, authorization or order has been obtained prior to the Effective Date, in each case except to the extent that the failure to obtain any such consent, approval, license, registration, authorization or order would not reasonably be expected to have a Material Adverse Effect with respect to Servicer or adversely affect the validity, enforceability or collectability of the Loans.

(e)    There are no judgments, proceedings or investigations pending against Servicer or, to Servicer's knowledge, threatened against Servicer, before any Regulatory Authority having jurisdiction over Servicer or its properties: (i) asserting the invalidity of this Agreement; (ii) seeking to prevent the consummation of any of the transactions contemplated by this Agreement; or (iii) seeking any determination or ruling that would reasonably be expected to have a Material Adverse Effect with respect to Servicer.

(f)    Servicer is solvent and no voluntary or involuntary bankruptcy petition has been commenced by or against Servicer, nor has Servicer made an offer or assignment or compromise for the

EXHIBIT 1  -  24

benefit of creditors and Servicer will not be rendered insolvent by the consummation of the transactions contemplated hereby.

Section 4.02.    Representations and Warranties of Client.

As a condition to the consummation of the transactions contemplated hereby, Client hereby makes the following representations and warranties to Servicer:

(a)    Client is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it was formed and has all licenses necessary to carry on its business as now being conducted, and is licensed, qualified and in good standing in each state where the laws of such state require licensing or qualification in order to conduct business of the type conducted by Client, except to the extent that the failure to obtain or maintain any such license would not reasonably be expected to have a Material Adverse Effect with respect to Client, and in any event Client is in compliance with all Applicable Law to the extent necessary to ensure the enforceability of the terms of this Agreement, and its ability to perform its obligations hereunder.

(b)    Client has the full power and authority to execute and deliver this Agreement and to perform in accordance herewith; the execution, delivery and performance of this Agreement by Client, and the consummation of the transactions contemplated hereby have been duly and validly authorized; this Agreement evidences the valid, binding and enforceable obligation of Client (except as such enforceability may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally and by general principles of equity) and all requisite action has been taken by Client to make this Agreement valid and binding upon Client in accordance with its terms.

(c)    Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement (assuming receipt of all necessary consents), nor compliance with its terms and conditions, conflicts with or results in the breach of, or constitute a default under, any Loan or any material contract, agreement or other instrument to which Client is a party or which may be applicable to Client or its assets.

(d)    No consent, approval, license, registration, authorization or order of any Regulatory Authority is required for the execution, delivery and performance by Client of, or compliance by Client with, this Agreement, or if required, such consent, approval, license, registration, authorization or order has been obtained prior to the date such Loan is boarded to Servicer for such Loan, in each case except to the extent that the failure to obtain any such consent, approval, license, registration, authorization or order would not reasonably be expected to have a Material Adverse Effect with respect to Client.

(e)    There are no judgments, proceedings or investigations pending against Client or, to Client's knowledge, threatened against Client, before any Regulatory Authority having jurisdiction over Client or its properties: (i) asserting the invalidity of this Agreement; (ii) seeking to prevent the consummation of any of the transactions contemplated by this Agreement; or (iii) seeking any determination or ruling that would reasonably be expected to have a Material Adverse Effect with respect to Client.

(f)    Client is solvent and no voluntary or involuntary bankruptcy petition has been commenced by or against Client, nor has Client made an offer or assignment or compromise for the benefit of creditors.

(g)    If Client originates the Loans, the Loan Documents require arbitration with all counterparties that will include Servicer as a party. The provision shall allow for the American Arbitration Association ("AAA") to hear the arbitration, and the provision shall be registered with the

AAA. Client's Loan Documents shall also include a class action waiver, to the extent permitted by the laws of the states in which Client originates Loans.

(h)    Client is fully compliant with all applicable provisions of the AML-BSA Laws and the Foreign Corrupt Practices Act of 1977, as amended, and other Applicable Laws, and has adopted policies and procedures reasonably designed to ensure its ongoing compliance with such laws, which policies and procedures are consistent with generally accepted standards within Client's industry for ensuring such compliance.

(i)    Payments on Loans may be subject to the backup withholding tax under Section 3406 of the Internal Revenue Code if the recipient fails to furnish certain information, including its taxpayer identification numbers, or otherwise fails to establish an exemption from such tax. Payments of interest on Loans held by a U.S. Person other than certain exempt recipients are required to be reported to the Internal Revenue Service. Payments of interest on Loans held by a non-U.S. Person are generally subject to 30% withholding tax under Chapter 3 of the Internal Revenue Code unless an exemption applies. Payments of interest and principal on Loans held by a non-U.S. Person may also be subject to withholding tax under the FATCA Provisions. In relation to and with full understanding of the foregoing, and following consultation by Client with its tax and legal advisors, Client represents and warrants to Servicer and covenants that:

(i)    (A) Client is a U.S. Person and is either (1) a U.S. Financial Institution or (2) acquiring the Loans as beneficial owner and not as a nominee of another; and (B) Client has delivered to Servicer an accurate and current form W-9; or

(ii)    (A) Client is a non-U.S. Person eligible to claim benefits under an applicable income tax treaty that reduces the rate of withholding on interest on Loans to zero, and has delivered to Servicer an accurate and current Form W 8BEN (or successor form) or W-8BEN-E (or successor form) claiming benefits under such treaty; and (B) Client is a non-U.S. Person eligible for the Portfolio Interest Exemption with respect to payment on each Loan and has delivered to Servicer an accurate and current Form W-8BEN (or successor form) or W-8BEN-E (or successor form) and such other documentation as Servicer may reasonably require in support of such exemption; or (C) Client is a non-U.S. Person otherwise exempt from withholding tax under Chapter 3 of the Internal Revenue Code and has delivered to Servicer appropriate tax documentation establishing such exemption; and

(iii)    Client has obtained all approvals, entered into all agreements and provided all certifications necessary to ensure that withholding is not required with respect to the Loans under the FATCA Provisions, and will maintain and update all such approvals, agreements, and certifications as is necessary to ensure that such withholding continues not to be required under the FATCA Provisions.

Section 4.03.    Indemnification.

(a)    Servicer shall defend and indemnify Client, its Affiliates and its permitted successors and assigns, and their respective agents, representatives, officers, directors and employees (the "Client Indemnified Parties") and hold them harmless against any and all claims, losses, damages, liabilities, penalties, fines, forfeitures, reasonable and documented out-of-pocket legal fees and related costs, judgments, and any other reasonable costs, fees and expenses that Client Indemnified Parties directly sustain as a result of the material breach by Servicer of its covenants or other agreements, representations or warranties set forth in this Agreement or Servicer's gross negligence, bad faith or willful misconduct; provided, however, that Servicer shall not be liable to any Client Indemnified Party for any damages caused by such Client Indemnified Party's gross negligence, bad faith or willful misconduct.

(b)    Client shall defend and indemnify Servicer and its officers, directors and employees (the "Servicer Indemnified Parties") and hold them harmless against any and all claims, losses, damages, liabilities, penalties, fines, forfeitures, reasonable legal fees and related costs, judgments, and any other reasonable costs, fees and expenses that Servicer Indemnified Parties directly sustain as a result of the material breach by Client of its covenants or other agreements, representations or warranties set forth in this Agreement or Client's gross negligence, bad faith or willful misconduct or losses incurred through incomplete or inaccurate data provided to Servicer by Client or any prior servicer, any matter arising out of the origination of the Loans, errors made by prior vendors or servicers, or lack or omission of executed Telephone Consumer Protection Act of 1991 releases, or executed ACH authorizations; provided, however, that Client shall not be liable to any Servicer Indemnified Party for any damages caused by such Servicer Indemnified Party's gross negligence, bad faith or willful misconduct.

## ARTICLE V.

### CONFIDENTIALITY

Section 5.01.    Disclosure of Confidential Information.

From time to time, in connection with the transactions contemplated by this Agreement, one Party ("Discloser") may disclose Confidential Information to the other Party ("Recipient"), whether in writing, orally, or by allowing inspection of tangible objects (*i.e.* documents, tapes disks, prototypes, samples, plants or equipment).

Section 5.02.    Handling of Confidential Information.

Subject with respect to Loan Confidential Information to Servicer's rights under Section 2.01(b), Recipient shall:

(a)    hold Confidential Information in the strictest confidence and use such Confidential Information solely (i) to fulfill its obligations hereunder or (ii) with respect to Loan Confidential Information held by or on behalf of Client, as is reasonably necessary to establish, maintain and enforce Client's rights with respect to any Loans, subject to Section 5.03;

(b)    disclose Confidential Information only to: (i) those personnel and third-party service providers of Recipient who need to receive such Confidential Information in connection with one or more of the permitted uses contemplated by this Agreement and the Servicing Agreement; (ii) to the extent disclosure is required by Applicable Law or other legal process or requested or demanded by any Regulatory Authority; (iii) in connection with the exercise or enforcement of any right or remedy under this Agreement, in connection with any litigation or other proceeding to which Recipient is a party or bound, or to the extent necessary to respond to public statements or disclosures by Discloser referring to Client; (iv) in the case of Client, to Client's respective officers, directors, agents, employees, accountants, legal counsel or other advisors (and Client agrees to be liable for any act or omission in breach of this Article V by the foregoing parties); (v) any subsequent purchaser or potential purchaser of any Loans, and to any actual or potential lender, investor or other financing source, and any trustee, administrator or agent acting on behalf of any lender or other financing source; or (vi) those recipients permitted by Section 2.02; provided, that Recipient must: (A) inform any such personnel or service provider of the confidential nature of such Confidential Information; (B) immediately notify Discloser if Recipient has reason to believe any such personnel or service provider has violated or intends to violate the provisions of this Article V; and (C) provided, further, that Recipient will be liable for any acts or omissions of any such service provider or any Recipient personnel in breach of this Article V;

(c)    not reverse engineer, disassemble or decompile any prototypes, software or other tangible objects embodying Confidential Information;

(d)     not make any copies of Confidential Information unless previously authorized in writing by Discloser, except that Client may make copies of Loan Confidential Information, subject to <u>Section 5.03</u>;

(e)     if authorized to make copies of Confidential Information, reproduce on such copies any proprietary rights and/or confidentiality notices appearing on the original Confidential Information in the same manner as on the original; and

(f)     use its commercially reasonable efforts to protect and maintain the confidentiality of the Confidential Information, which protections shall be at least equivalent in scope and effect to the measures taken by Recipient to protect its own confidential or proprietary information of a like or similar nature.

Section 5.03.     <u>Special Protections for Customer Information</u>.

Each of Servicer and Client understands and agrees that Customer NPPI is subject to Title V of the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801 et seq., the FTC's Rule regarding the Privacy of Consumer Financial Information, 16 C.F.R. Part 313, the FTC's Standards for Safeguarding Customer Information, 16 C.F.R. Part 314, and any other Applicable Laws regarding the privacy or security of Customer NPPI (collectively, the "<u>Privacy Laws</u>").  Each of Servicer and Client agrees that it shall comply with the Privacy Laws and will promptly notify Client and/or Servicer, as applicable, of any breach of the Privacy Laws or the provisions of this <u>Article V</u>.  No information shall be transferred to Servicer that would cause any violation of the Payment Card Industry Data Security Standard (PCI) by Servicer.

Section 5.04.     <u>Compelled Disclosure</u>.

Recipient may disclose Confidential Information required to be disclosed by law, regulation or a valid court order; <u>provided</u>, that Recipient: (a) uses commercially reasonable efforts to obtain confidential treatment for such Confidential Information; (b) gives Discloser prompt written notice of such requirement to disclose prior to such disclosure (to the extent permissible under the terms of the law, regulation or order compelling disclosure or as soon as is reasonably practicable); and (c) reasonably cooperates with Discloser as necessary to obtain a protective order or securing confidential treatment for such Confidential Information.

Section 5.05.     <u>Return or Destruction of Materials</u>.

Subject with respect to Loan Confidential Information to Servicer's rights under <u>Section 2.01(b)</u>, Recipient shall return or destroy, as Discloser indicates, all Confidential Information, including, without limitation, all copies, compilations, summaries, analyses or other materials containing or reflecting Recipient's use of Confidential Information, within 10 days after the later to occur of: (a) termination of this Agreement; or (b) Discloser's written request to Recipient; <u>provided</u>, that Recipient may maintain in its possession all Confidential Information of Discloser required to be maintained under Applicable Laws relating to the retention of records for the period of time required thereunder or stored on Recipient's network as part of standard back-up procedures (<u>provided</u>, that such information shall remain subject to the confidentiality provision of this <u>Article V</u>).  Recipient shall promptly send Discloser written certification of such destruction or return.

Section 5.06.     <u>Ownership of Confidential Information</u>.

Subject with respect to Loan Confidential Information to Servicer's rights under <u>Section 2.01(b)</u>, the Confidential Information (and related copies and materials) shall be the sole and exclusive property of Discloser.  Recipient has no rights under any of Discloser's patents, copyrights, trademarks, trade secrets or with respect to any of Discloser's other intellectual property, except as expressly set forth herein.

EXHIBIT 1  -  28

Recipient may not use Confidential Information to apply for or secure any patents or any other intellectual property rights. With the exception of Client's Confidential Information delivered to Servicer, all information, reports, studies, processes, object and source code (including without limitation anything delivered to Client by Servicer and all modifications, enhancements, additions, upgrades, or other works based thereon or related thereto), flow charts, diagrams, specifications, and other tangible or intangible material of any nature whatsoever produced through or as a result of or related to anything delivered to Client by Servicer (collectively, "Works") or development of any data analytics or usage models hereunder, and all patents, copyrights, and other proprietary rights related to such Works and models, each to the extent developed by Servicer or its Affiliates or their third party providers, shall remain the sole and exclusive property of Servicer or its Affiliates or of their third party providers. Nothing in this Agreement shall convey to Client any title to or ownership of anything delivered to Client by Servicer, Works, or models. Client hereby irrevocably assigns and transfers to Servicer all rights, title, and interest in any such Works and models.

**ARTICLE VI.**

TERMINATION

Section 6.01.    Termination for Servicer Event of Default.

(a)    This Agreement shall be terminable at the sole option of Client, upon written notice from Client to Servicer, if any of the following events of default exist on the part of Servicer (each, a "Servicer Event of Default"):

(i)    Servicer shall fail to perform or observe any material obligation, covenant or agreement contained in this Agreement and such failure shall continue for more than 60 days after Servicer receiving written notice of such failure; and such failure is not remedied within a period of 60 days after Servicer receiving written notice of such failure;

(ii)    an Insolvency Event shall occur with respect to Servicer; or

(iii)    any Regulatory Authority shall have condemned, seized or appropriated, or to have assumed custody or control of, all or any substantial part of the property of Servicer, or shall have taken any action to displace the management of Servicer or to curtail its authority in the conduct of the business of Servicer.

(b)    Upon payment of the Early Termination Payment, Client may give Servicer notice (the "Early Termination Notice") of early termination of this Agreement, which shall call for a termination date not earlier than three (3) months after the date of the Early Termination Notice. No Early Termination Payment shall be due in connection with any termination of this Agreement pursuant to a Servicer Event of Default. Client deboarding of 25% or more of the Loans over any six (6) month period shall be deemed an early termination requiring payment of the Early Termination Payment for the deboarded loans, and Client shall pay Servicer the applicable Early Termination Payment for such deboarded Loans prior to deboarding. Failure to accompany the Early Termination Notice with the Early Termination Payment shall render the Early Termination Notice null and void and of no effect.

(c)    Servicer may terminate this Agreement, by written notice to Client, if it does not receive any payment required to be made to it under the terms of this Agreement, which failure continues unremedied for a period of fifteen (15) days after written notice of such failure shall have been given to Client. If Servicer terminates this Agreement pursuant to this Section 6.01(c), Client shall pay Servicer the applicable Early Termination Payment prior to Servicer deboarding Loans to a successor servicer.

(d)    In the event that Client requests de-boarding of more than 25% of the Loans over any six (6) month period, this Agreement shall be terminable at the sole option of Servicer, upon written notice to Client from Servicer.  If Servicer terminates this Agreement pursuant to this Section 6.01(d), Client shall pay Servicer the applicable Early Termination Payment prior to Servicer deboarding Loans to a successor servicer.

(e)    Upon receipt by Servicer of written notice of termination pursuant to Section 6.01(a) or Section 6.01(b), or receipt by Client of written notice of termination pursuant to Section 6.01(c) or Section 6.01(d), all authority and power of Servicer under this Agreement, whether with respect to the Loans or otherwise, shall pass to and be vested in Client or its designee, and Client and its designee are hereby authorized and empowered to execute and deliver, as attorney-in-fact or otherwise, any and all documents and other instruments, and to do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement of the Loans and Loan Documents, to direct Borrowers, insurers, Subcontractors and Collection Agents to remit all Proceeds as directed by Client or otherwise, and all Servicing Rights with respect to Loans shall be immediately assigned, transferred and conveyed to Client or its designee.  Servicer shall prepare, execute and deliver to Client or its designee any and all documents and other instruments, promptly and in any event within 30 days place in such successor's possession, all Servicing Files, subject to Servicer's rights under Section 2.01(b), and, in a timely manner, do or cause to be done all other acts or things necessary or appropriate to effect the purposes of such notice of termination, including but not limited to the transfer of the Loans and related Loan Documents and Servicing Files.  Servicer shall, in a timely manner, cooperate with Client or its designee in effecting the termination of its servicing responsibilities and rights hereunder and the transfer of the servicing functions and the Servicing Files, subject to Servicer's rights under Section 2.01(b), including, without limitation, the transfer to such successor for administration by it of all cash amounts that shall at the time be credited by Servicer to any Deposit Account or thereafter received with respect to the Loans.  Servicer shall be entitled to any accrued and unpaid Servicing Compensation through the later of the effective date of such termination or the completion of the transfer of servicing functions and Servicing Files contemplated by this Section 6.01(e).  If Applicable Law requires Servicer to provide a Borrower with notice of the change of servicing, Servicer shall be allowed to service Client's loans until thirty days after receipt by Servicer of written notice of termination or upon automatic termination of this Agreement.  Within five calendar days of termination, Client shall provide Servicer with the name, address, telephone number, web site address, and (if applicable) the license number of any successor servicer.  If required by Applicable Law, Servicer shall send notice of the change in servicing to Borrowers and provide all information regarding Client's Borrowers, accounts, or loans to Client.

(f)    By a written notice, Client or Servicer may waive any default by the other in the performance of its obligations hereunder and its consequences.  Upon any waiver of a past default, such default shall cease to exist, and any Servicer Event of Default arising therefrom shall be deemed to have been remedied for every purpose of this Agreement.  No such waiver shall extend to any subsequent or other default or impair any right consequent thereon except to the extent expressly so waived.

(g)    The provisions of Sections 4.03, 6.01(e), 7.01, 7.02, 7.06, 7.07 and 7.08 and Article V shall survive termination of Servicer and termination of this Agreement.

**ARTICLE VII.**

MISCELLANEOUS PROVISIONS

Section 7.01.    Notices.

All notices and other communications hereunder and under any other transaction document will be in writing and will be deemed to have been duly given when delivered in person, by facsimile or email,

by express or overnight mail delivered by a nationally recognized air courier (delivery charges prepaid), or by registered or certified mail (postage prepaid, return receipt requested) to the respective Parties as follows:

> if to Client:
>
> One Way Loans, LLC dba Powerlend
> 10325 Jefferson Blvd
> Culver City, CA 90232
> Attention: David Redlener, CEO
> Email: david@powerlend.com
>
> if to Servicer:
>
> First Associates Loan Servicing, LLC
> 15373 Innovation Drive, Suite 300
> San Diego, CA  92128
> Attention:  Larry Chiavaro, EVP

or to such other address as the Party to whom notice is given may have previously furnished to the other Party in writing in the manner set forth above.  Any notice or communication delivered in person will be deemed effective upon delivery.  Any notice or communication sent by email or air courier will be deemed effective on the first business day at the place at which such notice or communication is received following the day on which such notice or communication was sent.  Any notice or communication sent by registered or certified mail will be deemed effective on the third business day at the place at which such notice or communication is received following the day on which such notice or communication was mailed.

Section 7.02.    <u>Costs.</u>

Except as otherwise specifically set forth in this Agreement, each of Client and Servicer shall bear its own costs and expenses in connection with this Agreement, including, without limitation, any sales commissions, legal fees or costs and expenses relating to due diligence.

Section 7.03.    <u>Amendment; Waiver.</u>

Except as otherwise expressly provided herein, Client and Servicer may amend this Agreement, from time to time, in a writing signed by duly authorized officers of each of Servicer and Client.  No waiver of any provision of this Agreement, nor consent to any departure by any Party therefrom, shall be effective unless the same shall be in writing and signed by a duly authorized officer of the Party to be charged with the waiver or consent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 7.04.    <u>Cumulative Rights.</u>

All rights and remedies of the Parties under this Agreement shall, except as otherwise specifically provided herein, be cumulative and non-exclusive of any rights or remedies that they may have under any other agreement or instrument, by operation of law or otherwise.

Section 7.05.    <u>Successors and Assigns; Assignment of Servicing Agreement.</u>

This Agreement shall be binding upon and inure to the benefit of and be enforceable by Servicer, Client and their respective successors and permitted assigns. This Agreement shall not be assigned, pledged or hypothecated by any Party without the prior written consent of the other Party.

EXHIBIT 1  -  31

Section 7.06.    Choice of Law.

This Agreement shall be construed in accordance with the laws of the State of California, without reference to the choice of law principles under the laws of the State of California.

Section 7.07.    Submission to Jurisdiction and Venue; Waiver of Jury Trial.

Each party hereby submits to the exclusive jurisdiction and venue of the United States District Court for the Southern District of California and any California State Court sitting in San Diego County for purposes of all legal proceedings arising out of or relating to this agreement or the transactions contemplated hereby. Each Party irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum. Each Party hereby consents to process being served in any suit, action or proceeding with respect to this agreement by the mailing of a copy thereof by registered or certified mail, postage prepaid, return receipt requested, to its respective address specified at the time for notices under this agreement or to any other address of which it shall have given written or electronic notice to the other party. The foregoing shall not limit the ability of any Party to bring suit in the courts of any jurisdiction.

EACH PARTY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT AND AGREES THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.

Section 7.08.    Limitation of Liability.

Except for acts or omissions that constitute gross negligence, bad faith or willful misconduct, in no event shall any Party or any of its respective Affiliates, beneficiaries, assignees or successors (by assignment or otherwise) be liable to the other Party or to any other entity for punitive or exemplary damages, any lost profits, costs of cover or other special damages, or any punitive, exemplary, remote, consequential, incidental or indirect damages, under this Agreement incurred or claimed by any Party or entity (or such party or entity's officers, directors, stockholders, members or owners), however caused, on any theory of liability.

Section 7.09.    Severability.

Any provision of this Agreement that is prohibited or not fully enforceable in any jurisdiction, will be ineffective only to the extent of such prohibition or unenforceability without otherwise invalidating or diminishing either Party's rights under the remaining provisions of this Agreement in such jurisdiction, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable in any respect any such provision in any other jurisdiction.

Section 7.10.    Entire Agreement.

As of the date hereof, Servicer and Client hereby acknowledge and agree that this Agreement, together with the exhibits hereto, represents the complete and entire agreement between the Parties with respect to the servicing of Loans, and shall supersede all prior written or oral statements, agreements or understandings between the Parties relating to the servicing of Loans.

Section 7.11.    Exhibits and Schedules.

The exhibits and schedules to this Agreement are hereby incorporated and made a part hereof and

EXHIBIT 1  -  32

are an integral part of this Agreement.

Section 7.12.    No Joint Venture or Partnership.

Each Party (including any of its respective permitted successors and assigns) acknowledges and agrees that such Party will not hold itself out as an agent, partner or joint venturer of the other Party and that this Agreement and the transactions contemplated hereby, including the payment of any fees or the reimbursement of any expenses, are not intended and do not create an agency, partnership, joint venture or any other type of relationship between or among the Parties.

Section 7.13.    Further Assurances.

Each Party, upon the reasonable written request of the other Party, shall execute and deliver to such other Party any reasonably necessary or appropriate additional documents, instruments or agreements as may be reasonably necessary or appropriate to effectuate the purposes of this Agreement or the consummation of the transactions contemplated hereunder.

Section 7.14.    Counterparts.

This Agreement may be executed simultaneously in any number of counterparts.  Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.  The Parties agree that this Agreement and signature pages may be transmitted between them by facsimile or by electronic mail and that faxed and PDF signatures may constitute original signatures and that a faxed or PDF signature page containing the signature (faxed, PDF or original) is binding upon the Parties.

Section 7.15.    Waivers, Etc.

No waiver of any single breach or default of this Agreement shall be deemed a waiver of any other breach or default of this Agreement.

Section 7.16.    CPI Adjustments

(a)    To the extent that any fee schedules established under this Agreement extend further than two (2) years beyond the execution of this Agreement, First Associates shall be entitled to increase such fees by a percentage equal to the then applicable annual percentage increase in the Consumer Price Index (CPI).  CPI shall mean the Consumer Price Index for all Urban Consumers – All Cities Average (1982-1984=100) published by the Bureau of Labor Statistics, United States Department of Labor.

Section 7.17.    Investments.

(a)    Servicer acknowledges and agrees that Client and its Affiliates currently may be invested in, may invest in or consider investments in companies held by or that compete either directly or indirectly with Servicer and that this Agreement shall in no way be construed to prohibit or restrict Client's or any of its Affiliates' ability to maintain, make or consider such investments.

(b)    Client acknowledges and agrees that Servicer and its Affiliates currently may be invested in, may invest in or consider investments in companies held by or that compete either directly or indirectly with Client and that the execution of this Agreement shall in no way be construed to prohibit or restrict Servicer's or any of its Affiliates' ability to maintain, make or consider such investments.

Section 7.18.    No Petition.

Notwithstanding any prior termination of this Agreement, to the fullest extent permitted by law, for a period of a year and a day following the repayment of all Loans, each Party agrees that it shall not institute, or join any other person in instituting, a petition or a proceeding that causes (a) the other Party to be a debtor under any federal or state bankruptcy or similar insolvency law or (b) a trustee, conservator, receiver, liquidator, or similar official to be appointed for such other Party or any substantial part of any of its property.

[Signature Page Follows]

EXHIBIT 1  -  34

IN WITNESS WHEREOF, the parties hereto have caused to be duly authorized, executed and delivered, as of the date first written above, this Loan Servicing Agreement.

SERVICER:

**FIRST ASSOCIATES LOAN SERVICING, LLC**

By:     _____
Name:   _____
Title:  _____

CLIENT:

**One Way Loans, LLC dba Powerlend**

By:     _____
Name:   David Redlener
Title:  CEO

LOAN SERVICING AGREEMENT – SIGNATURE PAGE

EXHIBIT 1   -   35

EXHIBIT A

ACCEPTED SERVICING PRACTICES

[TO INSERT]

EXHIBIT B

SERVICING DUTIES AND SERVICING COMPENSATION

- **Client Set-Up and Portfolio Conversion**                 **$19,500**

  - Project management
  - Enhanced private label functionality
    - Dedicated client 800 number
    - Client branded IVR
    - Client branded statements
    - Client branded outbound communications
    - Consumer payment portal
    - Correspondence PO Box
  - Servicing platform set up
    - LOS mapping/testing as required
    - Control files
    - Activity code and list queue profiles
    - Systems control record set-up
    - Security matrix and control profiles
    - FA standard field architecture
    - Customized fields are available
    - Multilevel portfolio hierarchy (as required)
  - Funds flow and control
    - Multiple consumer payment options
    - Consumer payment portal
    - Single and recurring ACH
    - Western Union
    - MoneyGram
    - Check by Phone
  - FA standard lockbox and account configuration
    - Fully integrated/automated lockbox
    - FA Client Trust Account
  - Credit bureau reporting
    - Client bureau subscriber codes
    - Metro 2 mapping and reporting setup
  - Investor reporting
    - Standard reporting setup
- Customized reports and/or data feeds are available

- **Loan Boarding**                                      **$6.50 per loan**

  - Receive file from LOS with pre-determined boarding fields
  - Upload into servicing system based upon billing schedule
  - Issue Welcome Letters and Privacy notices


- **Servicing**

  - Borrower statements
    - Via USPS and/or email
    - Availability via consumer portal
  - Payment collections
    - Consumer payment portal
    - Single and recurring ACH
    - Western Union
    - MoneyGram
    - Check by Phone
  - Payment processing
    - ACH NACHA file processing
    - Automated secure lockbox feeds
    ACH recruitment
  - Customer Service with IVR and live agent availability during business hours
  - Paid in full processing
  - Metro 2 credit bureau reporting
  - Campaign programming and execution across multiple channels

    - text
    - email
    - voice alert
    - outbound IVR
    - agent outbound
    - USPS
  - Investor reporting
  - Fund remittance

- **Monthly Servicing Fees**

  - Monthly Billing:
    - 1-5,000 loans                                    $9.50 per loan
    - 5,001-25,000 loans                         $7.50 per loan
  - Additional monthly per loan charges:
    - Weekly billing                                 add $4.00 per loan
    - Bi-weekly billing                             add $2.00 per loan
    - Non ACH loans                              add $2.00 per loan

- **Minimum Monthly Servicing Fees**

  - Months 1-3                                        $7,500 per month
  - Months 4-12                                      $10,000 per month
  - Months 13+                                       $20,000 per month

- **Document Custodial Services**

  - Board electronic documents          ~~$1.50 per document~~ *waived*
  - Board physical documents             $2.50 per document
  - Custodial services                          $0.30 per month per loan

- **Administrative Fees**

  In the event First Associates files insurance or bankruptcy claims in connection with any client receivable, First Associates shall receive $225 per filing. ACH recruitment fee- $20.00 each, Modification Fees - $50.00 each, Payoffs $30.00 each, loan deboarding $125, and Post charge-off work (TBD)

  All Pass Through Expenses shall be subject to an Administrative Overhead Recovery Fee of 15%.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 333 South Grand Avenue, Suite 3400, Los Angeles, CA 90071.

A true and correct copy of the foregoing document entitled (*specify*):  **DEBTOR'S MOTION FOR ORDER AUTHORIZING REJECTION OF LOAN SERVICING AGREEMENT WITH FIRST ASSOCIATES LOAN SERVICING, LLC; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF DAVID REDLENER IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)  June 28, 2019, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Dawn M Coulson on behalf of Interested Party Courtesy NEF - dcoulson@eppscoulson.com, cmadero@eppscoulson.com
- Carl Grumer on behalf of Interested Parties JGB (Cayman) Glenmachrie Ltd. and JGB Collateral, LLC - cgrumer@manatt.com, mchung@manatt.com; fstephenson@manatt.com
- Andrew Haley on behalf of Interested Party CF Culver City Office, L.P. - ahaley@shoreline-law.com, kbarone@shoreline-law.com
- Asa S Hami on behalf of Debtor One Way Loans, LLC, d/b/a PowerLend -
- ahami@sulmeyerlaw.com, agonzalez@sulmeyerlaw.com; agonzalez@ecf.inforuptcy.com; ahami@ecf.inforuptcy.com
- David S Kupetz on behalf of Debtor One Way Loans, LLC, d/b/a PowerLend - dkupetz@sulmeyerlaw.com, dperez@sulmeyerlaw.com; dperez@ecf.courtdrive.com; dkupetz@ecf.courtdrive.com
- Dare Law on behalf of U.S. Trustee (LA) - dare.law@usdoj.gov, ron.maroko@usdoj.gov; Alvin.mar@usdoj.gov
- Ron Maroko on behalf of U.S. Trustee (LA) - ron.maroko@usdoj.gov
- Sabrina L Streusand on behalf of Creditor Actum Processing - Streusand@slollp.com
- United States Trustee (LA) - ustpregion16.la.ecf@usdoj.gov
- Claire K Wu on behalf of Debtor One Way Loans, LLC, d/b/a PowerLend -
- ckwu@sulmeyerlaw.com, mviramontes@sulmeyerlaw.com; ckwu@ecf.courtdrive.com; ckwu@ecf.inforuptcy.com

☐ Service information continued on attached page.

**2. SERVED BY UNITED STATES MAIL**:
On (*date*)  June 28, 2019, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

First Associates Loan Servicing, LLC
10182 Telesis Court, Suite 300
San Diego, CA 92121

First Associates Loan Servicing, LLC
Attention: Larry Chiavaro, EVP
15373 Innovation Drive, Suite 300
San Diego, CA 92128

☐ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*)  June 28, 2019, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

The Honorable Sandra R. Klein – **VIA PERSONAL DELIVERY**
U.S. Bankruptcy Court
Roybal Federal Building
255 E. Temple Street
Los Angeles, CA 90012 - Bin outside of Suite 1582

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 28, 2019 | Andrea Gonzalez | ./s/ Andrea Gonzalez |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

# EXHIBIT B

1   David S. Kupetz (CA Bar No. 125062)
      *dkupetz@sulmeyerlaw.com*
2   Asa S. Hami (CA Bar No. 210728)
      *ahami@sulmeyerlaw.com*
3   Claire K. Wu (CA Bar No. 295966)
      *ckwu@sulmeyerlaw.com*
4   **Sulmeyer**Kupetz
    A Professional Corporation
5   333 South Grand Ave., Suite 3400
    Los Angeles, California  90071-1406
6   Telephone: 213.626.2311
    Facsimile: 213.629.4520
7
    Attorneys for Debtor and Debtor in Possession
8   One Way Loans, LLC, d/b/a PowerLend

9                 **UNITED STATES BANKRUPTCY COURT**

10        **CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION**

11  In re                                    Case No. 2:18-bk-24572-SK

12  ONE WAY LOANS, LLC, a California limited   Chapter 11
    liability company, d/b/a POWERLEND,
13                                            **NOTICE OF DEBTOR'S MOTION FOR
                                              ORDER AUTHORIZING REJECTION OF
14        Debtor.                             LOAN SERVICING AGREEMENT WITH
                                              FIRST ASSOCIATES LOAN SERVICING,
15                                            LLC**

16                                            [No hearing required unless requested]

17

18

19

20

21

22

23

24

25

26

27

28

ASH\ 2675585v1

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

**TO FIRST ASSOCIATES LOAN SERVICING, LLC, THE OFFICE OF THE UNITED STATES TRUSTEE, AND OTHER PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE THAT** One Way Loans, LLC, d/b/a PowerLend, the debtor and debtor in possession in the above-captioned bankruptcy case (the "Debtor"), has filed a motion, pursuant to 11 U.S.C. § 365(a), for an order authorizing the Debtor's rejection of its "Loan Servicing Agreement," dated as of January 15, 2018 (the "Servicing Agreement"), with First Associates Loan Servicing, LLC ("First Associates"), effective as of entry of the order granting such motion (the "Motion").

The Motion is made pursuant to 11 U.S.C. § 365(a) on the grounds that the Servicing Agreement is an executory contract that has become burdensome to the Debtor and the bankruptcy estate (the "Estate"). As discussed in more detail in the Motion and accompanying memorandum of points and authorities, the monthly minimum fees charged by First Associates under the Servicing Agreement to service the Debtor's performing loans is excessive in relation to the amount collected on such loans. Moreover, given the relatively small size of the Debtor's existing loan portfolio, the Debtor is capable of servicing the loans internally and no longer requires the services of First Associates. As a result, in the exercise of its business judgment, the Debtor believes rejection of the Servicing Agreement and having the loans "de-boarded" from First Associates is in the best interests of the Debtor, the Estate, and creditors.

**PLEASE TAKE FURTHER NOTICE** that the Motion has been filed with the Clerk of the United States Bankruptcy Court and may be viewed at the Clerk's office at 255 E. Temple Street, Los Angeles, CA 90012, and/or through the Court's Case Management/Electronic Case Files system. A copy of the Motion also may be obtained by contacting counsel at the address and telephone number indicated in the upper left corner of the first page of this Notice.

**PLEASE TAKE FURTHER NOTICE** that any opposition or other response to the Motion, and request for hearing thereon, must comply with Local Bankruptcy Rule 9013-1(f)(1), and must be in writing and filed with the Clerk of the United States Bankruptcy Court and served upon the Debtor and its counsel at the address indicated in the upper left corner of the first page of this Notice, and upon the United States Trustee, not later than 14 days from the date of this Notice,

1    plus an additional three days if you were served with this Notice by mail, electronically, or

2    pursuant to Rule 5(b)(2)(D), (E), or (F) of the Federal Rules of Civil Procedure.  If any such

3    response is timely filed, the Debtor will set a hearing on the Motion and send notice thereof in

4    accordance with the Local Bankruptcy Rules.  No hearing will be set by the Debtor if no response

5    and request for hearing is filed timely.

6         **PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9013-1(h),

7    the failure to file a response to the Motion may be deemed by the Court as consent to the relief

8    requested therein.

9    Dated:  June 28, 2019          **Sulmeyer**Kupetz
     A Professional Corporation

10

11

12    By:  */s/ Asa S. Hami*
     Asa S. Hami

13    Attorneys for Debtor and Debtor in Possession
     One Way Loans, LLC, d/b/a/ PowerLend

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA  90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 333 South Grand Avenue, Suite 3400, Los Angeles, CA 90071.

A true and correct copy of the foregoing document entitled (*specify*):  **NOTICE OF DEBTOR'S MOTION FOR ORDER AUTHORIZING REJECTION OF LOAN SERVICING AGREEMENT WITH FIRST ASSOCIATES LOAN SERVICING, LLC** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)  June 28, 2019, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Dawn M Coulson on behalf of Interested Party Courtesy NEF - dcoulson@eppscoulson.com, cmadero@eppscoulson.com
- Carl Grumer on behalf of Interested Parties JGB (Cayman) Glenmachrie Ltd. and JGB Collateral, LLC - cgrumer@manatt.com, mchung@manatt.com; fstephenson@manatt.com
- Andrew Haley on behalf of Interested Party CF Culver City Office, L.P. - ahaley@shoreline-law.com, kbarone@shoreline-law.com
- Asa S Hami on behalf of Debtor One Way Loans, LLC, d/b/a PowerLend -
- ahami@sulmeyerlaw.com, agonzalez@sulmeyerlaw.com; agonzalez@ecf.inforuptcy.com; ahami@ecf.inforuptcy.com
- David S Kupetz on behalf of Debtor One Way Loans, LLC, d/b/a PowerLend - dkupetz@sulmeyerlaw.com, dperez@sulmeyerlaw.com; dperez@ecf.courtdrive.com; dkupetz@ecf.courtdrive.com
- Dare Law on behalf of U.S. Trustee (LA) - dare.law@usdoj.gov, ron.maroko@usdoj.gov; Alvin.mar@usdoj.gov
- Ron Maroko on behalf of U.S. Trustee (LA) - ron.maroko@usdoj.gov
- Sabrina L Streusand on behalf of Creditor Actum Processing - Streusand@slollp.com
- United States Trustee (LA) - ustpregion16.la.ecf@usdoj.gov
- Claire K Wu on behalf of Debtor One Way Loans, LLC, d/b/a PowerLend -
- ckwu@sulmeyerlaw.com, mviramontes@sulmeyerlaw.com; ckwu@ecf.courtdrive.com; ckwu@ecf.inforuptcy.com

☐ Service information continued on attached page.

**2. SERVED BY UNITED STATES MAIL**:
On (*date*)  June 28, 2019, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

First Associates Loan Servicing, LLC
10182 Telesis Court, Suite 300
San Diego, CA 92121

First Associates Loan Servicing, LLC
Attention: Larry Chiavaro, EVP
15373 Innovation Drive, Suite 300
San Diego, CA 92128

☒ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*)  June 28, 2019, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

The Honorable Sandra R. Klein – **VIA PERSONAL DELIVERY**
U.S. Bankruptcy Court
Roybal Federal Building
255 E. Temple Street
Los Angeles, CA 90012 - Bin outside of Suite 1582

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 28, 2019 | Andrea Gonzalez | ./s/ Andrea Gonzalez |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                    **F 9013-3.1.PROOF.SERVICE**

## <u>SERVICE LIST</u>

### 20 LARGEST UNSECURED CREDITORS

Jorge Aroche
930 Kings Parkway
Baldwin, NY 11510-2105

Lead Economy LLC
Attn:  Lana
8 The Green, Suite 8162
Dover, DE 19901

Lead Economy LLC
Attn: Brian Bastio
8 The Green, Suite 8162
Dover, DE  19901-3618

Zero Parallel LLC
Attn:  Michael Cordova and Melanie Babayan
505 North Brand Blvd., 16th Fl.
Glendale, CA 91203

VISA
Cardmember Service
Post Office Box 790408
Saint Louis, MO 63179-0408

Sebastian LLC
Attn:  Emily Acevedo
33 Sade Street
Clifton, NJ 07013

defi Solutions
Attn:  Stephanie Alsbrooks
1500 Solana Blvd., Bldg. 6
Fourth Fl.
Westlake, TX  76262

Defi Solutions
Attn Accounting Dept.
1500 Solana Blvd., Suite 6400
Westlake, TX  76262-1703

Effortless Office
4484 South Pecos Road
Las Vegas, NV 89121

Branch Management Group
Prime/Baytech
Attn:  Jeff Skvorc
1835 Newport Blvd., Suite A109-313
Costa Mesa, CA 92627

Hartford Insurance
Attn:  Tom Costello
8711 University East Drive
Charlotte, NC 28213

Hartford Fire Insurance Company
Bankruptcy Unit, HO2-R, Home Office
(One Hartford Plaza)
Hartford, CT  06155

American Express
Post Office Box 0001
Los Angeles, CA 90096-0001

American Express
Attn:  Express Mail Remittance Processing
20500 Belshaw Ave.
Carson, CA  90746

American Express
c/o Becket and Lee LLP
PO Box 3001
Malvern, PA  19355-0701

American Express
c/o Becket and Lee LLP
16 General Warren Blvd.
Malvern, PA  19355

ACC Business/AT&T
Post Office Box 105306
Atlanta, GA 30348-5306

ACC Business/AT&T
Attn: Cori Storm
Finance, Credit & Collections
400 West Avenue
Rochester, NY  14611

Keesal Young Logan
Attn:  Sandor Mayuga
400 Oceangate, Suite 1400
Long Beach, CA 90802

Adv. Direct IT Media **RTS 4-12-19**
Attn:  Harvey Sherifield/Michael Hendifar
72 North 300 East, Suite A
Sapulpa, OK 74066

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Adv. Direct IT Media
Attn:  Harvey Sherifield/Michael Hendifar
2800 Olympic Blvd. Ste. 100
Santa Monica, CA  90404-4101

Anthem Blue Cross
Post Office Box 51011
Los Angeles, CA 90051-5310

Kaiser Permanente
Post Office Box 23250
San Diego, CA 92193-3250

Broadvoice
9221 Corbin Avenue, Suite 155
Northridge, CA 91324

Broadvoice
9221 Corbin Avenue, Suite 155
Northridge, CA 91324

Parking Networks
Attn:  Joseph Santana
350 South Figueroa Street, Suite 420
Los Angeles, CA 90071

Infinity Enterprise Lending
Velocity Ventures Group LLC
Attn:  Ryen Leyva
4864 Sparks Boulevard
Sparks, NV 89436

Hudson Cook LLP
7037 Ridge Road, Suite 300
Hanover, MD 21076

Online Lenders Alliance
Attn:  Mary Jackson
2001 Jefferson Davis Highway, Suite 405
Arlington, VA 22202

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                    **F 9013-3.1.PROOF.SERVICE**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 333 South Grand Avenue, Suite 3400, Los Angeles, CA 90071.

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION THAT NO PARTY REQUESTED A HEARING ON MOTION LBR 9013-1(o)(3)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) July 16, 2019, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Dawn M Coulson on behalf of Interested Party Courtesy NEF - dcoulson@eppscoulson.com, cmadero@eppscoulson.com
- Carl Grumer on behalf of Interested Parties JGB (Cayman) Glenmachrie Ltd. and JGB Collateral, LLC - cgrumer@manatt.com, mchung@manatt.com; fstephenson@manatt.com
- Andrew Haley on behalf of Interested Party CF Culver City Office, L.P. - ahaley@shoreline-law.com, kbarone@shoreline-law.com
- Asa S Hami on behalf of Debtor One Way Loans, LLC, d/b/a PowerLend -
- ahami@sulmeyerlaw.com, agonzalez@sulmeyerlaw.com; agonzalez@ecf.inforuptcy.com; ahami@ecf.inforuptcy.com
- David S Kupetz on behalf of Debtor One Way Loans, LLC, d/b/a PowerLend - dkupetz@sulmeyerlaw.com, dperez@sulmeyerlaw.com; dperez@ecf.courtdrive.com; dkupetz@ecf.courtdrive.com
- Dare Law on behalf of U.S. Trustee (LA) - dare.law@usdoj.gov, ron.maroko@usdoj.gov; Alvin.mar@usdoj.gov
- Ron Maroko on behalf of U.S. Trustee (LA) - ron.maroko@usdoj.gov
- Sabrina L Streusand on behalf of Creditor Actum Processing - Streusand@slollp.com
- United States Trustee (LA) - ustpregion16.la.ecf@usdoj.gov
- Claire K Wu on behalf of Debtor One Way Loans, LLC, d/b/a PowerLend -

- ckwu@sulmeyerlaw.com, mviramontes@sulmeyerlaw.com; ckwu@ecf.courtdrive.com; ckwu@ecf.inforuptcy.com

☐ Service information continued on attached page.

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) July 16, 2019, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

First Associates Loan Servicing, LLC
10182 Telesis Court, Suite 300
San Diego, CA 92121

First Associates Loan Servicing, LLC
Attention: Larry Chiavaro, EVP
15373 Innovation Drive, Suite 300
San Diego, CA 92128

☐ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) July 16, 2019, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

The Honorable Sandra R. Klein – **VIA PERSONAL DELIVERY**
U.S. Bankruptcy Court
Roybal Federal Building
255 E. Temple Street
Los Angeles, CA 90012 - Bin outside of Suite 1582

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 16, 2019 | Andrea Gonzalez | ./s/ Andrea Gonzalez |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.